No. 23-1736

# In the United States Court of Appeals for the Sixth Circuit

MACKINAC CENTER FOR PUBLIC POLICY

AND

CATO INSTITUTE,
*Plaintiffs-Appellants*,

v.

MIGUEL CARDONA, *et al.*,
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Eastern District of Michigan

———————————

**Plaintiffs-Appellants' Opening Brief**

———————————

Oral Argument Requested

October 10, 2023

Sheng Li
Russell Ryan
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
sheng.li@ncla.legal

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 6th Circuit Rule 26.1, the undersigned counsel states that Plaintiffs-Appellants Mackinac Center for Public Policy and Cato Institute have no parent corporations, and no publicly held corporation owns 10 percent or more of their stock.

*/s/ Sheng Li*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF CONTENTS...............................................................ii

STATEMENT REGARDING ORAL ARGUMENT......................................vi

STATEMENT OF JURISDICTION ..................................................1

STATEMENT OF ISSUES ............................................................1

INTRODUCTION ......................................................................1

STATEMENT OF THE CASE........................................................4

   I.    LEGAL BACKGROUND ......................................................4

   II.   THE ONE-TIME ACCOUNT ADJUSTMENT..................................6

   III.  PROCEEDING BELOW ......................................................9

STANDARD OF REVIEW ..........................................................10

SUMMARY OF THE ARGUMENT ...............................................11

ARGUMENT ..........................................................................12

   I.    PLAINTIFFS-APPELLANTS HAVE STANDING BASED ON
      COMPETITIVE INJURY ....................................................12

      A.   Competitive Standing Is Satisfied by Economic Disadvantage...............13

      B.   PSLF Provides Economic Advantage to Public Service Employers.......16

      C.   The Adjustment Reduces the Economic Advantage PSLF Offers .........18

      D.   Competitive Injury Is Traceable to the Adjustment and
          Redressable by a Favorable Decision ..........................................22

   II.   PLAINTIFFS-APPELLANTS HAVE STANDING BASED ON DEPRIVATION
      OF THEIR PROCEDURAL RIGHTS UNDER THE APA............................24

      A.   Plaintiffs-Appellants Suffered an Injury to a Procedural Right that
          Protects Their Concrete Interest in Receiving Full PSLF Benefits.........25

      B.   Plaintiffs-Appellants' Procedural Injury Is Caused by Defendants
          and Would Be Redressed by a Favorable Decision...................30

CONCLUSION ........................................................................31

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS...............32

CERTIFICATE OF COMPLIANCE.................................................33

CERTIFICATE OF SERVICE........................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABA v. Dep't of Educ.*,
370 F. Supp. 3d 1 (D.D.C. 2019) ................................................................17, 27, 29

*Adams v. Watson*,
10 F.3d 915 (1st Cir. 1993) .............................................................. 12, 15, 21, 22

*Can. Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) ............................................................12, 14, 15

*Clinton v. City of New York*,
524 U.S. 417 (1998)................................................................................................12

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
140 S. Ct. 1009 (2020) ......................................................................................24

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ........................................................26, 27, 28

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ......................................................................................22

*Dismas Charities, Inc. v. DOJ*,
401 F.3d 666 (6th Cir. 2005) ..........................................................................21

*FEC v. Cruz*,
142 S. Ct. 1638 (2022) .............................................................................. 11, 25

*Hyland v. Navient Corp.*,
No. 18-CV-9031 (DLC), 2019 WL 2918238 (S.D.N.Y. July 8, 2019) ........................6

*Klein v. U.S. Dep't of Energy*,
753 F.3d 576 (6th Cir. 2014) ........................................................................ 26, 30

*Lujan v. Def. of Wildlife*,
504 U.S. 555 (1992)....................................................................................... 10, 22

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983)................................................................................................15

*Murray v. U.S. Dep't of Treasury*,
681 F.3d 744 (6th Cir. 2012) ........................................................................11

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) ........................................................26, 27, 28

*New Mexico v. Dep't of Interior,*
   854 F.3d 1207 (10th Cir. 2017) ..................................................................25

*Rice v. Vill. of Johnstown, Ohio,*
   30 F.4th 584 (6th Cir. 2022) ......................................................................30

*Sherley v. Sebelius,*
   610 F.3d 69 (D.C. Cir. 2010) ....................................................................12

*Sierra Club v. U.S. Army Corps of Engineers,*
   446 F.3d 808 (8th Cir. 2006) ....................................................................27

*Sw. Penn. Growth All. v. Browner,*
   144 F.3d 984 (6th Cir. 1998) ..............................................................passim

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ....................................................................24

*United States v. Ritchie,*
   15 F.3d 592 (6th Cir. 1994)................................................................10, 25

*United States v. Students Challenging Regul. Agency Procs.,*
   412 U.S. 669 (1973) ("*SCRAP*")................................................................21

*United Transp. Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) ..................................................................14

*Weingarten v. Devos,*
   468 F. Supp. 3d 322 (D.D.C. 2020) ............................................................6

**Statutes**

20 U.S.C. § 1070 ..............................................................................................4

20 U.S.C. § 1085 ..............................................................................................5

20 U.S.C. § 1087e ....................................................................................2, 4, 5, 6

20 U.S.C. § 1098e ..........................................................................................4, 5, 6

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1331 ..............................................................................................1

28 U.S.C. § 1361 ..............................................................................................1

28 U.S.C. § 2201 ..............................................................................................1

5 U.S.C. § 553..................................................................................................24

5 U.S.C. § 702..................................................................................................1

5 U.S.C. § 703..................................................................................................1

**Regulations**

34 C.F.R. § 682.211 ............................................................................................. 6, 7

34 C.F.R. § 685.205 ............................................................................................. 6, 7

34 C.F.R. § 685.209 ........................................................................................ 4, 5, 6

34 C.F.R. § 685.219 .......................................................................................... 5, 16

34 C.F.R. § 685.219 (2022) ....................................................................................5

34 C.F.R. § 685.221 .......................................................................................... 5, 6

**Other Authorities**

ALEXANDRA HEGJI, KYLE D. SHOHFI & RITA R. ZOTA,
    CONG. RSCH. SERV., R47196 FEDERAL STUDENT LOAN DEBT CANCELLATION:
    POLICY CONSIDERATIONS (2022) .................................................................4

Cheyenne Haslet,
    *Biden administration begins cancelling student loan debt for 804,000 borrowers,*
    ABC News (Aug. 14, 2023) .............................................................................8

STEVEN A. GREENLAW & DAVID SHAPIRO,
    PRINCIPLES OF ECONOMICS (2d ed. 2017) ...................................................17

*Subsidies,* LEARN ECON., available at
    https://www.learn-economics.co.uk/Subsidies.html ..................................16

U.S. Dep't of Educ. Press Release,
    Department of Education Announces Actions to Fix Longstanding Failures in
    Student Loan Programs (Apr. 19, 2022) ..........................................3, 6, 7, 20

U.S. Dep't of Educ., Press Release,
    Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in
    Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment
    Plans (July 14, 2023) ......................................................................................8

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument because it will assist the Court in its review of the issues presented by this appeal.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellants invoked the district court's jurisdiction under 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1361, and 2201. Complaint, RE 1, PageID # 4. The district court entered final judgment on August 14, 2023, which disposed of all parties' claims. Final Order, RE 14. Plaintiffs timely filed a notice of appeal on August 15, 2023. Notice of Appeal, RE 15. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether, as non-profit employers enjoying statutorily-conferred competitive advantages that help them recruit and retain college-educated workers, Plaintiffs-Appellants have standing to challenge an administrative policy that threatens and undermines those statutory competitive advantages and was adopted without the opportunity for public notice and comment.

## INTRODUCTION

Plaintiffs-Appellants are non-profit corporations that depend largely on college-educated staff to manage and operate their organizations. Together they employ more than 200 people and, when they filed their complaint, had nine unfilled job postings. Goettler Decl., RE 1-1, PageID # 24 and Lehman Decl., RE 1-2 PageID # 26.

As non-profit employers, Plaintiffs-Appellants enjoy substantial competitive advantages in recruiting and retaining college-educated talent. Those advantages derive primarily from the Public Service Loan Forgiveness program ("PSLF"), which was

established with overwhelming bipartisan support in both houses of Congress as part of the College Cost Reduction and Access Act of 2007, Pub. L. 110-84, 121 Stat. 784, (codified at 20 U.S.C. § 1087e(m)). The PSLF program incentivizes student-loan debtors to seek and maintain employment with non-profit organizations like Plaintiffs-Appellants by cancelling their entire remaining student-loan debt balance after they work for any combination of qualifying employers for 10 years and make all their 120 required monthly loan payments during that period.

Plaintiffs-Appellants' complaint sought to stop Defendants-Appellees—the Department of Education, its Secretary, and one of its senior officers (collectively referred to herein as "the Department")—from continuing with an administrative policy that undermines and reduces the statutory competitive advantages Congress gave Plaintiffs-Appellants through the PSLF program. By administrative fiat, accomplished via a vague press release rather than through notice-and-comment rulemaking, the Department in April 2022 announced a "one-time account adjustment" (the "Adjustment") that effectively counts up to three years of *non-payments* by certain student-loan debtors as "payments" toward the 120 payments required for loan cancellation under both PSLF and another major loan-forgiveness program described below. U.S. Dep't of Educ. Press Release, Department of Education Announces

Actions to Fix Longstanding Failures in Student Loan Programs (Apr. 19, 2022) (hereinafter "April 2022 Press Release").[1]

Through this press release, the Department effectively amended the statutes governing these loan-forgiveness programs by redefining the statutory term "payments" to include *non-payments* and thereby reducing statutory requirements that borrowers make a minimum number of loan payments to earn forgiveness under these programs. These changes have inflicted and continue to inflict concrete harm on Plaintiffs-Appellants because they reduce the incentive for college-educated student-loan debtors to remain employed in public service jobs for the full 10 years Congress required to earn PSLF loan forgiveness. This reduction in service inevitably increases Plaintiffs-Appellants' employee turnover rates and associated recruitment costs and burdens. The Department lacked any statutory authority to administratively amend the PSLF program in this manner, especially without going through the notice-and-comment rulemaking process required by the Administrative Procedure Act ("APA").

The district court summarily dismissed the complaint after concluding that Plaintiffs-Appellants lack standing to challenge the Adjustment. That decision constitutes reversible error. Plaintiffs-Appellants have standing because they have suffered and continue to suffer concrete and redressable competitive harm from

---

[1] https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs (last visited October 10, 2023).

Defendants' unlawful Adjustment and because the Defendants effectuated the Adjustment in a manner that wholly deprived Plaintiffs-Appellants of their statutory procedural right under the APA to protect their competitive interests through participation in the notice-and-comment process required by applicable law.

This Court should reverse the district court's dismissal and remand the case to allow Plaintiffs-Appellants to pursue the relief to which they are entitled.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

The Department administers student loan programs under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq*. The direct loan program accounts for most of the $1.6 trillion in federal student debt owed by approximately 45 million borrowers. ALEXANDRA HEGJI, KYLE D. SHOHFI & RITA R. ZOTA, CONG. RSCH. SERV., R47196 FEDERAL STUDENT LOAN DEBT CANCELLATION: POLICY CONSIDERATIONS 1–2 (2022). Congress has statutorily authorized several loan-forgiveness programs, including the Income Driven Repayment ("IDR") and PSLF programs. *See* 20 U.S.C. §§ 1087e(m) (authorizing PSLF forgiveness), 1098e(b)(7) (authorizing certain IDR forgiveness); *see also* 34 C.F.R. § 685.209(a)–(c) (authorizing other IDR forgiveness under 20 U.S.C. § 1087e(e)).

Under IDR, a borrower's debt will be forgiven after the borrower makes the requisite number of qualifying monthly payments. A borrower can choose among four

IDR plans,[2] each with specific monthly repayment amounts—which are based on the borrower's income and family size—and a forgiveness timeline of either 20 or 25 years. *See* 34 C.F.R. §§ 685.209(a)–(c), 685.221. Up to three years of deferment under 20 U.S.C. § 1085(o) for "economic hardship" may count toward IDR's monthly-payment requirement. 20 U.S.C. §§ 1087e(e)(7)(B), (f)(2)(B), 1098e(b)(7)(B).

Congress enacted PSLF in 2007 "to encourage individuals to enter and continue in full-time public service employment." 34 C.F.R. § 685.219(a). It accomplishes this goal by forgiving a borrower's entire remaining student-loan balance *after* the borrower makes 120 qualifying monthly payments while employed in a public service job. 20 U.S.C. § 1087e(m)(1). Qualifying payments include payments made under IDR plans or a standard plan. *Id.* Under regulations applicable during the relevant timeframe, "the borrower must make the monthly payments within 15 days of the [plan's] scheduled due date for the full scheduled installment amount[.]" 34 C.F.R. § 685.219(c)(1)(iii) (2022). Late or partial payments do not count toward the 120 monthly payments needed to earn PSLF forgiveness. Unlike IDR, any deferment given for "economic hardship" does not count toward PSLF's 120 monthly payments.

Loan servicers, lenders, or the Secretary of Education ("Secretary") may grant borrowers "forbearance" from making monthly payments on student-loan debt.

---

[2] There are four types of IDR plans during the relevant period. One plan, the income-based repayment (IBR) plan, is established under 20 U.S.C. § 1098e. Three others, the income-contingent repayment (ICR) plan, the PAYE plan, and the REPAYE plan are established under 20 U.S.C. § 1087e(e). *See* 34 C.F.R. § 685.209(a)–(c).

34 C.F.R. §§ 682.211(a)(1), 685.205(a)(1). Forbearance is defined as "permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously were scheduled." *Id.* Periods of forbearance do not count as qualified monthly payments a borrower must make to obtain IDR or PSLF loan forgiveness. *See* 20 U.S.C. §§ 1087e(m)(1)(A), § 1098e(b)(7); 34 C.F.R. §§ 685.209(a)(6), (b)(3)(iii)(D), (c)(5), 685.221(f); *see also Hyland v. Navient Corp.*, No. 18-CV-9031, 2019 WL 2918238, at *1 (S.D.N.Y. July 8, 2019) ("Moreover, periods of deferment or forbearance do not count toward [PSLF's] 120 qualifying payments."); *Weingarten v. Devos*, 468 F. Supp. 3d 322, 328 (D.D.C. 2020) (accord).

## II.    THE ONE-TIME ACCOUNT ADJUSTMENT

In April 2022, the Department announced in a press release "actions to fix longstanding failures" of student-loan programs through the Adjustment. April 2022 Press Release. According to the press release, the Department believed "loan servicers placed borrowers into forbearance in violation of Department rules," which provide for "a 12-month limit for any single use of forbearance, and a 36-month cumulative limit on discretionary forbearance." *Id.*

"To mitigate the harms of inappropriate steering into long-term forbearance," the Adjustment "count[s] forbearance[] [periods] of more than 12 months consecutive and more than 36 months cumulative towards forgiveness under IDR and PSLF." *Id.* In other words, contrary to longstanding practice and understanding of the governing statutes, periods of *non-payment* during forbearance would now count as qualifying

6

monthly "payments" under IDR and PSLF—ostensibly because the Department believes some borrowers sought and were accorded forbearance for longer-than-allowed periods. Yet the Adjustment was not limited to forbearance in violation of the Department's rules, *i.e.,* periods of forbearance exceeding the 12-month limit for a single use or the 36-month limit for cumulative use. Instead, for example, a borrower with 38 months of cumulative forbearance would receive 38 months of credit toward forgiveness instead of just the 2 months that exceeded the 36-month limit. Nor is the Adjustment limited only to excessive forbearance granted by loan servicers, as opposed to those granted by the Secretary. *Compare* 34 C.F.R. § 682.211(a)(1) (authorizing forbearance by loan servicers) *with* § 685.205(a)(1) (authorizing forbearance by the Secretary). The Department did not cite any statutory authority for this largesse.

The Adjustment resulted in immediate and total debt cancellation for at least 40,000 PSLF borrowers. Approximately 3.6 million additional borrowers will receive at least three years of forbearance credit toward IDR forgiveness. April 2022 Press Release. The Department did not estimate how many borrowers would receive fewer than three years (but more than one year) of credit. Nor did it estimate the number of PSLF participants who would receive credit toward that program's 120 monthly-payment requirement, aside from the 40,000 whose debts were immediately cancelled.

The Department did not estimate the Adjustment's total cost. Taking just the 3.6 million borrowers who will receive at least three years of credit toward IDR, each will now have at least three fewer years of required payments (36 fewer monthly payments)

before his or her debt is forgiven under IDR. That portion of the Adjustment alone will cost the Treasury over 130 million forgone monthly loan payments.

On July 14, 2023, the Department pledged as part of the Adjustment to provide "$39 billion in debt relief for … 804,000 borrowers." U.S. Dep't of Educ., Press Release, Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans ("July 2023 Press Release").[3] Borrowers would receive a forgiveness notice if they "reached the necessary forgiveness threshold as a result of receiving [forbearance] credit toward IDR forgiveness." *Id.*

Defendants began to prematurely cancel this $39 billion on August 14, 2023. Cheyenne Haslet, *Biden administration begins cancelling student loan debt for 804,000 borrowers*, ABC News (Aug. 14, 2023).[4] The remaining millions of affected borrowers will receive premature cancellation of their student-loan debt in the future under both IDR and PSLF as the unlawful forbearance credit provided by the Adjustment enables them to meet the monthly-payment requirements needed for cancellation of their debt sooner than they would statutorily qualify.

---

[3] https://www.ed.gov/news/press-releases/biden-harris-administration-provide-804000-borrowers-39-billion-automatic-loan-forgiveness-result-fixes-income-driven-repayment-plans (last visited October 10, 2023).
[4] https://abcnews.go.com/Politics/biden-administration-begins-wiping-student-loan-debt-804000/story?id=102264052 (last visited October 10, 2023).

If the $39 billion prematurely cancelled for 804,000 borrower is representative, the full cost of premature cancellations for all 3.6 million affected borrowers who received at least three years of IDR credit from the Adjustment would be approximately $175 billion. This figure does not account for premature cancellation of the undisclosed number of borrowers who received at least one year but fewer than three years of IDR credit. Nor does it account for the undisclosed number of PSLF participants who received or will receive premature cancellation because of the Adjustment.

On October 4, 2023, the White House announced an additional $9 billion unlawful cancellation of loans, including $5.2 billion for 53,000 PSLF participants and $2.8 billion for 51,000 IDR participants. White House, President Biden Announces an Additional $9 Billion in Student Debt Relief for 125,000 Americans, Oct. 4, 2023.[5] The announcement did not articulate any legal authority to justify the action and instead characterized the policy as "fixes" made to IDR and PSLF, which suggests that this latest round of cancellations was made as part of the Adjustment. *Id.*

### III. PROCEEDING BELOW

On August 4, 2023, Plaintiffs-Appellants filed a Complaint challenging the Adjustment as violating the Appropriations Clause of Article I of the U.S. Constitution, exceeding the Department's statutory authority under the HEA, and violating the

---

[5] https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/04/president-biden-announces-an-additional-9-billion-in-student-debt-relief-for-125000-americans/ (last visited October 10, 2023).

Administrative Procedure Act, 5 U.S.C. § 551 et. seq. RE 1 PageID ## 15–20. As § 501(c)(3) nonprofit organizations, Plaintiffs-Appellants qualify as public service employers under PSLF. They compete with non-qualifying employers to recruit and retain highly educated employees, and they benefit in that competition from incentives Congress provided through the PSLF program. *Id.* PageID # 3.

On August 7, Plaintiffs-Appellants filed a Motion for a Temporary Restraining Order and Preliminary Injunction to "prevent Defendants [from] implementing the Adjustment, including the cancellation of $39 billion in federal student-loan debt." Motion for TRO/PI, RE 7 PageID # 39. The district court dismissed the Complaint for lack of standing and denied the motion for injunctive relief as moot on August 14. Order, RE 13; Judgment, RE 14. Plaintiffs-Appellants appealed on August 16.

## STANDARD OF REVIEW

In reviewing a dismissal for lack of subject-matter jurisdiction, "the court must take the material allegations … as true and construed in the light most favorable to [Plaintiffs-Appellants]." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). One requirement of subject-matter jurisdiction is Article III standing, which is satisfied where a plaintiff pleads: (1) an injury in fact that is concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely such injury will be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561–62 (1992). Appellate courts "review a district court's decision regarding a plaintiff's Article III standing *de novo*[,]" *Murray v.*

*U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012), and must "accept as valid the merits of [the plaintiff's] legal claims[.]" *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022).

## SUMMARY OF THE ARGUMENT

Plaintiffs-Appellants have standing for at least two reasons. *First,* the Adjustment erodes statutory competitive benefits PSLF provides to public service employers. By crediting up to three years or more of non-payments as monthly payments needed for forgiveness under PSLF, the Adjustment shortens PSLF's 120-month payment-and-service requirement to merely 84 months for millions of affected borrowers. Premature cancellation of student-loan debt under the Adjustment further erodes PSLF benefits by shrinking the pool of borrowers with outstanding debt whom PSLF incentivizes to work for public service employers like Plaintiffs-Appellants. Finally, crediting years of non-payment toward IDR forgiveness makes IDR relatively more attractive for millions of affected borrowers than PSLF, thus discouraging those borrowers from seeking PSLF forgiveness by working for public service employers. In sum, PSLF's service term requirement becomes shorter, the pool of PSLF-borrowers shrinks, and millions of borrowers are incentivized away from PSLF and toward IDR. These effects reduce benefits that public service employers like Plaintiffs-Appellants enjoy under the PSLF program in their competition against non-public-service employers, including for-profit companies, for highly educated workers. That competitive injury suffices for Article III standing.

11

*Second*, Defendants deprived Plaintiffs-Appellants of their notice-and-comment rights to protect their concrete interest in receiving full PSLF benefits. Public service employers like Plaintiffs-Appellants have a concrete interest in receiving full competitive benefits from PSLF in the recruitment and retention of highly educated workers. The Adjustment erodes those competitive benefits and thus impacts Plaintiffs-Appellants' concrete interest. Defendants' failure to comply with the APA's notice-and-comment procedures before announcing the Adjustment suffices to establish a procedural injury for Article III standing purposes.

## ARGUMENT

### I.     PLAINTIFFS-APPELLANTS HAVE STANDING BASED ON COMPETITIVE INJURY

The Supreme Court "routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up). Under the doctrine of competitive standing, an injury-in-fact occurs when a party's "position in the relevant marketplace would be affected adversely by the challenged governmental action." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993); *accord Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008).

This Court recognizes that a party has competitive standing to challenge government action that places it in a position of "economic disadvantage" relative to

its competitors. *Sw. Penn. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998). Here, PSLF confers on qualifying public service employers an economic advantage over their non-public-service competitors, including for-profit employers in the private sector, in recruiting highly educated employees. The Adjustment undermines and reduces that advantage. The unlawful Adjustment thus lessens the statutory recruiting advantage the PSLF program confers on public service employers like Plaintiffs-Appellants versus for-profit and other non-qualifying competitors.

## A. Competitive Standing Is Satisfied by Economic Disadvantage

The district court rejected Plaintiffs-Appellants' theory of competitive standing because Plaintiffs-Appellants "do not allege that any current employee received Adjustment credit" nor that "they will imminently hire any employee who will have received such credit." RE 13 PageID # 91.[6] The district court thus required Plaintiffs-Appellants to show tangible economic loss relating to specific employees. *Id.*

But the competitive standing doctrine explicitly obviates the need for "analysis linking [the challenged conduct] to specific, demonstrated economic harms." *Can.*

---

[6] It is unclear how the district court expected Plaintiffs-Appellants to make this allegation given that employers are not typically involved in the PSLF loan-forgiveness process until an employee completes his or her 120-month payment-and-service requirement and seeks certification from current and former employers. Dep't of Educ., Fed. Student Aid, *The Employer's Role in Public Service Loan Forgiveness*, available at: https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/employers-role (last visited October 10, 2023). As such, there is no practical way for a public service employer to control or verify whether current or prospective PSLF-eligible employees will eventually obtain loan forgiveness under PSLF or whether

*Lumber*, 517 F.3d at 1332. Manufacturers, for example, need not show "lost sales, decreased market share[,]" and the like. *Id.* Indeed, the district court itself recognized that evidence of tangible injury is not needed because the "competitive standing doctrine supplies the link between increased competition and tangible injury." RE 13 PageID # 91 (cleaned up) (quoting *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023)); *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 n. 7 (D.C. Cir. 1989) (noting that in "garden-variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic").

In *Browner*, 144 F.3d at 988, an association representing Pennsylvania manufacturers challenged an agency's environmental designation that resulted in lower compliance costs for competing firms in Ohio. This Court held that the association had competitive standing because reduced costs gave Ohio firms "an economic advantage over [their] neighbors in southwestern Pennsylvania," which necessarily means each Pennsylvania firm "suffers an economic disadvantage compared to its Ohio neighbor." *Id.* There was no need to link the environmental designation to tangible economic injury, such as particular lost sales or revenue for a specific Pennsylvania firm. It was enough to link the agency designation to reduced compliance costs for Ohio firms, which placed *each* Pennsylvania firm at a relative economic disadvantage. *Id.*

---

they received forbearance credits enabling them to obtain premature PSLF loan forgiveness.

Here, there likewise is no need to link the Adjustment to specific tangible loss, such as the effect on a specific current or prospective employee. Rather, what is needed is linking the Adjustment to economic disadvantage, which is satisfied because the Adjustment reduces competitive benefits PSLF confers on each public service employer, including both Plaintiffs-Appellants. Plaintiffs-Appellants may "fairly employ economic logic" to establish that link. *Can. Lumber*, 517 F.3d at 1333. "Indeed, most 'competitor standing' cases depend on … core economic postulates," such as "standard principles of 'supply and demand.'" *Adams*, 10 F.3d at 923.

Consider a hypothetical statutory tax credit for purchasers of electric vehicles. While funds flow directly into the bank accounts of consumers who purchase electric vehicles, the tax credits are also a subsidy targeting electric-vehicle manufacturers by making their products relatively more attractive than non-electric vehicles. Now suppose an agency arbitrarily reduced the tax credit by 30%—through administrative fiat and without notice and comment—for a large subset of undisclosed consumers. This reduced subsidy "presumably [would] cause a decrease in demand" for electric vehicles (compared to gasoline vehicles) and thus "lower total revenues" for EV manufacturers. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 590 n.14 (1983) (quoting PAUL A. SAMUELSON, ECONOMICS 381–83, 389–90 (10th ed. 1976)).

According to economic logic, the reduction of the subsidy means that, at any given price, consumer demand for electric vehicles falls because non-electric vehicles

15

become relatively more attractive for those no longer eligible for the subsidy. Such economic disadvantage constitutes an Article III injury for all manufacturers of electric vehicles. There is no need for each manufacturer to show that some particular consumer would have purchased an electric vehicle from that specific manufacturer (as opposed to a non-electric one from another manufacturer) but for the reduced subsidy. Rather, the reduced demand for the manufacturer's product *is itself* an economic injury.

The same economic logic applies to the employment market, where workers supply labor and firms demand it. When an agency arbitrarily reduces the financial incentive for student-loan debtors to seek and remain in jobs with public service employers, at any given wage, the supply of workers willing to take and keep jobs with such employers inevitably falls. That reduced supply of workers for public service jobs is a concrete economic injury that constitutes an Article III injury suffered by public service employers like Plaintiffs-Appellants.

### B. PSLF Provides Economic Advantage to Public Service Employers

PSLF provides financial incentives that "encourage individuals to enter and continue in full-time public service employment" instead of for-profit jobs in the private sector (or not working). 34 C.F.R. § 685.219(a). It does not matter whether the incentive goes to the borrower-employee or the public service employer. The economic benefits accrue to both parties because an employee (supplier of labor) who receives a subsidy will pass on a portion of the benefits to the employer (consumer of labor) in

the form of lower wages (price of labor)—and *vice versa*.[7] Hence, loan forgiveness under PSLF not only benefits individual borrower-employees, but it also "promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service." *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

For-profit employers in the private sector do not benefit from a similar statutory subsidy. PSLF thus confers a deliberate competitive advantage on public service employers over for-profit employers when seeking to recruit and retain the approximately 45 million highly educated individuals with outstanding student-loan debt.[8] Put in economic terms, because of PSLF's financial incentives, at any wage offered by a public service employer, the supply of workers willing to take that job is higher than it otherwise would be. When those financial incentives are eroded, the supply of workers seeking public service jobs (as opposed to for-profit jobs) necessarily

---

[7] *See Subsidies*, LEARN ECON., available at https://www.learn-economics.co.uk/Subsidies.html (last visited October 10, 2023) (explaining "how the benefit of [a] subsidy is distributed between consumers and producers"). This logic applies in the labor market. *See* STEVEN A. GREENLAW & DAVID SHAPIRO, PRINCIPLES OF ECONOMICS ch. 5—Elasticity, ch. 4.1—Demand and Supply at Work in Labor Markets (2d ed. 2017), available at: https://openstax.org/books/principles-economics-2e/pages/4-1-demand-and-supply-at-work-in-labor-markets (last visited October 10, 2023)("Markets for labor have demand and supply curves, just like markets for goods.").

[8] PSLF also gives public service employers a competitive advantage over certain nonprofit companies that do not qualify, such as Section 501(c)(6) organizations that engage in lobbying activity.

17

falls, and public service employers like Plaintiffs-Appellants must increase wages (or offer additional benefits) to make up for that shortfall, which increases their labor costs.

**C. The Adjustment Reduces the Economic Advantage PSLF Offers**

Government action that reduces the competitive advantage conferred by PSLF on public service employers, by definition, would place such employers at a relative *dis*advantage in the job market as compared to their non-public-service competitors, including for-profit companies in the private sector.[9] The Adjustment inflicts such competitive injury because it reduces PSLF benefits to public service employers in at least three ways.

*First*, by crediting borrowers with years of non-payment toward PSLF's payment-and-service requirements, the Adjustment unlawfully abridges PSLF's statutory 10-year payment requirement. For PSLF-eligible borrowers who received forbearance credits of at least 36 months, the Adjustment reduces their payment-and-service requirement under PSLF to only 7 years or less. Without the forbearance credits conferred by the Adjustment, such borrowers would need to make qualifying monthly payments while working for a public service employer for at least three more years to earn forgiveness. The Adjustment destroys that incentive to work three more years for public service employers, thereby reducing the statutory competitive advantage PSLF confers on such employers over non-public-sector employers.

---

[9] By reducing the financial incentives under PSLF to take a public service job, the Adjustment also encourages affected borrowers not to work at all.

*Second*, cancelling debt because of the Adjustment takes individuals out of the pool of borrowers whom PSLF incentivizes to work for public service employers. The Adjustment immediately cancelled the entire debt of at least 40,000 PSLF participants, and the Department cancelled the debt of 800,000 additional borrowers in August 2023. Another round of debt cancellation for 125,2000 borrowers in October 2023 appears to be at least partially attributable to the Adjustment. More unlawful debt cancellations under PSLF and IDR will follow as Adjustment credits propel millions of other affected borrowers toward premature loan forgiveness. These cancellations eliminate any incentive for the affected recipients to seek debt forgiveness through PSLF. The Adjustment has already prematurely taken nearly a million individuals out of the pool of borrowers whom PSLF incentivizes to work for public service employers, with millions more to follow. Lowering the number of borrowers PSLF incentivizes in this manner undermines the statutory competitive advantage Congress conferred on public service employers like Plaintiffs-Appellants.

*Third*, crediting forbearance toward IDR also reduces the incentives provided by PSLF by making IDR forgiveness relatively more attractive by comparison. Borrowers can simultaneously participate in IDR and PSLF—they can have monthly payments capped by one of the IDR plans and still have their debt cancelled after making qualified payments and working for only 10 years in public service jobs—as opposed to 20 or 25 years under only IDR. In addition to being faster, forgiveness under PSLF requires 120 fewer monthly payments compared to a 20-year (240-month) IDR plan, and 180 fewer

monthly payments compared to a 25-year (300-month) IDR plan. These fewer required payments provide a significant financial incentive for borrowers to seek PSLF forgiveness by working for public service employers instead of waiting for IDR forgiveness.

"More than 3.6 million borrowers … receive at least three years of additional credit toward IDR forgiveness[]" because of the Adjustment. April 2022 Press Release. These 3.6 million IDR borrowers would have also received credits toward PSLF only to the extent they worked at a public service employer during their forbearance periods. Many did not and thus would not have received forbearance credits toward PSLF (or received less PSLF credit than IDR credit). For borrowers who received three years of IDR credit, the Adjustment reduced IDR's 20-year monthly-payment requirement to only 17 years and the 25-year monthly-payment requirement to only 22 years. For the substantial subset of these IDR borrowers who received no PSLF credits,[10] the payment-and-service requirement under PSLF remains 10 years. The Adjustment thus made loan cancellation under IDR comparatively more attractive than under PSLF. For instance, affected borrowers enrolled in a 20-year IDR plan would receive forgiveness only 7 years faster under PSLF, instead of 10. And they would save only 84 monthly payments under PSLF instead of 120.

---

[10] Because they did not spend their period of forbearance working at a public service employer.

The advantage of PSLF forgiveness over IDR is reduced by three years by unlawfully crediting 36 non-payments as monthly payments. Millions of borrowers thus have less incentive to seek PSLF forgiveness by working for public service employers, as opposed to waiting for IDR forgiveness. This in turn reduces the competitive benefits PSLF grants public service employers over their for-profit competitors.

In short, because of the Adjustment, PSLF provides less incentive to fewer borrowers and a shorter minimum time required for employment with public service employers. The Adjustment therefore reduces Plaintiffs-Appellants' competitive advantage compared to for-profit employers against whom they compete for college-educated workers. Such reduction in competitive advantage is a competitive injury for Article III standing purposes. *Browner*, 144 F.3d at 988.

That many other public service employers share Plaintiffs-Appellants' competitive injury does not affect their standing. *Adams*, 10 F.3d at 924 ("[T]he Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal."). "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973). Indeed, competitor standing doctrine exists in part to ensure unlawful government actions that have diffuse economic impacts such as the Adjustment may

be challenged in federal court. *See Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 677 (6th Cir. 2005) (noting that "the absence of competitor standing may render [unlawful] agency actions effectively immune from judicial review" and that a prior agency "violation would presumably have continued unabated in the absence of competitor standing").

### D. Competitive Injury Is Traceable to the Adjustment and Redressable by a Favorable Decision

Plaintiffs-Appellants also satisfy the requirements of traceability and redressability. *See Lujan*, 504 U.S. at 560–61. The district court's conclusion that Plaintiffs-Appellants' competitive injury is "fairly traceable to the decision of individual borrowers, independent third parties to this case" is misplaced. RE 13 PageID # 94. The district court believed borrowers to be third parties whose employment decisions are not affected by the reduction of PSLF incentives. *Id.* Not so. Standing can be based on the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). "Indeed, most 'competitor standing' cases depend on [using] core economic postulates" to predict third parties' "*probable* market behavior." *Adams*, 10 F.3d at 923. While individuals have varied reasons for their employment decisions, it is hardly speculative to say that financial incentives play a significant role.

Take the district court's example that "[a] borrower who has worked for a PSLF employer for 7 years making proper monthly payments, could simply quit, drop PSLF

participation, enter the private sector or switch qualified public employer at any time, regardless of the Adjustment." RE 13 PageID # 94. To start, the fact that the borrower could switch to another public service employer is irrelevant because the Article III injury here is a competitive disadvantage as compared to for-profit employers in the private sector. In *Browner*, a consumer's ability to switch between different Pennsylvania firms did not change the fact that each Pennsylvania firm suffered an Article III injury by being placed at a competitive disadvantage compared to Ohio firms across the border. 144 F.3d at 988. A borrower's ability to switch between public service employers likewise does not change the fact that the Adjustment reduces each public service employer's statutory competitive advantage compared to its non-public-service competitors.

Next, while the borrower in the district court's example could always quit public service employment for a for-profit job (or leave the workforce altogether), it is indisputable that the borrower has greater financial incentive to do so because of the Adjustment. But for the Adjustment, the borrower would have a financial incentive to keep working for a public service employer like Plaintiffs-Appellants for three additional years so his or her loans could be forgiven. By prematurely granting the borrower three years of PSLF credit now, the Adjustment eliminates that strong financial incentive to stay in public service work for another three years. This reduction in financial incentive for millions of borrowers is the competitive injury traceable to the Adjustment.

23

This Court's decision in *Browner* again illustrates the district court's erroneous reasoning. A third-party buyer's choice in selecting which firm in Ohio or Pennsylvania to shop at did not prevent this Court from finding competitive injury in *Browner*, 144 F.3d at 988. That is because lower costs for Ohio firms helps *each* of them lure customers away from *each* Pennsylvania firm. *Id.* For the same reason, the fact that third-party borrowers may choose whether to work for a public service or for-profit employer does not prevent competitive injury here. Reduced PSLF financial incentives make each public service employer, including Plaintiffs-Appellants, less attractive as employers and less able to compete against for-profit employers in the recruitment and retention of college-educated workers.

Because the Adjustment is a "but for" cause of reduced PSLF incentives, Plaintiffs-Appellants satisfy Article III's traceability requirement. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). A favorable decision would also redress Plaintiffs-Appellants' injury by preventing the Adjustment from further eroding PSLF incentives and by restoring incentives that it has already undermined. Plaintiffs-Appellants therefore satisfy all three elements of Article III standing.

## II.    PLAINTIFFS-APPELLANTS HAVE STANDING BASED ON DEPRIVATION OF THEIR PROCEDURAL RIGHTS UNDER THE APA

Plaintiffs-Appellants also have standing based on the deprivation of their rights under the APA to participate in a notice-and-comment process regarding the Adjustment policy. *See* 5 U.S.C. § 553. "A plaintiff can show a cognizable injury if it has

been deprived of 'a procedural right to protect [its] concrete interests.'" *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). "A violation of the APA's notice-and-comment requirements is one example of a deprivation of [such] a procedural right." *Id.* The right to notice and comment protects Plaintiffs-Appellants' concrete interest in retaining the competitive advantages Congress gave them through the PSLF program. By adopting a policy that reduces these PSLF advantages without notice and comment, Defendants inflicted a procedural injury traceable to lack of notice and comment and redressable by the court.

### A. Plaintiffs-Appellants Suffered an Injury to a Procedural Right that Protects Their Concrete Interest in Receiving Full PSLF Benefits

"For standing purposes, [the Court must] accept as valid the merits of [Plaintiffs-Appellants'] legal claims," *Cruz*, 142 S. Ct. at 1647, and must further construe facts in their favor, *Ritchie*, 15 F.3d at 598. Hence, the Court must presume that the Adjustment erodes PSLF incentives that benefit public service employers, that it was required to undergo the APA's notice-and-comment procedures, and that it failed to follow such procedures. The only question is whether Plaintiffs-Appellants had a concrete interest in the impacted PSLF benefits.

Procedural injury cases are most common in the environmental context, where the "concrete interest" requirement is not especially demanding. Courts have "frequently found standing based on a procedural injury in cases in which environmental groups have alleged that an agency failed to follow the required

procedures in taking an action that negatively impacted members' concrete interest in protecting and enjoying the affected land." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017) (collecting cases). For instance, *Klein v. U.S. Dep't of Energy*, 753 F.3d 576 (6th Cir. 2014), involved environmental activists who sued an agency for failing to follow certain procedural requirements in determining that a plant that converted lumber into ethanol would have no significant environmental impact. This Court found a procedural injury sufficient for Article III standing based on Klein's asserted "concrete interest" in visiting the area surrounding the plant and his allegations that the plant would erode the area's air quality. *Id.* at 579 (quoting *Lujan*, 504 U.S. at 560–561)); *see also id.* at 586 ("NEPA and the Administrative Procedure Act therefore afford Klein a procedural right that protects his concrete interests—here, his health, which will be threatened by pollution from the ethanol plant.") (Stranch, J., concurring).

Courts have likewise found a concrete interest based on a member's asserted interest in enjoying or observing a species of flora or fauna that an environmental group alleges would be negatively impacted by agency action. In *Ctr. for Biological Diversity v. EPA*, the D.C. Circuit found that individuals' asserted interests "in observing the Valley Elderberry Longhorn Beetle" and "look[ing] for Mitchell's satyr butterflies[]" were concrete and provided standing to challenge the agency's procedural omissions in approving a new pesticide that might impact those insect species. 861 F.3d 174, 183 (D.C. Cir. 2017). The Ninth Circuit similarly held that individuals demonstrated a procedural injury through "declarations stating that they enjoy watching the monarch

butterfly migration" and that "they are concerned they will no longer be able to enjoy observing monarch butterflies because of [an approved pesticide's alleged] effects on milkweed." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020).

In short, a concrete interest in the environmental context is satisfied where an individual asserts "an aesthetic or recreational interest in a particular place, or animal, or plant species and [alleges] that interest is impaired by a defendant's conduct." *Id.* (quoting *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000)). Absolute certainty is not required: "The injury-in-fact is *increased risk* of environmental harm stemming from the agency's allegedly uninformed decision-making." *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006) (emphasis added). Nor is there a need to allege with specificity which or precisely how many beetles and butterflies the individual would be unable to observe because of the agency's conduct. By analogy, in the employment context, a concrete interest would be satisfied by an employer alleging an economic interest in recruiting a particular species of worker— here PSLF-eligible borrowers—and that Defendants' conduct impaired such interest.

Plaintiffs-Appellants have an economic interest in recruiting PSLF-eligible borrowers because PSLF "promotes the interests of [all] public service employers by providing significant financial subsidies to [all PSLF-eligible] borrowers they hire[.]" *ABA*, 370 F. Supp. 3d at 19. Each public service employer thus has a concrete interest in extending this subsidy to all eligible individuals and for the full 10-year term of statutorily required service and payments. That interest is no less real than those of a

naturalist alleging that agency action will reduce the number of butterflies in a particular area (or shorten their lifespan). *Cf. Ctr. for Biological Diversity*, 861 F.3d at 183; *Nat'l Fam. Farm Coal.*, 966 F.3d at 909. It might well be even more concrete. Agency action that shrinks the pool of PSLF-eligible borrowers (or shortens their required term of service) directly impacts the concrete economic interests of public service employers in receiving a statutorily granted financial subsidy for employing such borrowers.

The district court, however, held that Plaintiffs-Appellants lack a concrete interest because they "have not shown any … [current] employee was *actually impacted* by the Adjustment." RE 13 at PageID # 90 (emphasis in original) (citing RE 1-1, 1-2). It is insufficient, according to the district court, for Plaintiffs-Appellants to "assert that [they] plan to recruit PSLF participants in the future, some of whom *may* be impacted by the Adjustment." *Id.* (emphasis in original) (citing RE 1-1, 1-2). This reasoning would mean plans to observe butterflies or beetles in the future, some of whom may be impacted by a pesticide approved by an agency, is not sufficient to establish a concrete interest in environmental cases. Rather, the naturalist could show a concrete interest only by identifying the specific beetles or butterflies that would be impacted—and thus

not observed—which conflicts with decades of procedural-injury case law. *Cf. Ctr. for Biological Diversity*, 861 F.3d at 183; *Nat'l Fam. Farm Coal.*, 966 F.3d at 909.[11]

The district court's error is even starker in the context of market behavior (as opposed to aesthetic enjoyment), where it is well understood that the withdrawal of a financial subsidy for a particular type of transaction has a negative economic impact on *all* parties that are interested on being on either side of that type of transaction—whether buyer or seller (or in this case, employer or employee). Consider Pell Grants that help low-income students pay for college. The grants benefit not only the recipients but also the colleges that admit them, because the funds ultimately end up in the colleges' bank accounts. Suppose the Department arbitrarily—and without notice and comment—took away Pell Grants for a subset of otherwise eligible students whom the agency refused to disclose. Under the district court's flawed logic, a college with a history of recruiting Pell Grant recipients and that benefits financially from admitting such students would lack a concrete interest to challenge the policy because that college *merely* plans to recruit future Pell Grant recipients, some of whom may be impacted.

If fewer people are subsidized to attend college, colleges benefiting from the eroded subsidies must lower their tuition (or offer more scholarships) to compensate. Such an outcome impacts each college's concrete financial interest. The result is no

---

[11] The environmental group in *National Family Farm Coalition* did not even allege that the agency action would directly affect any butterflies. 966 F.3d at 909. Rather, it alleged that the approved pesticide would affect Milkweed, which in turn would have an impact on the butterfly population. *Id.*

different in the employment market. The Adjustment results in fewer borrowers being incentivized to work for public service employers and reduced incentive for them to do so for a full ten years (as opposed to seven). In *ABA*, 370 F. Supp. 3d at 19, the court found interest to challenge agency action that deprived a single public service employer of *all* PSLF benefits. Here, the Adjustment deprives *all* public service employers of *some* PSLF benefits. That is a distinction without a difference because standing does not depend on the size of injury or the number of victims. All public service employers, including Plaintiffs-Appellants, have a concrete interest in PSLF's operation and continued vitality. Defendants' decision to impair that concrete interest without notice and comment therefore inflicts a real and cognizable procedural injury.

### B. Plaintiffs-Appellants' Procedural Injury Is Caused by Defendants and Would Be Redressed by a Favorable Decision

In "procedural-rights cases like this one, the causation and redressability requirements are relaxed." *Klein*, 753 F.3d at 579. That is because the injury is a "lost [ ] chance to" exercise a procedural right, here notice and comment. *Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 592 (6th Cir. 2022) (alteration in original) (quoting *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017)). "As a result, a litigant can demonstrate causation from the denial of procedural protections even if, when applied, the procedures might not result in relief." *Id.* (citation omitted). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that

30

allegedly harmed the litigant." *Klein*, 753 F.3d at 579 (quoting *Massachusetts v. EPA*, 548 U.S. 497, 517–18 (2007)).

The Adjustment's negative impact on the Plaintiffs-Appellants' concrete interest in the PSLF program without providing them an opportunity for notice and comment is a cognizable procedural injury directly traceable to Defendants-Appellees' conduct. That injury is redressable because there is some possibility that Defendants would reconsider the Adjustment after notice and comment, or at least narrow its scope. Plaintiffs-Appellants therefore have standing to challenge the violation of their procedural right.

## CONCLUSION

The Court should reverse the district court's decision and remand the case to the district court.

October 10, 2023                    Respectfully Submitted,

*/s/ Sheng Li*
Sheng Li
Russell Ryan
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
sheng.li@ncla.legal

*Counsel for Plaintiffs-Appellants*

31

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| RE | Description | PageID #'s |
|---|---|---|
| 1 | Complaint | 1–22 |
| 1-1 | Declaration of Peter N. Goettler | 23–24 |
| 1-2 | Declaration of Joseph G. Lehman | 25–26 |
| 7 | Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 39–70 |
| 13 | Order Dismissing Without Prejudice Plaintiffs' Complaint and Denying as Moot Plaintiffs' *Ex Parte* Motion or Temporary Restraining Order | 78–95 |
| 14 | Final Order | 96 |
| 15 | Notice of Appeal | 97–99 |

**CERTIFICATE OF COMPLIANCE**

This brief complies with Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,939 words. This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(4)-(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*/s/ Sheng Li*

**CERTIFICATE OF SERVICE**

I certify that on October 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Sheng Li*