No. 23-1736

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

———————————

MACKINAC CENTER FOR PUBLIC POLICY and CATO INSTITUTE,

Plaintiffs-Appellants,

v.

MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity, *et al.*,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Michigan

———————————

## BRIEF FOR APPELLEES

———————————

*Of Counsel:*

TOBY MERRILL
*Deputy General Counsel*

BRIAN SIEGEL
*Assistant General Counsel*

*Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

DAWN N. ISON
*United States Attorney*

MICHAEL S. RAAB
THOMAS PULHAM
*Attorneys, Appellate Staff
Civil Division, Room 7323
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-4332*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUE ............................................................. 3

STATEMENT OF THE CASE ............................................................... 3

    A.    Income-Driven Repayment and Public Service Loan
           Forgiveness ........................................................................... 3

    B.    Factual Background ........................................................... 13

    C.    Prior Proceedings ............................................................. 14

SUMMARY OF ARGUMENT ............................................................. 16

STANDARD OF REVIEW .................................................................. 18

ARGUMENT ........................................................................................... 18

The District Court Correctly Dismissed Plaintiffs' Complaint for Lack
    of Standing ........................................................................................ 18

    A.    Standing Requires a Litigant To Demonstrate a Personal
           Stake in the Case .............................................................. 18

    B.    Plaintiffs Cannot Establish Competitor Standing ....................... 20

           1.    The Competitor Standing Doctrine Applies When a
                  Challenged Action Increases Competition ........................... 20

           2.    Plaintiffs Have Not Adequately Alleged Increased
                  Competition Resulting in Presumptive Injury ................. 23

           3.    Plaintiffs' Have Not Adequately Alleged Causation
                  or Redressability ....................................................... 31

4.      Plaintiffs Fail To Identify Error in the District
Court's Judgment ....................................................................34

C.      Plaintiffs Fail To Establish Procedural Injury ............................39

CONCLUSION........................................................................................44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Adams v. Watson,*
    10 F.3d 915 (1st Cir. 1993) ..............................................................................23, 30

*Air Excursions LLC v. Yellen,*
    66 F.4th 272 (D.C. Cir. 2023)................................................15, 22, 23, 29, 31, 34

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013) ...............................................................................17, 23, 34

*American Bar Ass'n v. U.S. Dep't of Educ.,*
    370 F. Supp. 3d 1 (D.D.C. 2019)................................................................42, 43

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) .........................................................................................25

*Binno v. American Bar Ass'n,*
    826 F.3d 338 (6th Cir. 2016)............................................................................18

*Block Commc'ns, Inc. v. Federal Commc'ns Comm'n,*
    808 F. App'x 332 (6th Cir. 2020)..........................................................21, 31, 35

*California v. Texas,*
    141 S. Ct. 2104 (2021) .....................................................................................32

*Canadian Lumber Trade All. v. United States,*
    517 F.3d 1319 (Fed. Cir. 2008) ..................................................................24, 29

*Center for Biological Diversity v. Lueckel,*
    417 F.3d 532 (6th Cir. 2005).............................................................................33

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................18, 19, 31, 32, 38

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ........................................................................20

*DEK Energy Co. v. Federal Energy Regulatory Comm'n,*
  248 F.3d 1192 (D.C. Cir. 2001) ......................................................30

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ....................................................................38

*Department of Educ. v. Brown,*
  600 U.S. 551 (2023) ..................................................................39, 41

*Dismas Charities, Inc. v. U.S. Dep't of Justice,*
  401 F.3d 666 (6th Cir. 2005)...........................................................21

*El Paso Nat. Gas Co. v. Federal Energy Regulatory Comm'n,*
  50 F.3d 23 (D.C. Cir. 1995) ............................................................22

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................40

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ........................................................................43

*Louisiana Energy & Power Auth. v. Federal Energy Regulatory Comm'n,*
  141 F.3d 364 (D.C. Cir. 1998) ........................................................21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ......................................16, 19, 20, 29, 33, 39, 41

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803).................................................... 19-20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ........................................................................42

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ......................................................30

iv

*Mobile Relay Assocs. v. Federal Commc'ns Comm'n,*
    457 F.3d 1 (D.C. Cir. 2006) .................................................................35

*National Family Farm Coal. v. U.S. EPA,*
    966 F.3d 893 (9th Cir. 2020)...............................................................40

*New World Radio, Inc. v. Federal Commc'ns Comm'n,*
    294 F.3d 164 (D.C. Cir. 2002) ............................................................24

*Parsons v. U.S. Dep't of Justice,*
    801 F.3d 701 (6th Cir. 2015)...............................................................41

*Patterson v. United HealthCare Ins. Co.,*
    76 F.4th 487 (6th Cir. 2023) ...............................................................28

*PSSI Glob. Servs., LLC v. Federal Commc'ns Comm'n,*
    983 F.3d 1 (D.C. Cir. 2020) .........................................................22, 35

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ...........................................21, 22, 29, 31

*Simon v. Eastern Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) .....................................................................32, 33, 34

*Southwestern Pa. Growth All. v. Browner,*
    144 F.3d 984 (6th Cir. 1998).........................................................30, 35

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ......................................................................18, 19

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ......................................................15, 18, 39, 40

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................19

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ..................................................................19, 20

*Turaani v. Wray*,
   988 F.3d 313 (6th Cir. 2021)..................................................................25

*U.S. Catholic Conference, In re*,
   885 F.2d 1020 (2d Cir. 1989)...............................................................21

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ...........................................................................38

**U.S. Constitution:**

Art. III, § 2, cl. 1...................................................................................18

**Statutes:**

Higher Education Act of 1965,
   20 U.S.C. § 1070 *et seq.* ....................................................................3
   20 U.S.C. § 1087a-1087j ....................................................................3
   20 U.S.C. § 1087e(b)(7)......................................................................4
   20 U.S.C. § 1087e(d)(1)(D)................................................................5
   20 U.S.C. § 1087e(e) ..........................................................................4
   20 U.S.C. § 1087e(e)(7).......................................................................4
   20 U.S.C. § 1087e(m)..........................................................................5
   20 U.S.C. § 1087e(m)(1)(A)................................................................5
   20 U.S.C. § 1087e(m)(3)(B)(i) ...........................................................6
   20 U.S.C. § 1098e................................................................................4
   20 U.S.C. § 1098e(b)(7)(B)..................................................................5
   20 U.S.C. § 1098e(e)(2)........................................................................5

Pub. L. No. 110-84, 121 Stat. 784 (2007)..................................................5

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

**Regulations:**

34 C.F.R. § 682.209 ...................................................................4

34 C.F.R. § 682.215(f) ...............................................................5

34 C.F.R. § 685.208 ...................................................................4

34 C.F.R. § 685.209 ...................................................................4

34 C.F.R. § 685.209(a)(6) ..........................................................5

34 C.F.R. § 685.209(c)(5) ..........................................................5

34 C.F.R. § 685.219(c) ...............................................................5

34 C.F.R. § 685.221(f) ...............................................................5

**Other Authorities:**

CFPB, *CFPB Spotlights Borrower Complaints About Student Loan Servicers Mishandling Public Service Loan Forgiveness Program* (June 22, 2017), https://perma.cc/5LVB-88VN .................................7

CFPB, *Staying on Track While Giving Back:  The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* (June 22, 2017), https://perma.cc/2ZCC-5777 ....................................6

Fed. Student Aid, *Combined Public Service Loan Forgiveness (PSLF) Form Report* (June 2023), https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data ....................................................6

Fed. Student Aid, *Payment Count Adjustments Toward Income-Driven Repayment and Public Service Loan Forgiveness Programs*, https://perma.cc/L4LT-FS5L ....................................................26

Fed. Student Aid, U.S. Dep't of Educ., *Federal Student Loan Portfolio*, https://perma.cc/2UKS-TSHY ...................................................4

GAO, GAO-22-103720, *Federal Student Aid: Education Needs To Take Steps To Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness* (2022) ............................................................................8, 9

Mackinac Ctr. for Pub. Policy, *Careers at the Mackinac Center*, https://perma.cc/M8MV-QT75 ............................................................28

Nat'l Pub. Radio, *Exclusive: How the Most Affordable Student Loan Program Failed Low-Income Borrowers* (Apr. 1, 2022), https://perma.cc/6AXA-ZH3M............................................................8

*Navient Multi-State Settlement*, https://perma.cc/2GNJ-P8GN (Jan. 13, 2022) ...................................................................................................7

Press Release, U.S. Dep't of Educ., Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans (July 14, 2023), https://perma.cc/N9ZE-BEJX......................................................12, 13, 26, 33

Press Release, U.S. Dep't of Educ., Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs (Apr. 19, 2022), https://perma.cc/9F2Z-8BKG ...................................10, 11, 12

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe that oral argument is necessary.  But appellees respectfully request leave to participate in oral argument if this Court determines that it would facilitate consideration of the issues.

**INTRODUCTION**

To aid students in accessing higher education without crippling their financial futures, Congress has created several income-driven repayment (IDR) plans that tie monthly payments on federal student loans to the borrower's income and guarantee that any outstanding loan balance will be forgiven after 20 or 25 years' worth of payments.  Congress further created the Public Service Loan Forgiveness program (PSLF) to provide for loan forgiveness after 10 years if the borrower makes monthly payments while employed in a public-service job.  Several investigations and audits found that students participating in these programs were not obtaining the loan forgiveness to which they were statutorily entitled because of improper recordkeeping and abusive practices by loan servicers.

To address the historical failures in the administration of these important programs, the Department of Education decided to take a series of actions collectively referred to as the "Account Adjustment."  One aspect of the Account Adjustment targets relief to borrowers most likely to have been kept unlawfully (and sometimes without their knowledge) in long-term forbearances—periods during which borrowers are not making progress toward forgiveness and their loan balances are actually increasing, even

when the borrower's monthly payments under an IDR plan could have been as low as $0. To remedy the effects of this abusive practice, the Department decided to adjust the loan accounts of borrowers who were put into forbearance for periods exceeding 12 months consecutively or 36 months cumulatively, levels that violate federal regulations and servicer contracts. This adjustment counts months spent in such excessive forbearance periods as payments toward forgiveness, but it does not affect the requirement for PSLF that all qualifying payments must be made while the borrower is employed at a public service organization. Accordingly, it remains the case that no PSLF participant can receive loan forgiveness under that program unless she has worked full-time in a qualifying public-service job for at least 120 months (10 years).

Plaintiffs, two non-profit organizations, contend that this aspect of the Account Adjustment is unlawful. The district court dismissed their complaint *sua sponte*, holding that plaintiffs suffer no concrete harm from the Department's efforts to address failings in the administration of its programs and to ensure that borrowers receive the loan forgiveness to which they are statutorily entitled. This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  Compl., RE 1, PageID#4.  The district court dismissed plaintiffs' complaint for lack of jurisdiction on August 14, 2023.  Judgment, RE 14, PageID#96; Order, RE 13, PageID#94.  A timely notice of appeal was filed on August 15.  RE 15, PageID#97.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether two non-profit organizations have standing to challenge an administrative adjustment to the accounts of student-loan borrowers participating in loan forgiveness programs.

## STATEMENT OF THE CASE

### A.    Income-Driven Repayment and Public Service Loan Forgiveness

**1.**  The Department of Education administers federal student financial aid programs under Title IV of the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1070 *et seq*.  Those programs include the William D. Ford Federal Direct Loan Program (Direct Loans), *id.* §§ 1087a-1087j, under which the federal government lends money directly to student borrowers.  More than 43 million borrowers have outstanding loans under federal student loan

3

programs, and their debts total roughly $1.63 trillion.  Fed. Student Aid, U.S. Dep't of Educ., *Federal Student Loan Portfolio*, https://perma.cc/2UKS-TSHY.

The Direct Loan program provides a variety of repayment plan options that dictate the schedule, overall number, and dollar amount of loan payments.  *See* 20 U.S.C. §§ 1087e(e)(7), 1098e(b)(7); 34 C.F.R. §§ 682.209, 685.208, 685.209.  The default option, known as the Standard Repayment Plan, sets a fixed monthly payment calculated to repay the loan over a 10-year period.  But for borrowers with large loan balances, particularly those with modest salaries, the monthly payments required for full repayment on this timescale can be unaffordable.

To address this problem, Congress has created various IDR plans that tie monthly payments to a percentage of the borrower's disposable income.  *See* 20 U.S.C. §§ 1087e(e), 1098e; 34 C.F.R. §§ 685.208, 685.209.  (Although these plans have differing eligibility criteria and terms, those distinctions are not relevant for present purposes.)  For some low-income borrowers, the required monthly payment may be as low as $0.  Because these lower monthly payments may be insufficient to pay off the outstanding balance, even over several decades, Congress provided that any outstanding loan

balance will be forgiven after an extended period of time, typically 20 or 25 years. *See* 20 U.S.C. § 1098e(b)(7)(B), (e)(2); *id.* § 1087e(d)(1)(D); 34 C.F.R. § 685.209(a)(6), (c)(5); *id.* §§ 682.215(f), 685.221(f).

Another option for student loan borrowers is the PSLF program created in 2007. Pub. L. No. 110-84, 121 Stat. 784 (2007); 20 U.S.C. § 1087e(m). Under this program, a borrower with Direct Loans will receive loan forgiveness if the borrower: (1) has made 120 monthly payments on an eligible loan after October 1, 2007, under designated repayment plans (including any IDR plan); (2) is employed in a public-service job at the time of loan forgiveness; and (3) was employed full-time in a public-service job at the time each of the 120 monthly payments was made. 20 U.S.C. § 1087e(m)(1)(A), (B); 34 C.F.R. § 685.219(c). Congress defined "public service" to include

> emergency management, government . . . , military service, public safety, law enforcement, public health . . . , public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a nonprofit organization), early childhood education . . . , public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services,

as well as work for non-profit organizations exempt from taxation under § 501(c)(3) of the Internal Revenue Code.  20 U.S.C. § 1087e(m)(3)(B)(i).  The Consumer Financial Protection Bureau (CFPB) has estimated that "1-in-4 U.S. workers were employed by a 'public service organization,'" as defined in Department regulations implementing this provision.  CFPB, *Staying on Track While Giving Back:  The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* 1 (June 22, 2017), https://perma.cc/2ZCC-5777.  Approximately two-thirds of borrowers receiving PSLF forgiveness over the past three years were government employees.  *See* Fed. Student Aid, *Combined Public Service Loan Forgiveness (PSLF) Form Report* (June 2023), https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data.

In general, any month in which a borrower makes the required payment (including an approved IDR payment of $0) counts toward forgiveness under these programs, as does any month in which a borrower is granted an economic hardship deferment.  But months do not count toward forgiveness where the borrower fails to make a required payment, receives a deferment for a reason other than economic hardship, or is placed in forbearance—a temporary, discretionary cessation of payments.

**2.**  Widespread and well-documented problems with the administration of these programs have hampered borrowers' ability to obtain the loan forgiveness to which they are statutorily entitled.  For example, in June 2017—four months before the first discharges could have occurred under the PSLF program—the CFPB issued a report describing "industry practices that delay or deny access to promised loan forgiveness, forcing some to forfeit months or years of qualifying service," and that "add hundreds or thousands of dollars to the total cost of borrowers' student debt."  CFPB, *CFPB Spotlights Borrower Complaints About Student Loan Servicers Mishandling Public Service Loan Forgiveness Program* (June 22, 2017), https://perma.cc/5LVB-88VN.  That same year, the CFPB sued Navient, then the nation's largest student-loan servicer, over abusive practices including, as relevant here, "steering of borrowers" into forbearance rather than income-based repayment plans.  Complaint ¶¶ 26-54, *CFPB v. Navient Corp.*, No. 3:17-cv-101 (M.D. Pa. Jan. 18, 2017), Dkt. No. 1.[1]

---

[1] Thirty-nine State Attorneys General also sued Navient and made similar "allegations of widespread unfair and deceptive loan servicing practices."  *Navient Multi-State Settlement*, https://perma.cc/2GNJ-P8GN (Jan. 13, 2022).  Those lawsuits were resolved in a large-scale settlement that requires Navient to provide information about IDR and PSLF before placing borrowers into forbearance.  *Id.*

Other investigations similarly revealed systemic problems, including the failure of some loan servicers to track properly borrowers' payment history. *See, e.g.*, Nat'l Pub. Radio, *Exclusive: How the Most Affordable Student Loan Program Failed Low-Income Borrowers* (Apr. 1, 2022), https://perma.cc/6AXA-ZH3M. The lack of adequate records meant that some borrowers could exceed 20-25 years' worth of qualifying IDR payments without receiving loan forgiveness. Another problem was that loan servicers applied inconsistent standards when it came to counting qualifying payments. For example, "if a monthly payment of $100.01 is owed but a borrower pays just $100," three servicers would count that as a qualifying payment, but four others would not. *Id.*

In March 2022, the United States Government Accountability Office (GAO) released the results of a two-and-a-half-year audit of Department data on loan repayment under IDR plans. GAO, GAO-22-103720, *Federal Student Aid: Education Needs To Take Steps To Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness* (2022). GAO found that, as of June 2021, *only 157 loans* repaid under IDR plans had been forgiven, out of approximately 70,300 loans that had been in repayment long enough to potentially qualify for forgiveness. *Id.* at 11. The overwhelming majority of

8

these loans—approximately 62,600—were not eligible for forgiveness because they had spent too many months in non-qualifying statuses, including forbearance. *Id.* Half of these had "at least 7 years' worth of non-qualifying months." *Id.* at 19. The remaining 7,700 loans potentially had enough qualifying payments to earn forgiveness. *Id.* at 10. But GAO could not conclusively determine why these loans were not forgiven due to gaps in the Department's data resulting from loan servicers' failures to track accurately all qualifying payments made by borrowers. *Id.* at 12; *see also id.* (noting that approved monthly payments of $0 were not consistently counted as qualifying payments).

GAO concluded that, because of these various issues, "an increasing number of loans may be at risk of delayed or missed IDR loan forgiveness." GAO, *supra*, at 15. It recommended that the Department "develop and implement procedures to identify loans that are at higher risk of having payment tracking errors" that thwart borrowers' eligibility for IDR forgiveness and take corrective action "to ensure that eligible borrowers with such loans receive timely forgiveness." *Id.* at 23.

**3.** On April 19, 2022, the Department announced that it would take multi-faceted action to "addres[s] historical failures in the administration of

9

the federal student loan programs" "that effectively denied the promise of loan forgiveness" made to borrowers by the HEA. Press Release, U.S. Dep't of Educ., Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs (Apr. 19, 2022), https://perma.cc/9F2Z-8BKG (April Press Release).

*First*, the Department would act to end forbearance steering—the practice by loan servicers of guiding or placing "borrowers into forbearance in violation of Department rules, even when their monthly payment under an IDR plan could have been as low as zero dollars." April Press Release. Borrowers subjected to this practice (or not given sufficient information to make an informed choice) not only "miss out on critical progress" toward forgiveness, but also may "see their loan balance and monthly payments grow due to interest capitalization." *Id.* Noting that regulations and servicer contracts prohibit forbearances exceeding 12 months consecutively or 36 months cumulatively, the Department decided to apply a targeted one-time account adjustment that would count such periods "toward forgiveness under

IDR and PSLF." *Id.*[2]  It also announced measures to prevent servicers from engaging in these practices in future.  *Id.*

*Second*, the Department would act to address "significant flaws" in payment-tracking procedures that also caused borrowers to "mis[s] out on progress" toward forgiveness.  April Press Release.  "[T]o correct for data problems and past implementation inaccuracies," the Department would conduct a one-time account adjustment to count toward forgiveness any month in which a borrower was in repayment status, regardless of the amount paid, the payment plan, or whether the borrower later consolidated her loans.  Because the available data systems could not distinguish between eligible and ineligible deferments prior to 2013, the Department would also count months spent in deferment (except in-school deferment) before 2013. And to ensure that these problems did not recur, the Department announced actions to fix payment tracking permanently going forward.  *Id.*

Overall, the Department estimated that adopting these measures would make approximately 40,000 borrowers eligible for immediate discharge under PSLF and thousands of others eligible for discharge under

---

[2] Borrowers who were placed in shorter periods of forbearance would be able to seek account review by filing a complaint with the Federal Student Aid Ombudsman.

IDR.  April Press Release.  Some 3.6 million borrowers would receive at least

three years of additional credit toward IDR forgiveness (and PSLF

forgiveness, for those who had qualifying employment).  *Id.*

4.  No changes to borrower loan status were made, however, until the

Under Secretary of Education later memorialized his direction to take the

actions described in the press release (collectively, the Account Adjustment).

On July 14, 2023, the Department provided an update to borrowers on the

"implementation of the payment count adjustment."  Press Release, U.S.

Dep't of Educ., Biden-Harris Administration to Provide 804,000 Borrowers

with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to

Income Driven Repayment Plans (July 14, 2023), https://perma.cc/N9ZE-

BEJX (July Press Release).  The Department announced that it would begin

notifying 804,000 borrowers that they reached eligibility for discharge

through IDR by virtue of having reached either 20 or 25 years of repayment

on their loans.  *Id.*  The press release further noted that the Department had

already discharged loans for borrowers who became eligible for forgiveness

through the PSLF program as a result of the one-time adjustment.

Borrowers who have not yet reached the threshold for possible loan

forgiveness will have the one-time account adjustment applied to their

payment histories over the coming months, ending in 2024.  *Id.*  Significantly, the Department noted that borrowers are provided notice 30 days before any loan is discharged and that any borrowers "who wish to opt out of the discharge for any reason" may do so.  *Id.*

### B.    Factual Background

Plaintiffs are non-profit organizations exempt from taxation under § 501(c)(3) of the Internal Revenue Code and are therefore qualified employers under PSLF.  Compl., RE 1, PageID#11.  They allege that they "have previously employed, and currently employ, borrowers who participate, may become eligible to participate, or have previously participated in the statutory PSLF program" and "expect to recruit other such employees in the future."  *Id.*

Plaintiffs filed suit in August 2023 to challenge only the component of the Account Adjustment that would count months spent in long-term forbearance as payments toward forgiveness.  They assert that this action will reduce the incentive borrowers have to work in public service, which will "depriv[e]" plaintiffs "of the full statutory benefit to which they are entitled under PSLF" and make it more difficult for them to recruit and retain employees.  Compl., RE 1, PageID#11-13.  Plaintiffs claim that counting

periods of excessive forbearance toward forgiveness violates the
Appropriations Clause of the Constitution, exceeds the Department's
statutory authority, and is substantively and procedurally deficient under the
Administrative Procedure Act.  *Id.*  PageID#15-20.  They seek to undo the
relief borrowers have received through the Account Adjustment by
requesting a judicial "order setting aside the cancellation of $39 billion in
debt to the extent such cancellation occurs before an injunction could issue,"
in addition to declaratory and injunctive relief.  *Id.* PageID#21.

### C.    Prior Proceedings

Plaintiffs filed a motion for a temporary restraining order and
preliminary injunction, seeking to prevent the Department from
implementing the long-term forbearance aspect of the Account Adjustment
and discharging any debt.  Mot. TRO, RE 7, PageID#39.  Before the
government could respond, the district court dismissed the complaint *sua
sponte* and denied the motion as moot.

The district court held that plaintiffs failed to demonstrate a concrete
injury in fact that was fairly traceable to the Department's conduct.  The
court observed that plaintiffs had posited two theories of injury: deprivation
of a procedural right and competitive harm.  For the procedural injury, the

14

court held that plaintiffs had failed to identify a "concrete interest" that was affected by the alleged deprivation of a right to comment, and that such a "procedural right *in vacuo*" is "insufficient to create Article III standing." Order, RE 13, PageID#89 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  For the competitive harm, the district court held that plaintiffs' "vague and conclusory statements that some 'undisclosed' number of borrowers will receive credit toward loan forgiveness" did not establish that the Account Adjustment "concretely increased their labor costs or decreased the effectiveness of their recruitment efforts."  *Id.*, PageID#92. Because plaintiffs "cannot show that the Adjustment results in 'an actual or imminent increase in competition,'" the district court held that they had not established standing based on competitive injury.  *Id.* (quoting *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023)).

Finally, the district court held that even if plaintiffs had established a cognizable injury, they had not demonstrated causation, "the second element for Article III standing."  Op., RE 13, PageID#94.  The court noted that borrowers were not required to participate in PSLF, to achieve PSLF forgiveness through 10 years of consecutive public service employment, to remain employed by any specific eligible employer, or even to receive loan

forgiveness as a result of the Account Adjustment.  Because "the Adjustment does no more" than offer borrowers "the option" of having certain periods of forbearance counted "toward their own forgiveness timelines," any injury would be "fairly traceable to the decisions of individual borrowers," not any action by the Department.  *Id.*

## SUMMARY OF ARGUMENT

The district court correctly concluded that plaintiffs lack Article III standing to challenge the Account Adjustment.  Standing is "substantially more difficult to establish" when the party bringing suit "is not himself the object of the government action or inaction he challenges."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).  And a party generally lacks standing to challenge the government's provision of a benefit to a third party.  Because plaintiffs do not have a personal stake in the loan balances of student borrowers, they attempt to establish standing by invoking doctrines of competitor standing and procedural injury.

Plaintiffs lack competitor standing because they cannot establish that the Account Adjustment will result in any increase in competition that would be presumed, under normal economic logic, to cause them harm.  The types of agency action commonly recognized as inflicting competitive injury—for

example, allowing a new participant into a market or lifting regulatory restrictions on an existing participant—operate directly on a litigant's competitors.  Here, the Account Adjustment operates solely on independent third parties.

Moreover, plaintiffs do not allege specific, concrete facts establishing that the Account Adjustment will increase competition against public-service employers in the national labor market or otherwise impair these employers' ability to recruit and retain employees.  Nor do plaintiffs establish that, even if some public-service employers were harmed, plaintiffs specifically would be among the injured.  A speculative chain of possibilities relying on the decisions of independent third parties cannot establish injury in fact or causation as a general matter, and the Supreme Court has expressly rejected a "boundless theory of standing" that would allow a litigant to sue any time something unlawful benefited the litigant's competitor. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).

Having failed to demonstrate concrete injury to a cognizable interest, plaintiffs also lack standing to pursue a claim of procedural injury. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to

create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

## STANDARD OF REVIEW

A district court's determination of Article III standing is reviewed de novo. *Binno v. American Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' COMPLAINT FOR LACK OF STANDING

### A. Standing Requires a Litigant To Demonstrate a Personal Stake in the Case

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[N]o principle is more fundamental to the judiciary's proper role in our system of government" than this jurisdictional limitation. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

"One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper*, 568 U.S. at 408 (quotation marks omitted). To demonstrate standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The

18

party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The injury-in-fact requirement "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted). The alleged injury must represent an "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Defenders of Wildlife*, 504 U.S. at 560). A "'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* at 340. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 339. And to show an "actual or imminent" injury, "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (cleaned up). Rather, a plaintiff relying on an injury that has not yet occurred must demonstrate that "the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).

Requiring a plaintiff to demonstrate a personal stake in the case "ensures that federal courts decide only 'the rights of individuals.'" *TransUnion*, 141 S. Ct. at 2203 (quoting *Marbury v. Madison*, 5 U.S. (1

Cranch) 137, 170 (1803)).  Under our system of limited and separated

government, federal courts "do not possess a roving commission to publicly

opine on every legal question" and they "do not exercise general legal

oversight of the Legislative and Executive Branches."  *Id.*  Rather, a federal

court may only exercise jurisdiction to resolve "a real controversy with real

impact on real persons."  *Id.*

These principles mean that standing is "substantially more difficult to

establish" when the party bringing suit "is not himself the object of the

government action or inaction he challenges."  *Defenders of Wildlife*, 504

U.S. at 562 (quotation marks omitted).  And a party generally lacks standing

to challenge the government's provision of benefits to a third party.  *See, e.g.*,

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-46 (2006).  Because

plaintiffs do not have a personal stake in the loan balances of student

borrowers, they attempt to establish standing by invoking doctrines of

competitor standing and procedural injury.  They fail on both counts.

## B.     Plaintiffs Cannot Establish Competitor Standing

### 1.     The Competitor Standing Doctrine Applies When a Challenged Action Increases Competition

The competitor-standing doctrine traces back to the efforts of national

banks to expand into new business areas like data processing and travel

services. *See In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). "The Supreme Court held that the organizations from which the banks sought to take away business—that is, with whom they sought to compete—had standing to challenge the banks' expansion into non-banking functions." *Id.* (collecting cases). Regardless of the particular context, though, the doctrine plays the same role, recognizing that market players "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them. *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (quoting *Louisiana Energy & Power Auth. v. Federal Energy Regulatory Comm'n*, 141 F.3d 364, 367 (D.C. Cir. 1998)); *see also Block Commc'ns, Inc. v. Federal Commc'ns Comm'n*, 808 F. App'x 332, 336 (6th Cir. 2020) (quoting the same standard); *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 677 (6th Cir. 2005) (noting that competitor standing arises "[w]hen a regulatory agency permits a regulated party to do something previously prohibited").

In this way, competitor standing is an application of well-established Article III principles, not a relaxation of them. Courts have accepted, as a matter of "economic logic," that increased competition causes harm to competitors in a given market, for example through lost business or

21

decreased profit.  *PSSI Glob. Servs., LLC v. Federal Commc'ns Comm'n*, 983 F.3d 1, 11 (D.C. Cir. 2020) (quotation marks omitted); *see Sherley*, 610 F.3d at 72 (stating that "increased competition almost surely injures a seller in one form or another").  For that reason, courts do not require a plaintiff facing increased competition to wait for the harm to materialize before challenging the government decision responsible for the increased competition.  *See El Paso Nat. Gas Co. v. Federal Energy Regulatory Comm'n*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competit[or] standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a plaintiff] to lose business, there is no need to wait for injury from specific transactions to claim standing.").  The doctrine of competitor standing "supplies the link between increased competition and tangible injury." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023).

Competitor standing does not, however, "supply the link between the challenged conduct and increased competition." *Air Excursions*, 66 F.4th at 281.  The Supreme Court has rejected "a boundless theory of standing" in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a

22

trademark, the awarding of a contract, a landlord-tenant arrangement, or so on." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013); *see also Air Excursions*, 66 F.4th at 280 ("[A] competitor's receipt of a windfall, whether monetary or otherwise, falls short of establishing that 'any specific harm' will result 'as a matter of economic logic.'").

Rather, a plaintiff must demonstrate that the challenged agency action presumptively inflicts competitive injury. It may do this by pointing to the nature of the challenged action itself—for example, one that "allows new entrants into a fixed regulated market," "lifts price controls on a firm's competitor," or "reimburses a firm's competitor for selling its product or service at discounted rates." *Air Excursions*, 66 F.4th at 280. Or, if the increase in competition is "not obvious, the plaintiff must plead [its] existence in his complaint with a fair degree of specificity." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993) (emphasis omitted); *see also Air Excursions*, 66 F.4th at 281.

### 2.   Plaintiffs Have Not Adequately Alleged Increased Competition Resulting in Presumptive Injury

The theory of plaintiffs' case is that, by adjusting the loan account of certain borrowers to count periods of excessive forbearance toward forgiveness, the Department has reduced an incentive for those borrowers to

work in public service, with the result that current and prospective employees who would otherwise desire such work will instead seek employment in the private sector, which will, in turn, make it make it more difficult and costly for plaintiffs to recruit and hire employees. It is, at a minimum, not obvious that the agency action challenged here will result in any increase in competition. In "garden variety competitor standing cases," *New World Radio, Inc. v. Federal Commc'ns Comm'n*, 294 F.3d 164, 172 (D.C. Cir. 2002), the connection is clear because the challenged action operates directly on a competitor in the relevant market. Here, by contrast, the Department's action operates on independent third parties, student loan borrowers, who do not compete with plaintiffs. None of the cases plaintiffs cite recognize competitive injury in such a scenario. The closest they come is *Canadian Lumber Trade Alliance v. United States*, but that case concerned the distribution of "duties imposed on Canadian goods" to an organizational "surrogat[e]" of the challenger's competitors that "aims to take away market share from Canadian" producers. 517 F.3d 1319, 1332, 1334 (Fed. Cir. 2008). There is no similar relationship between student loan borrowers and private-sector employers.

Accordingly, to take advantage of the competitive standing doctrine, plaintiffs would need to make clear through well-pleaded allegations that the Account Adjustment will subject them to an increase in competition.  Their allegations fail in several respects.

*First*, and most significantly, plaintiffs do not allege "specific, concrete facts," *Turaani v. Wray*, 988 F.3d 313, 318 (6th Cir. 2021), establishing that the Account Adjustment would subject public-service employers to a competitive harm in the labor market.  They assert that "the Department shortens by 36 months" the length of time that a participant in PSLF must work for a qualifying public-service employer, which reduces the "statutory benefit to which [employers] are entitled under PSLF."  Compl., RE 1, PageID#13.  This is "a legal conclusion couched as a factual allegation," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007), and it is inaccurate.  PSLF does not entitle an *employer* to anything; it entitles a *borrower* to loan forgiveness after satisfying the statutory requirements of making 120 payments on a qualifying repayment plan and being employed in a public-service job at the time each of those payments were made.  The Account Adjustment affects what counts as a payment but it does not change the PSLF requirement that the 120 payments must occur during periods of

eligible employment.  *See, e.g.*, July Press Release (explaining that any month counted for IDR "can also be counted toward PSLF if the borrower documents qualifying employment for that same period"); Fed. Student Aid, *Payment Count Adjustments Toward Income-Driven Repayment and Public Service Loan Forgiveness Programs*, https://perma.cc/L4LT-FS5L (explaining that time periods are "credited toward PSLF" only "where the borrower certifies public service employment").

No borrower whose time spent in long-term forbearance is counted as payment for purposes of PSLF could obtain loan forgiveness under that program without having worked in public service for (at least) 10 years. Thus, the Account Adjustment does not decrease the amount of public-service employment time required by statute.  What it does is prevent the failures of loan servicers to administer the program correctly from denying borrowers the relief to which they are entitled.  Public service employers are not harmed by the Department living up to its end of the statutory deal Congress offered to borrowers.

But even if plaintiffs were correct about how the credit toward forgiveness operated in practice, it is not plausible that accelerating loan forgiveness would cause any harm to public-service employers.  Rather,

common sense would suggest that the Account Adjustment would give them a competitive *advantage*. If borrowers know that they will receive the loan forgiveness that they are promised in a timely manner, and that their path to loan forgiveness will not be impeded by the poor recordkeeping or abusive practices of loan servicers, then PSLF will become a more attractive program than it is currently. In other words, borrowers will have a greater incentive to pursue public service work so that they can take advantage of its assured benefits. And if (as plaintiffs suggest) borrowers learn that they can actually achieve loan forgiveness in even less time than previously known—in seven years instead of 10—the incentive to participate in PSLF would only increase.

*Second*, plaintiffs fail to allege facts adequate to establish that any marginal change in the incentive for some borrowers to pursue public service employment would meaningfully affect eligible employers' ability to "recruit and retain college-educated employees." Compl., RE 1, PageID#13; *see* Op., RE 13, PageID#92 (observing that plaintiffs "do not say" how this alleged injury would come about). For example, plaintiffs do not allege what percentage of PSLF participants would see their payment counts adjusted by 36 months. *See* Op., RE 13, PageID#92 n.8 ("[O]nly some borrowers

27

affected by the Adjustment receive such a large credit.").  Nor do they allege

what subset of that group would be driven to make employment decisions

based on that change.  The decision to take, or leave, a job is influenced by

many factors.  Pay is one, but so too are location, lifestyle, and commitment

to the employer's mission.  *See, e.g.*, Mackinac Ctr. for Pub. Policy, *Careers at*

*the Mackinac Center*, https://perma.cc/M8MV-QT75  ("Above all, potential

candidates should possess a deep respect for human rights and receive

satisfaction from making a positive impact on society.").  The complaint's

allegations are insufficient to move the claim that all public service

employers—who make up one-quarter of the national labor market, *see*

*supra* p. 6—have been appreciably harmed by the Account Adjustment

"across the line from possible to plausible."  *Patterson v. United HealthCare*

*Ins. Co.*, 76 F.4th 487, 492 (6th Cir. 2023).

 *Third*, the complaint does not plausibly establish that, even if some

public service employers would be harmed, that plaintiffs specifically would

be among that group.  The complaint vaguely alleges that they "have

previously employed, and currently employ, borrowers who participate, may

become eligible to participate, or have previously participated in the

statutory PSLF program."  Compl., RE 1, PageID#11.  But it does not

specify what percentage of plaintiffs' workforce, if any, pursue PSLF (or even have student loans).  It does not state whether any current or future employees would have periods of excessive forbearance counted as payments toward forgiveness.  Nor does it explain how plaintiffs would ever obtain such knowledge.  *See* Order, RE 13, PageID#92 (explaining that plaintiffs "cannot" make such an allegation because "impacted borrowers are 'undisclosed'").  "[T]he 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  *Defenders of Wildlife*, 504 U.S. at 563.

Similarly, plaintiffs' allegations do not establish that they actually participate in any specific market where competition is increased.  "To invoke competitor standing," a litigant must demonstrate both that increased competition "will almost certainly cause an injury in fact to any competitor in the relevant market" and that the litigant "is in fact a *direct* and *current* competitor *in that market*."  *Air Excursions*, 66 F.4th at 279-80 (last emphasis added) (quotation marks omitted).  Thus, courts in competitor standing cases focus on the level of competition in the particular market in which the participants operate.  *See, e.g.*, *Sherley*, 610 F.3d at 72-73 (National Institute of Health research grants); *Canadian Lumber*, 517 F.3d at 1334

29

("hard red spring wheat" industry); *Southwestern Pa. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998) (geographic area containing businesses in eastern Ohio and their "neighbors" in southwestern Pennsylvania); *Adams*, 10 F.3d at 919 ("the Massachusetts milk market"); *see also Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014) ("Having concluded individuals competing in the herder labor market have standing to challenge the [agency action], we need only determine whether any of the plaintiffs in this action is a member of that market.").  Here, plaintiffs allege only that they "compete in the labor market" with "employers in the private sector" "to recruit and retain college-educated employees for staff positions." Compl., RE 1, PageID#11-12.  These conclusory allegations do not establish that plaintiffs, two think tanks located in Midland, Michigan, and Washington, D.C., in fact compete in the same nationwide labor market for all of their staff positions with all private-sector employers.  None of the cases they rely on suggests that a corporate plaintiff has standing simply because the government did something that might affect another entity somewhere in the country that also hires employees.  *Cf. DEK Energy Co. v. Federal Energy Regulatory Comm'n*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (holding that a supplier of natural gas in Northern California did not have

30

competitor standing to challenge an agency decision regarding the sale of natural gas in Oregon).

In the end, plaintiffs offer nothing more than a "speculative chain of possibilities," *Clapper*, 568 U.S. at 414, that they might be harmed by the Department's decision to adjust the loan accounts of certain borrowers subjected to long-term forbearances. Such speculation cannot establish competitor standing. *See Sherley*, 610 F.3d at 73 (emphasizing that "the basic requirement common to all [such] cases" is that the allegedly unlawful competitive benefit must "almost certainly cause an injury in fact"); *Block Commc'ns*, 808 F. App'x at 337 (rejecting competitor standing where "[a]ll the potential injuries" were "speculative and unsupported by specific facts"). "To hold otherwise would vitiate Article III's case or controversy requirement and permit a business to superintend its industry's regulatory scheme"—or, here, the government's student-loan programs—"even if the agency action at issue threatens the business with only highly attenuated or wholly speculative consequences." *Air Excursions*, 66 F.4th at 281.

### 3.    Plaintiffs' Have Not Adequately Alleged Causation or Redressability

As the district court recognized, plaintiffs cannot invoke competitor standing for the additional reason that "there is no causation sufficient for

Article III standing" on this theory. Op., RE 13, PageID#93. To satisfy the second element of standing, plaintiffs must establish that their claimed injury is "'fairly traceable' to the 'allegedly unlawful conduct' of which they complain." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021). The theory of the complaint is that, by counting periods of excessive forbearance toward loan forgiveness, the Department has made it less likely that borrowers will choose to work for plaintiffs. But the Supreme Court has repeatedly rejected "standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414.

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), demonstrates why causation is lacking here. In that case, low-income individuals and organizations representing their interests challenged a revenue ruling that allowed favorable tax treatment to a non-profit hospital that offered only emergency-room services to indigent patients. *Id.* at 32-34. They alleged that the revenue ruling "had 'encouraged' hospitals to deny services to indigents." *Id.* at 42. The Supreme Court held that the challengers did not have standing because it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to

32

petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42-43.

So too here. To the extent that plaintiffs are harmed when borrowers who receive credit toward forgiveness decline to pursue employment with them, that harm results from "the decisions of individual borrowers, independent third parties to this case." Order, RE 13, PageID#94. Even if it were plausibly alleged that the Account Adjustment "encouraged" the borrowers to seek private-sector employment, that would be insufficient to establish causation under *Simon*. And as the district court observed, causation is further attenuated here because it is up to the borrowers themselves whether to receive forgiveness as a result of the adjusted payment count. *See id.*; *see also* July Press Release.

For substantially the same reasons, plaintiffs cannot establish that their competitive injury is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560-61 (quotation marks omitted); *Center for Biological Diversity v. Lueckel*, 417 F.3d 532, 538 (6th Cir. 2005) (explaining that causation and redressability are "[c]losely related"). If any harm to plaintiffs resulting from borrowers' employment decisions are not fairly traceable to the

Department, there is little reason to expect relief against the Department would alleviate that harm. "[I]t is just as plausible" that current or prospective employees whose payment counts are adjusted would remain as dedicated to public service as they were before. *Simon*, 426 U.S. at 43. But to the extent that borrowers are less interested in pursuing an employment relationship with the specific entities that prevented them from obtaining timely loan forgiveness, it is conceivable that awarding plaintiffs the relief they request might bring about the very harm they seek to avoid.

### 4. Plaintiffs Fail To Identify Error in the District Court's Judgment

Plaintiffs first argue (Br. 12-16) that competitor standing exists whenever a litigant suffers "economic disadvantage." This is precisely the same "boundless theory of standing" that the Supreme Court rejected in *Already*. 568 U.S. at 99. The Court made clear that competitive injury must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Id.* Consistent with this approach, courts have recognized that "agency action does not confer competitor standing if it merely create[s] a skewed playing field by, for example, providing a windfall to a competitor." *Air Excursions*, 66 F.4th at 280 (alteration in original) (quotation marks and citation omitted);

34

*see also PSSI Glob. Servs.*, 983 F.3d at 11; *Mobile Relay Assocs. v. Federal Commc'ns Comm'n*, 457 F.3d 1, 13 (D.C. Cir. 2006).

Plaintiffs' reliance on this Court's decision in *Southwestern Pennsylvania Growth Alliance* is misplaced.  To the extent that decision can be read to endorse plaintiffs' overbroad theory of standing, it would not survive the Supreme Court's contrary ruling in *Already*.  But *Southwestern Pennsylvania Growth Alliance* also differs from this case in a fundamental respect—there, the challenged agency action lifted regulatory restrictions on Ohio businesses in competition with the Pennsylvania plaintiffs. *Southwestern Pa. Growth All.*, 144 F.3d at 988; *see Block Commc'ns*, 808 F. App'x at 336 (explaining that competitor standing "recognizes that plaintiffs suffer an economic injury when agencies lift regulatory restrictions on their competitors").  Here, the Department's one-time Account Adjustment had no effect on the regulatory landscape governing private-sector employers.

Plaintiffs next suggest (Br. 18-21) that they are harmed by the Account Adjustment in three specific ways.  They claim (Br. 18) that "the Adjustment unlawfully abridges PSLF's statutory 10-year payments requirement."  But as explained above, the challenged portion of the Account Adjustment affects only what is counted administratively as a payment.  It does not change the

PSLF requirement that the 120 payments must occur on eligible loans during the period of eligible employment.

Plaintiffs also claim (Br. 19) that they are injured because "the Adjustment takes individuals out of the pool of borrowers whom PSLF incentivizes to work for public service employers." But they do not allege that any of their employees left or demanded raises after receiving revised payment counts or that they have been unable to fill any existing vacancies. Nor have they established that affected borrowers leave public service altogether or that (even if they did) their numbers are significant enough to have a noticeable effect on the national labor market. That plaintiffs have employees who are not participating in PSLF demonstrates that they are able to hire without the benefit of the incentive they attribute to that program.

The third injury claimed by plaintiffs (Br. 19-21) is that "crediting forbearance toward IDR also reduces the incentives provided by PSLF by making IDR forgiveness relatively more attractive by comparison." This argument is truly remarkable. After arguing that adjusting the payment count of borrowers participating in PSLF causes plaintiffs injury, they now argue that offering the same relief to borrowers not participating in PSLF

36

also causes plaintiffs injury.  Plaintiffs' theory would give them standing whenever the Department does anything to make loan forgiveness more achievable for anyone, or for that matter, whenever any organization increases the benefits offered to its employees—anything that could conceivably make employment with plaintiffs less "attractive by comparison."

In any event, this argument fails on its own terms.  Borrowers who received credit toward forgiveness under IDR but not PSLF were individuals who chose not to work for a public service employer even though their loans would be discharged in only ten years instead of 20 or 25.  It is not plausible that plaintiffs are injured by the alleged reduction in an incentive that was insufficient in the first place.  To the extent these borrowers later become interested in pursuing public service employment for other reasons, nothing in the Department's action discourages them from doing so in any way.

Plaintiffs suggest (Br. 21-22) that, notwithstanding the diffuse and uncertain nature of the effects of the Account Adjustment on public service employers, they should be granted standing to challenge it because nobody else could do so.  Even if that premise were true (which they have not

demonstrated), the Supreme Court has made clear that the "assumption that if [a litigant] ha[s] no standing to sue, no one would have standing, is not a reason to find standing." *Clapper*, 568 U.S. at 420 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)).

Finally, plaintiffs argue (Br. 22-24) that their claimed injuries are properly traceable to the Department's action. Standing may take account of "the predictable effect of Government action on the decisions of third parties," but it may not "rest on mere speculation about the decisions of third parties." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *see also Clapper*, 568 U.S. at 414 (noting court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). Here, plaintiffs' theory of standing is that borrowers will be less interested in pursuing PSLF if the Department takes action to correct historical problems with the administration of the program and to ensure that borrowers receive the loan forgiveness to which they are entitled. For reasons already given, this theory falls on the latter end of the spectrum between predictable and speculative. That may explain why, out of

38

the million and a half eligible public service employers, only these two plaintiffs have challenged the Account Adjustment.

### C.    Plaintiffs Fail To Establish Procedural Injury

Plaintiffs claim in their complaint that the Department failed to comply with the Administrative Procedure Act when it adopted the Account Adjustment without following notice-and-comment procedures.  Compl., RE 1, PageID#20.  "[W]hen a statute affords a litigant 'a procedural right to protect his concrete interests,' the litigant may establish Article III jurisdiction without meeting the usual 'standards for redressability and immediacy.'"  *Department of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Defenders of Wildlife*, 504 U.S. at 572 n.7).  "Unlike redressability, however, the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  Thus, a litigant invoking a procedural injury is not "excused from demonstrating that it has a 'concrete interest that is affected by the deprivation' of the claimed right."  *Brown*, 600 U.S. at 562 (quoting *Summers*, 555 U.S. at 496).

As explained above, plaintiffs' complaint does not establish that they have suffered a cognizable injury in fact.  This shortcoming prevents them

39

from establishing standing to pursue their procedural claim just as it prevents them from establishing standing to pursue their other claims. *See Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

Plaintiffs' arguments to the contrary fail. They first contend that the "'concrete interest' requirement is not especially demanding" because it may be satisfied in environmental cases by harm to "an aesthetic or recreational interest in a particular place, or animal or plant species." Br. 25-27 (quoting *National Family Farm Coal. v. U.S. EPA*, 966 F.3d 893, 909 (9th Cir. 2020)). It is indeed well-established that "environmental plaintiffs adequately allege injury in fact when they aver that they use [an] affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). But it does not follow that the injury-in-fact analysis is relaxed in the procedural rights context. *See Summers*, 555 U.S. at 497. On the contrary, a litigant invoking a procedural injury must still demonstrate that she has "suffer[ed] a concrete injury as a

40

result of the disregarded procedural requirement." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 712 (6th Cir. 2015).

Plaintiffs next contend (Br. 27) that they have "an economic interest in recruiting a particular species of worker—here PSLF-eligible borrowers— and that Defendants' conduct impaired such interest." Their complaint, however, does not support the existence of any such interest. It says that plaintiffs "expect to recruit . . . such employees in the future." Compl., RE 1, PageID#11.[3] "Such 'some day' intentions" do not establish cognizable harm in environmental cases, *Lujan*, 504 U.S. at 564, or procedural injury cases, *Brown*, 600 U.S. at 562 (discussing *Summers*).

Nor have plaintiffs established that there is anything distinctive about PSLF-eligible employees that would support such an economic interest. They do not allege that such employees are more productive or that they can be paid less. Indeed, plaintiffs acknowledge (Br. 13 n.6) that they "typically" will not know whether someone participates in PSLF "until an employee

---

[3] The complaint in fact says that plaintiffs expect to recruit "borrowers who participate, may become eligible to participate, or have previously participated" in PSLF. RE 1, PageID#11. Or, as plaintiffs' presidents put it, plaintiffs allege an interest in recruiting "individuals who have federal student loans." *See* Goettler Decl., RE 1-1, PageID#24 (Cato Institute); Lehman Decl., RE 1-2, PageID#26 (same for Mackinac Center).

completes his or her 120-month payment-and-service requirement and seeks certification from current and former employers." As the reference to "former employers" makes clear, this may happen long after the employment relationship has ended.

Finally, plaintiffs rely on an out-of-circuit district court decision, *American Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1 (D.D.C. 2019), that, they contend (Br. 30), "found interest to challenge agency action that deprived a single public service employer of *all* PSLF benefits." The district court in that case did not analyze Article III standing but rather applied the zone-of-interests test to determine whether the employer there had a cause of action under the Administrative Procedure Act. *American Bar Ass'n*, 370 F. Supp. 3d at 18-19. In that context, the prudential zone-of-interests test "is not meant to be especially demanding"—"the benefit of any doubt goes to the plaintiff" in keeping with Congress's intent that judicial review of agency action is "presumptively" available. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). When assessing Article III standing, however, the presumption is reversed: "[i]t is to be presumed that a cause lies outside th[e] limited jurisdiction [of a federal court], and the burden of establishing the contrary rests upon the party

asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

The *American Bar Association* case actually undermines plaintiffs' contention (Br. 28) that they have a concrete interest "in receiving a statutorily granted financial subsidy." While the district court there did find the zone-of-interests test satisfied, it concluded that public service employers have "no legal obligations or rights under the PSLF statute." *American Bar Ass'n*, 370 F. Supp. 3d at 25.

43

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

*Of Counsel:*

TOBY MERRILL

DAWN N. ISON
*Deputy General Counsel*     *United States Attorney*

BRIAN SIEGEL
*Assistant General Counsel*

MICHAEL S. RAAB

*Department of Education*

*s/ Thomas Pulham*
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*
*thomas.pulham@usdoj.gov*

November 2023

44

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,502 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpdBT 14-point font, a proportionally spaced typeface.

*s/ Thomas Pulham*
Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.


*s/ Thomas Pulham*
Thomas Pulham

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government

designates the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| 1 | Complaint | 1-26 |
| 13 | Order | 78-95 |
| 14 | Judgment | 96 |
| 15 | Notice of Appeal | 97-99 |

**ADDENDUM**

# TABLE OF CONTENTS

20 U.S.C. § 1087e(m)...............................................................A1

**20 U.S.C. § 1087e(m)**

**§ 1087e. Terms and conditions of loans**

(m) Repayment plan for public service employees

(1) In general

The Secretary shall cancel the balance of interest and principal due, in accordance with paragraph (2), on any eligible Federal Direct Loan not in default for a borrower who—

(A) has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to any one or a combination of the following—

(i) payments under an income-based repayment plan under section 1098e of this title;

(ii) payments under a standard repayment plan under subsection (d)(1)(A), based on a 10-year repayment period;

(iii) monthly payments under a repayment plan under subsection (d)(1) or (g) of not less than the monthly amount calculated under subsection (d)(1)(A), based on a 10-year repayment period; or

(iv) payments under an income contingent repayment plan under subsection (d)(1)(D); and

(B)(i) is employed in a public service job at the time of such forgiveness; and

(ii) has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A).

(2) Loan cancellation amount

After the conclusion of the employment period described in paragraph (1), the Secretary shall cancel the obligation to repay the balance of principal and interest due as of the time of such cancellation, on the eligible Federal Direct Loans made to the borrower under this part.

(3) Definitions

In this subsection:

A1

(A) Eligible Federal Direct Loan

The term "eligible Federal Direct Loan" means a Federal Direct Stafford Loan, Federal Direct PLUS Loan, or Federal Direct Unsubsidized Stafford Loan, or a Federal Direct Consolidation Loan.

(B) Public service job

The term "public service job" means—

(i) a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title; or

(ii) teaching as a full-time faculty member at a Tribal College or University as defined in section 1059c(b) of this title and other faculty teaching in high-needs subject areas or areas of shortage (including nurse faculty, foreign language faculty, and part-time faculty at community colleges), as determined by the Secretary.

(4) Ineligibility for double benefits

No borrower may, for the same service, receive a reduction of loan obligations under both this subsection and section 1078-10, 1078-11, 1078-12, or 1087j of this title.