No. 23-1736

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

MACKINAC CENTER FOR PUBLIC POLICY AND CATO INSTITUTE,
*Plaintiffs-Appellants,*

v.

MIGUEL CARDONA, SECRETARY, U.S. DEPARTMENT OF EDUCATION, IN HIS
OFFICIAL CAPACITY, *ET AL.*,
*Defendants-Appellees.*

———————————

**On Appeal from the United States District Court
for the Eastern District of Michigan**
No. 1:23-cv-11906

———————————

**BRIEF OF AMICI CURIAE KENTUCKY EQUAL JUSTICE CENTER,
LEGAL AID SOCIETY OF CLEVELAND, MICHIGAN POVERTY LAW
PROGRAM, OHIO STATE LEGAL SERVICES ASSOCIATION, AND
TENNESSEE JUSTICE CENTER IN SUPPORT OF
DEFENDANTS-APPELLEES**

———————————

SETH E. MERMIN
   *Counsel of Record*
DAVID S. NAHMIAS
U.C. Berkeley Center for
Consumer Law & Economic Justice
308 Law Building
Berkeley, CA 94720-7200
(510) 643-3519
tmermin@law.berkeley.edu
dnahmias@law.berkeley.edu

PERSIS S. YU
R. T. WINSTON BERKMAN-BREEN
Student Borrower Protection Center
   (a fiscally sponsored project of
   the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
(202) 670-3871
persis@protectborrowers.org
winston@protectborrowers.org

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 26.1 and Sixth Circuit Rule 26.1, the undersigned counsel states that amici curiae Kentucky Equal Justice Center, Legal Aid Society of Cleveland, Michigan Poverty Law Program, Ohio State Legal Services Association, and Tennessee Justice Center have no parent corporations, and no publicly held corporation owns 10% or more of the stock of any of these organizations.

*/s/ David S. Nahmias*
David S. Nahmias

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF AMICI CURIAE ........................................................ 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT ........................................................ 4

I.    The Conventional Doctrines Of Article III Standing For Nonprofit Organizations Do Not Afford Plaintiffs Any Cognizable Theory Of Injury. ........................................................ 6

II.   Plaintiffs Cannot Plausibly Claim They Are Injured When They Can Point Only To Speculative Harms Caused By Unspecified Competitors In An Undefined Marketplace. ........................................................ 9

A.   Plaintiffs Have Failed to Define With Any Particularity the Labor Markets in Which They Claim to Compete for Employees. ........................................................ 10

B.   A Purported Future Harm to Plaintiffs' Staffing is Too Speculative to Confer a Competitive Injury. ........................................................ 15

C.   Plaintiffs' Claimed Competitive Injuries Are Not Traceable to the Account Adjustment Because They Rely on the Intervening Independent Actions of Individual Borrowers. ........................................................ 20

III.  Because Plaintiffs Cannot Adduce Any Cognizable Injury, Their Assertion Of Procedural Standing Also Fails. ........................................................ 26

CONCLUSION ........................................................ 28

CERTIFICATE OF COMPLIANCE ........................................................ 29

APPENDIX ........................................................ 30

CERTIFICATE OF SERVICE ........................................................ 33

# TABLE OF AUTHORITIES

## CASES

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ...................................................................... 10

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
389 F.3d 536 (6th Cir. 2004) ......................................................... 6

*Am. Fed'n of Gov't Emps. v. Clinton*,
180 F.3d 727 (6th Cir. 1999) ........................................... 5, 16, 20

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .............................................. 18, 20

*AVX Corp. v. Presidio Components, Inc.*,
923 F.3d 1357 (Fed. Cir. 2019) ............................................ 9, 18

*California v. Texas*,
141 S. Ct. 2104 (2021) .................................................... 4, 21, 24

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) .................................................... 5

*Changizi v. Dep't of Health & Human Servs.*,
82 F.4th 492 (6th Cir. 2023) ............................................... 21, 24

*Citizens for Responsibility & Ethics in Wash. v. Trump*,
953 F.3d 178 (2d Cir. 2019) ....................................................... 11

*Clinton v. New York*,
524 U.S. 417 (1998) .................................................................... 10

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) .......................................... 8, 18

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023) ......................................................... 3, 4, 26

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ............................................................................ 7

*Fla. State Conf. of NAACP v. Lee*,
    576 F. Supp. 3d 974 (N.D. Fla. 2021) ............................................................. 7

*Friends of Tims Ford v. Tenn. Valley Auth.*,
    585 F.3d 955 (6th Cir. 2009) .................................................................... 8, 27

*Garcia v. Stewart*,
    531 F. Supp. 3d 194 (D.D.C. 2021) ............................................................. 13

*Gen. Elec. Co. v. United Tech. Corp.*,
    928 F.3d 1349 (Fed. Cir. 2019) ............................................................. 11, 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................................ 8

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*,
    927 F.3d 396 (6th Cir. 2019) ......................................................... 5, 18, 27

*Kardules v. City of Columbus*,
    95 F.3d 1335 (6th Cir. 1996) ...................................................................... 6

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ................................................................. 13

*Nat'l Family Farm Coal. v. EPA*,
    966 F.3d 893 (9th Cir. 2020) ...................................................................... 27

*Online Merchs. Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) ................................................................. 4, 6

*Owner-Operator Indep. Drivers Ass'n, Inc. v. DOT*,
    831 F.3d 961 (8th Cir. 2016) ...................................................................... 20

*PSSI Glob. Servs., L.L.C. v. FCC*,
    983 F.3d 1 (D.C. Cir. 2020) ................................................................. 10, 11

*Rice v. Vill. of Johnstown*,
    30 F.4th 584 (6th Cir. 2022) ......................................................................... 27

*Save Jobs USA v. DHS*,
    942 F.3d 504 (D.C. Cir. 2019) ............................................................. 11, 13

*Shelby Advocates for Valid Elections v. Hargett*,
    947 F.3d 977 (6th Cir. 2020) ........................................................................... 5

*Sorenson Commc'ns, LLC v. FCC*,
    897 F.3d 214 (D.C. Cir. 2018) .................................................................... 10

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................................... 2

*Students for Fair Admissions, Inc. v. President & Fellows*
    *of Harvard Coll.*,
    600 U.S. 181 (2023) .................................................................................... 2, 7

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................................... 4

*Sw. Pa. Growth All. v. Browner*,
    144 F.3d 984 (6th Cir. 1998) ........................................................................... 9

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................................................. 27

*Turaani v. Wray*,
    988 F.3d 313 (6th Cir. 2021) ....................................................................... 22

*Wash. All. of Tech. Workers v. DHS*,
    50 F.4th 164 (2022) ............................................................................... 12, 13

*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) ........................................................................... 8

*XY Planning Network, LLC v. SEC*,
    963 F.3d 244 (2d Cir. 2020) ........................................................................ 15

*Zynda v. Arwood*,
    175 F. Supp. 3d 791 (E.D. Mich. 2016) ........................................................ 7

## **STATUTES**

20 U.S.C. § 1087e(m)(1) ........................................................................ 19

## **REGULATIONS**

34 C.F.R. § 685.219(a) .......................................................................... 23

## **RULES**

Fed. R. App. P. 29(a) ............................................................................. 1

## **LEGISLATIVE MATERIALS**

H.R. Rep. No. 110-210 (2007) ............................................................... 19

## **OTHER AUTHORITIES**

Alvaro Mezza et al., *Student Loans and Homeownership*,
    38 J. Lab. Econ. 215 (2020) .......................................................... 25

Am. Bar Ass'n, *Wage Trends Over 20 Years* (2023) ............................................. 14

Bureau of Labor Statistics, *Nonprofit Pay and Benefits:*
    *Estimates from the National Compensation Survey* (2016) ........................ 14

Cato Inst., *About: 5 of 5 Job Opportunities* ............................................................. 12

Cato Inst., IRS Form 990 (2021) ............................................................. 8

CFPB, *Student Loan Servicing: Analysis of Public Input*
    *and Recommendations for Reform* (2015) ................................................ 16

Claire McAnaw Gallagher, Bureau of Labor Statistics, *For-Profit,*
    *Nonprofit, and Government Sector Jobs in 2022* (2023) ............................ 12

Daniel Bleemer et al., *Echoes of Rising Tuition in Students'*
    *Borrowing, Educational Attainment, and Homeownership*
    *in Post-Recession America*,
    122 J. Urban Econ. 1 (2021)........................................................... 25

Eddy S. Ng & Jasmine McGinnis Johnson, *Game of Loans:*
    *The Relationship Between Education Debt, Social*
    *Responsibility Concerns, and Making a Career Choice*
    *in the Public, Private, and Nonprofit Sectors*,
    Nonprofit & Voluntary Sector Q. 305 (2020) ....................... 14, 24

Fed. Student Aid, *Payment Count Adjustments Toward*
    *Income-Driven Repayment and Public Service Loan*
    *Forgiveness Programs* (2023)................................................. 18, 22

Jesse Rothstein & Cecilia Elena Rouse, *Constrained After*
    *College: Student Loans and Early Career Occupational*
    *Choices*,
    95 J. Pub. Econ. 149 (2011) ........................................................ 24

Keely Jones Stater & Mark Stater, *Is It "Just Work"? The Impact*
    *of Work Rewards on Job Satisfaction and Turnover Intent*
    *in the Nonprofit, For-Profit, and Public Sectors*,
    49 Am. Rev. of Pub. Admin. 495 (2019) .................................... 23

Kevin Lewis & Nicole Vanatko, Cong. Rsch. Serv.,
    *Federal and State Regulation of Student Loan Servicers:*
    *A Legal Overview* (2019) ........................................................... 17

Mackinac Ctr. for Pub. Policy, *Careers at the Mackinac Center*.................... 12, 15

Mackinac Ctr. for Pub. Policy, *Our Purpose* (2021)................................ 8

Mark Wiederspan, MHEC Policy Brief, *Understanding State*
    *Loan Forgiveness and Conditional Grant Programs* (2018)................ 23, 24

Matthias Benz, *Not for the Profit, but for the Satisfaction?—*
    *Evidence on Worker Well-Being in Non-Profit Firms*,
    58 Kyklos 155 (2005)............................................................ 13, 14

Melissa Emrey-Arras, *Gov't Accountability Office, Public Service Loan Forgiveness: Opportunities for Education to Improve Both the Program and Its Temporary Expanded Process* (2019) ............... 17

Memorandum to Navient CEO Jack Remondi (June 2010) ................................... 17

Press Release, U.S. Dep't of Educ., Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans (July 14, 2023) ................................... 15

Student Borrower Protection Ctr. & Am. Fed'n of Teachers, *Broken Promises: The Untold Failures of ACS Servicing* (2020) .......... 16, 17

The Nonprofit Alliance, Public Service Loan Forgiveness (PSLF) Program ........................................................................... 19

U.S. Dep't of Educ., Office of Inspector General, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance With Requirements For Servicing Federally Held Student Loans* (2019) ......................................................... 16

Wenhua Di & Kelly D. Edmiston, *Student Loan Relief Programs: Implications for Borrowers and the Federal Government*, 671 Annals of the Am. Academy of Pol. & Soc. Sci. 224 (2017) ................ 25

Young-joo Lee & Vicky Wilkins, *More Similarities or More Differences? Comparing Public and Nonprofit Managers' Job Motivations*, Pub. Admin. Rev. 45 (2011) ....................................................................... 13

## INTEREST OF AMICI CURIAE[1]

Amici curiae Kentucky Equal Justice Center, Legal Aid Society of Cleveland, Michigan Poverty Law Program, Ohio State Legal Services Association, and Tennessee Justice Center are nonprofit employers whose employees have held federal Direct Student Loans and have participated in various Income-Driven (IDR) Repayment plans offered by the Department of Education. Amici are qualified public service employers for the purposes of the Public Service Loan Forgiveness (PSLF) program. As nonprofit organizations, amici encourage their employees to seek PSLF because of the benefits that loan forgiveness provides to borrowers' long-term financial wellbeing. Amici also believe that PSLF and similar programs allow borrowers to stay in public service *after* forgiveness, and that programs like the Account Adjustment and PSLF promote the goals of public service and the lasting sustainability of nonprofit organizations. Because PSLF is a valuable tool for recruitment and long-term retention for amici, amici fundamentally disagree with Plaintiffs' characterization of PSLF as diminishing their competitive advantages as nonprofit employers.

Individual organizations' statements of interest are in the Appendix.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties consented to the filing of this brief. *Id.*

## SUMMARY OF ARGUMENT

Plaintiffs Mackinac Center for Public Policy and Cato Institute have brought a lawsuit to express their displeasure with the Department of Education's IDR Account Adjustment, an initiative that they disagree with but that causes them no concrete harm. Their effort therefore faces an insurmountable obstacle: because they are not injured by the Account Adjustment, they have no standing to bring this challenge. In an attempt to circumvent this fundamental flaw in their lawsuit, they have manufactured a speculative and attenuated legal theory that resembles a Rube Goldberg machine in the complexity of its endeavor to link cause and effect. That effort falls far short of the "irreducible constitutional minimum" required by Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

For an organizational plaintiff to establish standing, it generally must show direct injury to itself or its members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). But the Account Adjustment has no direct effect on Plaintiffs' budgets. Plaintiffs have no members. And the one directly affected constituency—their workforce—is *helped* by the Account Adjustment. Unable to succeed through the usual channels, Plaintiffs assert competitive injury as their principal claim. But the Account Adjustment has not injured them with respect to their competitors. The program benefits student borrowers, including employees of nonprofit organizations such as (at least

theoretically) Plaintiffs. Students and employees are not groups in competition with Plaintiffs. To argue, as Plaintiffs do, that they compete with for-profit enterprises for employees is a stretch, especially when they offer no support for that contention. To claim, as Plaintiffs do, that for-profit enterprises are somehow advantaged over nonprofits by the Account Adjustment, makes no sense.

Plaintiffs simply have no legal stake here. Whatever case or controversy may exist with respect to the Account Adjustment, it does not involve them. Plaintiffs cannot and do not identify an "actual or imminent, not conjectural or hypothetical" harm to their organizational recruitment and retention efforts—or any other aspect of their operations—that is "fairly traceable to" the Account Adjustment. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Instead, Plaintiffs urge a broad-based, undifferentiated interpretation of competitor standing that would permit litigants to proceed with a lawsuit even when they have failed to identify (1) a relevant competitive marketplace, (2) a tangible economic injury, and (3) a plausible connection between the challenged action and that (unidentified) injury. Plaintiffs posit that the Account Adjustment competitively disadvantages nonprofit organizations because properly crediting previously uncredited periods of service might mean borrowers working in public service complete their PSLF service sooner; by consequence, Plaintiffs reason, they will be injured because public servants will depart for the private sector as soon as their loans are forgiven.

This implausible and illogical scenario falls short of establishing the bedrock constitutional prerequisite of concrete, imminent harm. *See California v. Texas*, 141 S. Ct. 2104, 2119 (2021) (rejecting plaintiffs' "highly attenuated chain of possibilities").

Absent any showing of concrete injury, Plaintiffs' tagalong theory of procedural standing also falls well short of Article III's requirements. Without a concrete injury in fact, a plaintiff cannot establish procedural standing. *Brown*, 600 U.S. at 562.

No matter the theory of standing that Plaintiffs assert—organizational, competitor, or procedural—the factual foundation is just too flimsy to support it. The judgment of the district court should be affirmed.

## **ARGUMENT**

Absent a clear showing that the Department's actions caused an immediate and substantial threat of injury to Plaintiffs, those organizations lack standing to halt the Account Adjustment. *See Online Merchs. Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) (requiring "actual present harm or a significant possibility of future harm"). Irrespective of the type of standing that plaintiffs posit— organizational, associational, competitor, or procedural—they must still establish an imminent, concrete harm that is caused by the Department. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009); *Am. Fed'n of Gov't Emps. v.*

*Clinton*, 180 F.3d 727, 731-33 (6th Cir. 1999) (dismissing claims of individual, associational, and organizational standing for failure to meet the injury-in-fact and traceability elements); *see also Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (requiring that "the claim [be] not abstract or conjectural").

Plaintiffs' speculation about the indirect future effects of the Account Adjustment is insufficient to create an imminent injury in fact, which requires "certainly impending" harm or "a substantial risk that the harm will occur." *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 410 (6th Cir. 2019); *see also Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (rejecting plaintiffs' individual, associational, and organizational theories of injury because "[a]ll three theories share, at a minimum, an imminence problem"). The record in this case is devoid of evidence or even allegations that, because of the Account Adjustment, some current or prospective employees have had their student loans forgiven and subsequently opted for jobs in the private sector. *See* Pet'rs' Br. at 13-14; TRO Br., RE 7, PageID # 57-59; Compl., RE 1, PageID # 11-15. Nor can Plaintiffs draw a sufficient causal link between their hypothesized injury and the Department's Account Adjustment, which rests on a constellation of assumptions about the intervening actions of student loan borrowers. *See Kardules v. City of Columbus*, 95 F.3d 1335, 1353 (6th

Cir. 1996) ("Courts are powerless to confer standing when the causal link is too tenuous" or based on "a number of very speculative inferences and assumptions").

## I.    The Conventional Doctrines Of Article III Standing For Nonprofit Organizations Do Not Afford Plaintiffs Any Cognizable Theory Of Injury.

It is telling that Plaintiffs do not even raise the ordinary theories of standing that nonprofit organizations typically assert. They essentially concede that the usual modes of establishing organizational standing are not available to them in this case. *See Cameron*, 995 F.3d at 547 ("An association or organization may assert standing in one of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members"). Plaintiffs do not argue that the Account Adjustment palpably impacts them as borrowers—nor could they, since they do not hold student loans; rather, their current or prospective employees do, and those employees benefit from the Department's actions. Nor do Plaintiffs argue that they anticipate an economic injury from having to spend resources to boost their retention and recruitment efforts to compete with private sector employers because of the Account Adjustment. *See Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 547 (6th Cir. 2004) (organizational standing requires "injury to the organization's activities—with the consequent drain on the organization's resources . . . more than simply a setback to the organization's

abstract social interest"). A nonprofit organization asserting that theory could aver, for instance, that it was forced to increase employee salaries to stay competitive and boost hiring efforts to forestall a likely exodus of employees whose student loans were forgiven. *See, e.g.*, *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 982 (N.D. Fla. 2021) (finding organizational standing where plaintiff had to hire five new employees to conduct voter outreach and education about a disputed new law); *Zynda v. Arwood*, 175 F. Supp. 3d 791, 805 (E.D. Mich. 2016) (concluding that a legal aid organization diverted resources for standing purposes in part by hiring a new contract attorney to handle its increased caseload). Simply diverting resources to challenge a government action that conflicts with the organization's mission does not suffice. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) ("[O]rganizations cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all").

Alternatively, organizations often seek representational standing on behalf of individual members who would "otherwise have standing to sue in their right"; however, Plaintiffs are plainly not the kind of "voluntary membership organization[s] with identifiable members" that would support this theory. *Students for Fair Admissions*, 600 U.S. at 199-201. Nor does the fact that Plaintiffs employ borrowers who may pursue PSLF amount to "indicia of membership in an

organization" for associational standing purposes. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977). Comparisons to organizational plaintiffs like environmental organizations that assert associational standing, *see* Petr's' Br. at 26-28, only serve to highlight the weakness of Plaintiffs' claims of injury. Environmental organizations often seek standing on behalf of members who themselves may possess "an aesthetic or recreational interest" in a particular threatened area. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 968 (6th Cir. 2009). Yet they must establish the three "black-letter rules" for Article III standing *plus* the three additional elements of an associational standing claim. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018). By contrast, Plaintiffs are nonprofit think tanks dedicated to advancing principles of a deregulated economy and limited government.[2] They do not purport to represent anyone's interests but their own, and without concrete injury traceable to the Account Adjustment, they have no standing to bring this case. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156 (D.C. Cir. 2005) (affirming

---

[2] The Mackinac Center seeks to "advance[e] the principles of free markets and limited government." Mackinac Ctr. for Pub. Policy, *Our Purpose* (2021), https://perma.cc/Y4MB-2EL7. The Cato Institute seeks to promote "the principles of individual liberty, limited government, free markets, and peace." Cato Inst., IRS Form 990 (2021), https://perma.cc/N3GH-K2D9.

dismissal of plaintiffs' organizational challenge to Department of Education rules that "do no more than arguably offend their policy goals").

## II.     Plaintiffs Cannot Plausibly Claim They Are Injured When They Can Point Only To Speculative Harms Caused By Unspecified Competitors In An Undefined Marketplace.

Because Plaintiffs cannot rely on the typical theories of standing available to organizations, they instead invoke a peculiar interpretation of a less common theory: competitor standing. Yet ultimately that argument fares no better, because Plaintiffs still cannot show that an abstract economic disadvantage they might experience because of the Account Adjustment amounts to an "injury in fact directly caused by" the Department's action. *Sw. Pa. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998). Competitor standing is reserved for cases where "the challenged government action nonspeculatively threatened economic injury to the challenger by the ordinary operation of economic forces." *AVX Corp. v. Presidio Components, Inc.*, 923 F.3d 1357, 1364 (Fed. Cir. 2019). The Department's correction of monthly IDR payments and increased loan forgiveness for borrowers does not alter the ordinary economic forces at work for nonprofit employers. And even if the Account Adjustment did somehow affect the relevant labor market, there is no plausible way to "show an actual or imminent increase in competition [in that market] that will almost certainly cause an injury in fact" to nonprofit organizations like Plaintiffs. *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 226

9

(D.C. Cir. 2018). To establish that a government regulation disadvantages a plaintiff by conferring benefits on its competition requires much more than speculation that the regulation could conceivably have a detrimental impact on that plaintiff's participation in an undefined market. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (disavowing a "boundless theory of [competitor] standing"); *Clinton v. New York*, 524 U.S. 417, 433 (1998) (requiring a "*probable* economic injury resulting from governmental actions that alter competitive conditions" (emphasis added)).

### A. Plaintiffs Have Failed to Define With Any Particularity the Labor Markets in Which They Claim to Compete for Employees.

Plaintiffs cannot contend that the Account Adjustment causes them any economic disadvantage as public service employers when they have not even identified any private sector employers that directly compete against them in a "relevant market." *See PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020). Their hypothesis—that as nonprofits they directly compete for job applicants with unspecified private sector employers in an undefined geographic area—fails to satisfy the requirement that Plaintiffs show they are "direct and current competitor[s] whose bottom line may be adversely affected by" the Adjustment. *Id*. Since Plaintiffs do not specify a geographical market, they must establish that the Account Adjustment has "alter[ed] the status quo of the field of

competition" between private sector and nonprofit organizations nationwide. *Gen. Elec. Co. v. United Tech. Corp.*, 928 F.3d 1349, 1354 (Fed. Cir. 2019). Yet such a broad conception of the relevant marketplace lacks the geographic specificity and market differentiation needed to support a claim of lost labor market competitiveness. *See Citizens for Responsibility & Ethics in Wash. v. Trump*, 953 F.3d 178, 190 (2d Cir. 2019) (requiring plaintiffs to plausibly allege that they "personally compete in the same arena as the unlawfully benefited competitor"), *vacated on other grounds*, 141 S. Ct. 1262 (2021); *PSSI Glob. Servs.*, 983 F.3d at 11 (holding that "[i]f the competitors serve distinct geographic markets, the risk of harm is too speculative").

The wide-ranging assortment of jobs, skill sets, and rationales to enter public service makes it too difficult, and too speculative, to characterize the markets in which nonprofit employers might compete with for-profit employers for talent—at least for the purposes of establishing Article III standing. *See Save Jobs USA v. DHS*, 942 F.3d 504, 510 (D.C. Cir. 2019) (explaining that a "direct and current competitor" refers to "an existing market participant," not "a potential—and unduly speculative—participant"). Plaintiffs have not explained how they, as nonprofit think tanks, compete for talent with private sector employers in undefined industries nationwide on such a broad, undifferentiated level. The nonprofit and government sectors supply at least twenty percent of jobs in the U.S.

economy.[3] Public interest and public service organizations—the kind that qualify for PSLF—comprise everything from hospitals to universities, think tanks to churches, and government agencies to advocacy organizations. The jobs within those institutions also vary widely.[4] That variety is epitomized by the currently open positions at Plaintiffs' organizations, which include jobs for researchers, lobbyists, events and fundraising managers, and digital marketing managers.[5] Without greater specificity about the types of jobs at issue, it is nearly impossible to accurately draw conclusions about the markets in which Plaintiffs and for-profit enterprises allegedly compete.

Plaintiffs' sweeping conception of the "employment market," Pet'rs' Br. at 16, is therefore insufficient to establish a particularized competitive injury. A proper competitor standing analysis contemplates a precise delineation of the applicable labor market in order to establish that a government action like the Account Adjustment causes an "actual or imminent increase in competition." *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 176 (2022) (recognizing that

---

[3] Claire McAnaw Gallagher, Bureau of Labor Statistics, *For-Profit, Nonprofit, and Government Sector Jobs in 2022*, at tbl.2 (2023), https://perma.cc/M4Q3-7ADH.

[4] *See, e.g.*, *id.* at tbl.8 (comparing the occupational share of workers by nonprofit and for-profit status in various fields).

[5] *See* Cato Inst., *About: 5 of 5 Job Opportunities* (last visited Dec. 2, 2023), https://perma.cc/44G6-F5XW; Mackinac Ctr. for Pub. Policy, *Careers at the Mackinac Center* (last visited Dec. 2, 2023), https://perma.cc/4A7X-328V.

"workers may . . . suffer injury from an action that increases competition for jobs in *their* labor market" (emphasis added)). For this reason, courts have found competitor standing in the labor context where the market is narrowly defined to particular occupations, and the challengers have established an injury resulting from an "increased supply of labor," *Save Jobs*, 942 F.3d at 509, in those fields. *See, e.g.*, *Wash All.*, 50 F.4th at 176 (market for science, technology, engineering, and mathematics jobs); *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (market for open-range herding jobs); *Garcia v. Stewart*, 531 F. Supp. 3d 194, 207 (D.D.C. 2021) (market for seasonal agricultural jobs); Resp. Br. at 29-31. That standard is not satisfied by Plaintiffs' undifferentiated claim that the Account Adjustment will impact all sectors of jobs throughout the nation.

Moreover, public service jobs—like those that amici and Plaintiffs provide—are generally not interchangeable with private sector jobs, even when they demand similar skills. The intrinsic value of contributing to public service and mission-driven organizations drives employees to forgo perhaps higher-paying careers in the private sector.[6] Other personal and social benefits beyond salary

---

[6] Matthias Benz, *Not for the Profit, but for the Satisfaction?—Evidence on Worker Well-Being in Non-Profit Firms*, 58 Kyklos 155, 157-58, 173 (2005) (examining literature finding that "non-profit employees are willing to work for lower wages in exchange for the intrinsically valued qualities for their workplaces"); Young-joo Lee & Vicky Wilkins, *More Similarities or More Differences? Comparing Public and Nonprofit Managers' Job Motivations*, Pub. Admin. Rev. 45, 45-46, 53 (2011)

regularly motivate nonprofit employees to enter and stay in public service. These

employees also tend to have higher job satisfaction than their counterparts in the

private sector.[7] As a result, while a professional like a lawyer will likely earn less

in the nonprofit or government sectors than in private sector,[8] the greater personal

satisfaction and alignment between a person's personal and professional values

with the public service organization's mission often make up for the comparative

financial disadvantage due to lower wages.[9] This alignment of values and mission

may be particularly important for advocacy organizations like Plaintiffs, which

expressly seek job candidates who are "interested in helping improve their world"

---

(noting that "public and nonprofit employees are less likely to be motivated by extrinsic factors and more likely to be motivated by intrinsic rewards compared to workers in the for-profit sector").

[7] Eddy S. Ng & Jasmine McGinnis Johnson, *Game of Loans: The Relationship Between Education Debt, Social Responsibility Concerns, and Making a Career Choice in the Public, Private, and Nonprofit Sectors*, Nonprofit & Voluntary Sector Q. 305, 308 (2020); Benz, *supra* note 6, at 164.

[8] Am. Bar Ass'n, *Wage Trends Over 20 Years*, at "Public Service Lawyers" (2023), https://perma.cc/BNG3-8FE6 (finding that public service lawyers with eleven to fifteen years of legal experience earn less than half of entry-level lawyers in Big Law jobs); Bureau of Labor Statistics, *Nonprofit Pay and Benefits: Estimates from the National Compensation Survey* (2016), https://perma.cc/XM8Z-4VJK (findings that management, professional, and related workers at nonprofits earn $4.67 per hour less in pay and benefits).

[9] *See* Ng & McGinnis Johnson, *supra* note 7, at 296; Benz, *supra* note 6 at 165 (finding that "[a] higher job satisfaction for non-profit workers would . . . purely reflect non-monetary benefits from work").

and who "receive satisfaction from making a positive impact on society."[10]
Accordingly, to assert that they as nonprofit employers compete on a direct and
current level with private employers ignores the significant differences between the
two sectors. Absent any particularity in characterizing the labor market at issue,
Plaintiffs cannot contend that loan forgiveness caused by the Account Adjustment
would harm their competitive advantage in those markets across the board.

**B. A Purported Future Harm to Plaintiffs' Staffing is Too Speculative to Confer a Competitive Injury.**

Plaintiffs also fail to show that the Account Adjustment results in an
increase in labor market competition. *See XY Planning Network, LLC v. SEC*, 963
F.3d 244, 251 (2d Cir. 2020) ("The basic requirement of competitor standing is
that the complainant show an actual or imminent increase in competition."). Any
borrower whose loans have been discharged because of the Account Adjustment
has already "completed decades of repayment" and "earned loan forgiveness
[under IDR or PSLF] but never received it" because of years-long administrative
mismanagement of borrowers' accounts by third-party student loan servicers.[11] It is
impermissibly speculative to assume that some current or potential employees'

---

[10] Mackinac Ctr., *supra* note 5.

[11] Press Release, U.S. Dep't of Educ., Biden-Harris Administration to Provide
804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of
Fixes to Income Driven Repayment Plans (July 14, 2023), https://perma.cc/N9ZE-
BEJX (quoting Undersecretary of Education James Kvaal).

employment or job prospects will suddenly change as soon as they obtain loan

forgiveness that has been owed to them for years. *See Am. Fed'n of Gov't Emps.*,

180 F.3d at 731-33 (rejecting individual, associational and organizational standing

because anticipated harm to workers' future "career prospects" was "too

speculative, and insufficiently concrete and particularized").

A critical aspect of this case, omitted by Plaintiffs in their opening brief, is

that the Account Adjustment is not a governmental beneficence but rather a

corrective to misconduct by student loan servicers that the government allowed to

persist for decades. *See* Resp. Br. at 7-9. Since at least 2015, investigations have

revealed that student loan servicers "steered" or placed as many as 761,000

borrowers into unauthorized administrative forbearances, sometimes for five years

or more, instead of informing them about more affordable repayment options like

IDR plans.[12] Loan servicers financially benefited from this practice because

placing a borrower in forbearance cost them far less in terms of staff time than

---

[12] *See, e.g.*, Student Borrower Protection Ctr. & Am. Fed'n of Teachers, *Broken Promises: The Untold Failures of ACS Servicing* 14 (2020) ("*Broken Promises*"), https://perma.cc/R5AX-TGE6; U.S. Dep't of Educ., Office of Inspector General, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance With Requirements For Servicing Federally Held Student Loans* 19 (2019), https://perma.cc/7HML-LCZP; CFPB, *Student Loan Servicing: Analysis of Public Input and Recommendations for Reform* 25-26 (2015), https://perma.cc/RDV3-FQ9A.

helping enroll borrowers in IDR plans[13]; they also could charge the Department

account management fees for longer periods.[14] Once placed in forbearance,

borrowers could not make qualifying payments on their loans and progress toward

IDR and PSLF forgiveness. Instead, they saw their loan balances and monthly

payments increase by accruing thousands of dollars in interest rather than

progressing through repayment under IDR plans, which protect against interest

capitalization.[15] Borrowers were "sometimes unaware . . . that forbearance . . .

would affect their qualifying payments," and they routinely "complained of

spending years making payments, believing that they were making progress toward

PSLF loan forgiveness, and then learning that they were not eligible."[16] The

Account Adjustment helps right this years-long wrong by crediting IDR and PSLF

borrowers for the months and years of improper forbearances; for those borrowers

---

[13] Kevin Lewis & Nicole Vanatko, Cong. Rsch. Serv., *Federal and State Regulation of Student Loan Servicers: A Legal Overview* 12 & n.105 (2019), https://perma.cc/R5ME-R9JC.

[14] An internal strategy memo for the loan servicer Navient explained that "we are very liberal with the use of forbearance," and that "[w]e have targeted responses to maximize servicing fee revenue in the early stages" after a borrower becomes delinquent on their loans. *See* Memorandum to Navient CEO Jack Remondi (June 2010), https://perma.cc/A48D-GRUT.

[15] *Broken Promises*, *supra* note 12, at 14.

[16] Melissa Emrey-Arras, Gov't Accountability Office, *Public Service Loan Forgiveness: Opportunities for Education to Improve Both the Program and Its Temporary Expanded Process* 7 (2019).

who have "reach[ed] the end of [their] repayment period," it results in the

forgiveness of loans that would have been discharged by now but for improper

administrative forbearances.[17]

Accordingly, the imagined risk that loan forgiveness, which is only available

to borrowers with long-standing student loans, could indirectly disadvantage

Plaintiffs' staffing as compared to their unspecified private sector competitors is

wholly insufficient to constitute an injury in fact. *See Kanuszewksi*, 927 F.3d at

405 (requiring "a substantial risk" of harm); *Ctr. for Law & Educ.*, 396 F.3d at

1161 (finding no standing to challenge an action by the Department because

"hypothesized 'increased risk' has never been deemed sufficient 'injury'").

Positing that ten-year public servants will decamp to the private sector once

their loans are forgiven requires the sort of speculation that Article III does not

permit. *See AVX Corp.*, 923 F.3d at 1364 (explaining that competitor standing

requires "a nonspeculative threat" of harm, not an alleged injury from "an agency

action that is, at most, the first step in the direction of future competition"); *Arpaio*

*v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (declaring that courts "have not

hesitated to find competitor standing lacking where the plaintiff's factual

---

[17] Fed. Student Aid, *Payment Count Adjustments Toward Income-Driven*
*Repayment and Public Service Loan Forgiveness Programs* (2023),
https://perma.cc/Q2KZ-L3BQ.

allegations raised only some vague probability that increased competition would occur"). The attractiveness of public service jobs, like those at Plaintiffs' organizations, does not diminish once PSLF works as it was intended to—that is, to enable public servants to have their student loans forgiven after ten years. Borrowers eligible for PSLF through the Account Adjustment still must certify their employment with a public service employer, even if they were on a temporary forbearance—meaning that they must have worked for the government or nonprofit organizations for at least a decade.[18]

Contrary to Plaintiffs' contention, the availability of a properly administered PSLF is actually a competitive advantage to organizations like Plaintiffs and amici, since the program serves as a recruitment incentive for federal student loan borrowers. Resp. Br. at 26-27.[19] Congress intended for public service workers with federal student loans to benefit from debt cancellation after performing their ten years of service.[20] That specific and intentional congressionally conferred

---

[18] Fed. Student Aid, *supra* note 17 ("If you've applied or will apply for PSLF and certify your employment, you may see the benefits of this adjustment").

[19] *See also* The Nonprofit Alliance, *Public Service Loan Forgiveness (PSLF) Program*, https://perma.cc/EJ5V-YPEV (PSLF "offers an important benefit for recruiting staff into the nonprofit sector").

[20] *See* 20 U.S.C. § 1087e(m)(1) (authorizing debt cancellation for borrowers who have made 120 monthly payments while employed in public service jobs); H.R. Rep. No. 110-210, at 48-49 (2007) (Congress intended to "encourage public service" by creating an option for loan forgiveness after ten years of "participation in these careers").

benefit—both to borrowers and to the public service employers they seek out—makes Plaintiffs' already speculative theory of harm even more unlikely.

Plaintiffs' claims therefore lack the concreteness necessary to establish competitor standing. Plaintiffs do not claim that a particular private sector employer or type of employer has suddenly gained some competitive edge in the market for workers who now no longer have student loans. All that Plaintiffs proffer are vague assertions of lost opportunities or jobs to the private sector. Vagaries are insufficient. *See Gen. Elec.*, 928 F.3d at 1353-54 (denying standing where plaintiff did not assert that it "lost bids to customers" or "lost business or lost opportunities"); *Owner-Operator Indep. Drivers Ass'n, Inc. v. DOT*, 831 F.3d 961, 967-68 (8th Cir. 2016) (dismissing lawsuit where trade association failed to identify any business that would benefit from the government action to the detriment of plaintiff); *Am. Fed'n of Gov't Emps.*, 180 F.3d at 731-33 (explaining that employees' "loss or possible loss of jobs" was too "unknowable and speculative" to establish standing).

## C. Plaintiffs' Claimed Competitive Injuries Are Not Traceable to the Account Adjustment Because They Rely on the Intervening Independent Actions of Individual Borrowers.

The supposed causal nexus between the Account Adjustment and Plaintiffs' hypothetical injury is also far too speculative and attenuated for competitor standing. *See Arpaio*, 797 F.3d at 23 ("Because of the generally contingent nature

of predictions of future third-party action, we have remained sparing in crediting

claims of anticipated injury by market actors and other parties alike"). Plaintiffs'

theory relies too much on future actions that individual borrowers might take based

on their own independent financial decisions after their loans are forgiven. *See*

*California v. Texas*, 141 S. Ct. at 2117 ("[W]here a causal relation between injury

and challenged action depends upon the decision of an independent third party . . .

standing is not precluded, but it is ordinarily substantially more difficult to

establish"); *Changizi v. Dep't of Health & Human Servs.*, 82 F.4th 492, 497 (6th

Cir. 2023) ("An injury that results from a third party's voluntary and independent

actions does not establish traceability").

     Plaintiffs' flimsy daisy-chain of cause-and-effect relying on independent

borrowers' decisions falls well short of establishing that the Account Adjustment

causes them imminent hiring or retention challenges. Instead, Plaintiffs'

concatenation of unlikely assumptions would require the establishment of each of

the following unsupported facts about their employees: (1) that the employees

currently hold federal Direct student loans and are enrolled in an IDR plan[21]; (2)

that they have also sought loan forgiveness through the PSLF program, which is

---

[21] Privately held and commercial loans that have not been consolidated into Direct
Loans are not eligible for the One-Time Adjustment. *See* Fed. Student Aid, *supra*,
note 17.

separate from IDR plans; (3) that they have certified or will certify their

employment with Plaintiffs or with other qualifying public service employers[22]; (4)

that they are eligible for the aspects of the Account Adjustment that are being

challenged[23]; (5) that their remaining loan balances are forgiven because of the

Account Adjustment or that they remain employed after the Account Adjustment

long enough to accrue the remaining credits needed for forgiveness; (6) that once

they no longer have loans, they will immediately decide to leave their current jobs

for private sector positions, and (7) that their job transition decision is because they

no longer have federal student loan debt. Article III standing requires more than

such a gossamer thin chain of claims.

In particular, Plaintiffs' claim of lost employment advantage relies far too

heavily on speculation about the interceding employment and financial decisions

of independent borrowers in response to debt forgiveness. *Turaani v. Wray*, 988

F.3d 313, 317 (6th Cir. 2021) ("A third party's 'legitimate discretion' breaks the

chain of constitutional causation"), *cert. denied*, 142 S. Ct. 225 (2021). Nonprofit

employees transfer jobs or leave public service altogether for a multitude of

---

[22] *Id.*

[23] Only those borrowers who were enrolled in an IDR plan and were placed on
forbearance for 12 to 36 months are eligible for credit for those periods of
forbearance under the Account Adjustment. *Id.*

reasons.[24] Plaintiffs' contention that borrowers pursue PSLF solely as a

workaround to minimize their loan repayment timeline and then leave the sector

for lucrative careers in the private sector is dubious at best. It also runs counter to

the purpose of the PSLF program "to encourage individuals to enter and *continue*

*in* full-time public service employment" after their loans are forgiven. 34 C.F.R. §

685.219(a) (emphasis added).

As noted above, multiple intrinsic and extrinsic factors drive borrowers to

pursue public service.[25] Those intrinsic rewards do not disappear once a person's

student loan balance is discharged. In fact, in the experience of amici, employees

in public service jobs regularly continue in those positions after they no longer

shoulder any student loans.[26] This is especially true given the length of time that

PSLF requires. After ten years, workers are generally in or entering the middle of

their careers and are therefore often committed to the public service work in which

they have been engaged for a decade. Meanwhile, borrowers who make their

---

[24] Keely Jones Stater & Mark Stater, *Is It "Just Work"? The Impact of Work Rewards on Job Satisfaction and Turnover Intent in the Nonprofit, For-Profit, and Public Sectors*, 49 Am. Rev. of Pub. Admin. 495, 507 (2019) (noting the role of "personal factors, such as family and location" in turnover at nonprofits).

[25] *See supra* note 6.

[26] *See also* Mark Wiederspan, MHEC Policy Brief, *Understanding State Loan Forgiveness and Conditional Grant Programs* 7 (2018) (finding that "individuals in . . . loan forgiveness programs stay in their respective high-need area after fulfilling the service requirements compared to individuals who did not received any financial incentive").

employment decisions on the basis of student loan debt are more likely to seek
higher-paying private sector jobs first and transition to lower-paying public service
work once paying off their loans.[27]

Because of the wide assortment of reasons for which a person might enter or
leave public service, the Account Adjustment does not have "determinative or
coercive effect" on current employees' decisions to continue working at Plaintiffs'
organizations or to deter prospective employees from seeking jobs there. *Changizi*,
82 F.4th at 497; *see also Turaani*, 988 F.3d at 316 ("An indirect theory of
traceability requires that the government cajole, coerce, command"). Nor is leaving
a stable job a foreseeable byproduct of debt relief. *See California v. Texas*, 141 S.
Ct. at 2119 (requiring more than "mere speculation" to show that plaintiffs relied
on the "predictable effect of Government action"). To the contrary, loan
forgiveness may be just one of numerous factors—or not even a factor—that entice
a person to seek and stay in a public service job.[28] Moreover, changes in debt
burden can trigger any number of economic decisions by borrowers. People with

---

[27] Ng & McGinnis Johnson, *supra* note 7, at 308; Jesse Rothstein & Cecilia Elena
Rouse, *Constrained After College: Student Loans and Early Career Occupational
Choices*, 95 J. Pub. Econ. 149, 158, 162 (2011).

[28] Brian Jacob et al., Nat'l Bureau of Econ. Rsch., *The Value of Student Debt Relief
and the Role of Administrative Barriers: Evidence from the Teacher Loan
Forgiveness Program* 28 (2023) (finding no evidence that loan forgiveness
affected retention of Michigan public school teachers); Wiederspan, *supra* note 26,
at 8.

student loan debt are regularly forced to delay significant life milestones like marriage, starting a family, and buying a home in order to keep up with their payments.[29] Once borrowers' student loans are paid off or discharged, they have greater financial and social flexibility to make important social and financial choices. Borrowers therefore may make any number of financial and personal decisions based on having their loans forgiven, but it is improperly speculative to assume that they will change careers or employers as a result. Drawing a causal link between automatic loan forgiveness enabled by the Account Adjustment and harms to Plaintiffs' workforce requires too many inferential leaps to satisfy traceability.

Plaintiffs' efforts to strike down the Account Adjustment through a competitor standing theory thus fail because they cannot pinpoint any concrete harm caused by the adjustment that results in a comparative advantage enjoyed by relevant market stakeholders.

---

[29] Daniel Bleemer et al., *Echoes of Rising Tuition in Students' Borrowing, Educational Attainment, and Homeownership in Post-Recession America*, 122 J. Urban Econ. 1, 18 (2021); Alvaro Mezza et al., *Student Loans and Homeownership*, 38 J. Lab. Econ. 215, 253 (2020); Wenhua Di & Kelly D. Edmiston, *Student Loan Relief Programs: Implications for Borrowers and the Federal Government*, 671 Annals of the Am. Academy of Pol. & Soc. Sci. 224, 225 (2017).

**III.    Because Plaintiffs Cannot Adduce Any Cognizable Injury, Their Assertion Of Procedural Standing Also Fails.**

Without any injury in fact resulting from the Account Adjustment, Plaintiffs cannot establish standing by claiming the procedures by which the Department promulgated the adjustment caused them any cognizable harm. *See Brown*, 600 U.S. at 562 ("[W]e have never held a litigant who asserts such a right is excused from demonstrating that it has a 'concrete interest that is affected by the deprivation' of the claimed right"); Resp. Br. at 39-43. Earlier this year, the Supreme Court unanimously dismissed a procedural challenge to a different student loan forgiveness program for want of standing on grounds strikingly similar to those at issue here. *Brown*, 600 U.S. at 556. The Court observed that plaintiffs in that case "argue[d] simultaneously (1) that the Department might have treated them more generously if it had solicited their input in developing the [forgiveness program] and (2) that the Department lacks substantive authority to promulgate broad-based loan forgiveness." *Id.* at 562; *see* Compl., RE 1, PageID#20 (challenging the lack of notice-and-comment and negotiated rulemaking in issuing the Account Adjustment); *id.* at PageID#17-19 (alleging the Department issued the regulation in excess of its statutory authority and arbitrarily and capriciously). Here, just as in *Brown*, "[i]t is difficult to see how such an injury could be particular . . . or concrete." *Brown*, 600 U.S. at 564.

Without a "certainly impending" substantive legal violation caused by the Account Adjustment that injures Plaintiffs, *Kanuszewski*, 927 F.3d at 405-06, Plaintiffs cannot establish procedural standing either. As discussed above, Plaintiffs have not shown any actual or imminent economic harm that could make out the requisite injury in fact for procedural standing. *See Rice v. Vill. of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022) (noting "palpable economic injuries have long been recognized as sufficient" for procedural standing). Moreover, the successful claims of procedural standing asserted by environmental organizations in prior cases are distinguishable from Plaintiffs' claims because those organizations could demonstrate that the procedures at issue protected their "concrete . . . aesthetic and recreational interest." *Tims Ford*, 585 F.3d at 968; *accord Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020); Resp. Br. at 40-42.

The Department's Account Adjustment bestows important and salutary benefits, including forgiveness in many cases, to hundreds of thousands of student loan borrowers. It causes no concrete harm to the myriad nonprofit organizations and government agencies that employ public servants, including Plaintiffs. And as the Supreme Court has established: "No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).

Plaintiffs' challenge to the Account Adjustment must be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,


<u>s/ Seth E. Mermin</u>

SETH E. MERMIN
  *Counsel of Record*
DAVID S. NAHMIAS
U.C. Berkeley Center for Consumer
Law & Economic Justice
308 Law Building
Berkeley, CA 94720-7200
(510) 663-3519
tmermin@law.berkeley.edu
dnahmias@law.berkeley.edu

*Counsel for Amici Curiae*

December 7, 2023

PERSIS S. YU
R. T. WINSTON BERKMAN-
BREEN
Student Borrower Protection Center
        (a fiscally sponsored project of
        the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
(202) 670-3871
persis@protectborrowers.org
winston@protectborrowers.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,402 of 6,500 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

_/s/ David S. Nahmias_
David S. Nahmias

*Counsel for Amici Curiae*

## APPENDIX

The **Kentucky Equal Justice Center** (KEJC) promotes equal justice for all Kentuckians by advocating for low income and other vulnerable members of society. KEJC is a nonprofit law firm and advocacy organization that works in Kentucky's courtrooms, communities, and capitol in the areas of family law, workers' rights, public benefits, healthcare, consumer rights, and housing.

The **Legal Aid Society of Cleveland** is a nonprofit organization that provides critical civil legal services to low and no-income individuals in the greater Cleveland, Ohio area. One of our practice areas addresses consumer-related issues, including those related to federal and private student loans. The clients we serve are only a small fraction of student loan borrowers in our area that are struggling under the weight of student loan debt. As one of the poorest large cities in America, Cleveland's citizens have a strong interest in ensuring that the federal student loan discharge programs, including Public Service Loan Forgiveness, work as intended. As a nonprofit organization, the Legal Aid Society of Cleveland also employs individuals with federal student loan debt who can seek Public Service Loan Forgiveness.

The **Michigan Poverty Law Program** (MPLP) is a statewide legal services program that provides support services for local legal aid programs and other poverty law advocates. MPLP is a program of Michigan Statewide Advocacy

Services (MSAS), a statewide advocacy program that provides services to Michigan's low-income residents, Michigan's immigrant communities, and seniors. MPLP engages in systemic advocacy to help alleviate barriers faced by low income individuals. Our goals are to support the advocacy of local legal aid programs; to coordinate advocacy for the poor among the local programs; and to assure that a full range of advocacy continues on behalf of the poor. MPLP also advocates and represents individuals in areas such as public benefits, family law, low-income housing, consumer protections, student loans, predatory lending and foreclosure prevention.

The **Ohio State Legal Services Association** (OSLSA) is a nonprofit organization that provides critical civil legal services to low and no-income individuals in the greater Columbus, Ohio area and Southeastern Ohio area through its offices at Legal Aid Society of Columbus and Southeastern Ohio Legal Services. Our mission is to secure justice and resolve fundamental problems for seniors and those who are low-income by providing high quality legal services and working for systemic solutions. We represent the low income in a wide range of civil legal issues, including consumer protection, family law and domestic violence, health, housing, public utilities, unemployment compensation, and public benefits programs. OSLSA furnishes a front line of defense for Ohio's poor. Indeed, on some frequently litigated issues, ours is their sole voice. In connection

with our missions, our organization files amicus curiae briefs in cases, such as the

instant appeal, where outcomes may affect important rights or obligations of

Ohioans, providing input to jurists and government officials who are addressing

decisions of great public interest that affect the economic security of the vulnerable

and the poor. One of our practice areas addresses consumer-related issues,

including those related to federal and private student loans. The clients we serve

are only a small fraction of student loan borrowers in our area that are struggling

under the weight of student loan debt. The population we serve have a strong

interest in ensuring that the federal student loan discharge programs, including

PSLF, work as intended. As a nonprofit organization, OSLSA employs individuals

with federal student loan debt who can seek PSLF.

The **Tennessee Justice Center** (TJC) is a 501(c)(3) nonprofit that

provides civil legal assistance to residents of Tennessee. Focusing primarily on

access to health and nutrition safety-net programs, TJC works directly with

individual clients in addition to using litigation and policy advocacy to advance

systemic change. A number of TJC's current and former employees hold federal

student loans and intend to seek PSLF because of the benefits it offers to their

financial and personal wellbeing.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.

<u>*/s/ David S. Nahmias*</u>
David S. Nahmias

*Counsel for Amici Curiae*