No. 23-1736

# In the United States Court of Appeals for the Sixth Circuit

MACKINAC CENTER FOR PUBLIC POLICY

AND

CATO INSTITUTE,
*Plaintiffs-Appellants,*

v.

MIGUEL CARDONA, *et al.*,
*Defendants-Appellees.*

————————

On Appeal from the United States District Court
for the Eastern District of Michigan

————————

**Plaintiffs-Appellants' Reply Brief**

————————

January 11, 2024

Sheng Li
Russell Ryan
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
sheng.li@ncla.legal

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION.................................................................................................. 1

ARGUMENT ......................................................................................................... 2

    I.    Plaintiffs Have Competitor Standing................................................... 2

        A.    Economic Disadvantage Is a Cognizable Injury ....................... 4

        B.    The Adjustment Economically Disadvantaged Plaintiffs.......................... 7

            1.    The Adjustment Reduces PSLF Incentives that Benefit Public Service Employers ...................................................................... 7

            2.    The Adjustment Undermines Public Service Employers' Recruitment and Retention Efforts................................................. 10

            3.    Plaintiffs Are Among Public Service Employers that the Adjustment Injures................................................................... 13

        C.    Plaintiffs Satisfy Causation and Redressability.......................... 17

    II.    Plaintiffs Suffered Procedural Injury ................................................. 21

CONCLUSION ................................................................................................... 24

CERTIFICATE OF COMPLIANCE ................................................................. 26

CERTIFICATE OF SERVICE ........................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ABA v. Dep't of Educ.*,
370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................8, 21, 23

*Adams v. Watson*,
10 F.3d 915 (1st Cir. 1993) ..................................................................10, 11, 12

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) .................................................................. 17, 19

*Already, LLC v. Nike, Inc.*
568 U.S. 85 (2013) ................................................................................... 4, 5

*Block Comm'ns, Inc. v. FCC*,
808 Fed. App'x 332 (6th Cir. 2020) .............................................................. 20

*California v. Texas*,
141 S. Ct. 2104 (2021) .......................................................................... 18, 19

*Can. Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) .......................................... 11, 12, 17, 18

*Chase Bank USA, N.A. v. City of Cleveland*,
695 F.3d 548 (6th Cir. 2012) ...................................................................... 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................. 18

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ................................................................... 22

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ............................................................................. 19

*Dismas Charities, Inc. v. DOJ*,
401 F.3d 666 (6th Cir. 2005) ..................................................................... 21

*FEC v. Cruz*,
142 S. Ct. 1638 (2022) ............................................................................... 8

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................. 22

*In re Higgins*,
159 B.R. 212 (S.D. Ohio 1993) .................................................................... 4

*Lujan v. Def's of Wildlife*,
   504 U.S. 555 (1992)................................................................................. 22

*Malone v. Stanley Black & Decker, Inc.*,
   965 F.3d 499 (6th Cir. 2020)................................................................... 16

*Nat'l Fam. Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020)................................................................... 22

*NFIB v. Sebelius*,
   567 U.S. 519 (2012)................................................................................. 19

*Pennsylvania Growth Alliance v. Browner*,
   144 F.3d 984 (6th Cir 1998)..............................................................passim

*Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*,
   485 F.3d 840 (6th Cir. 2007)................................................................... 16

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010) .................................................................. 12

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976)............................................................................... 3, 17

*U.S. Telecom Ass'n v. FCC*,
   295 F.3d 1326 (D.C. Cir. 2002) ............................................................. 14

*United States v. Ritchie*,
   15 F.3d 592 (6th Cir. 1994) ............................................................. 11, 13

*United States v. Wehunt*,
   230 F. Supp. 3d 838 (E.D. Tenn. 2017) .................................................. 4

**Statutes**

20 U.S.C. § 1087e.......................................................................................... 8

**Regulations**

34 C.F.R. § 685.219 .................................................................................passim

**Other Authorities**

Dep't of Educ. Press Release,
   *Department of Education Announces Actions to Fix Longstanding Failures in Student Loan Programs*, Apr. 19, 2022,
   https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs
   (last visited Jan. 11, 2023)...................................................................... 10

GAO,
   GAO-22-103720, *Federal Student Aid: Education Needs to Take Steps To Ensure Eligible
   Loans Receive Income-Driven Repayment Forgiveness* (2022) ................................................. 1

*Subsidies*, LEARN ECON.,
   available at https://www.learn-economics.co.uk/Subsidies.html
   (last visited Jan. 10, 2024) ................................................................................................. 6

## INTRODUCTION

Defendant-Appellee Department of Education ("Department") codified the Public Service Loan Forgiveness ("PSLF") statute's economic logic in a rule that states PSLF provides financial incentives specifically to "encourage individuals to enter and continue in full-time public service employment[.]" 34 C.F.R. § 685.219(a). The Department now attempts to repudiate its own economic logic by contesting Plaintiffs-Appellants' standing as public service employers to protect the very benefit that Congress created for them.

Periods of forbearance do not count toward the 120-month payment-*and*-service requirement needed for loan cancellation under the PSLF statue. By counting such periods anyway, the One-Time Account Adjustment ("Adjustment") unlawfully and prematurely cancels the debt of affected PSLF participants, thereby extinguishing PSLF incentive that otherwise would have encouraged them to work at public service employers like Plaintiffs.[1] This unlawful administrative cancellation erodes labor-market advantages PSLF confers by law on public service employers like Plaintiffs.

---

[1] Defendants claim that the One-Time Account Adjustment includes various measures to correct "lack of adequate records," "loan servicers' failures to track accurate[ly] all qualifying payments made by borrowers[,]" and other bookkeeping errors. Appellees' Br. at 8-9 (citing GAO, GAO-22-103720, *Federal Student Aid: Education Needs to Take Steps To Ensure Eligible Loans Receive Income-Driven Repayment Forgiveness* 12 (2022)). Plaintiffs do not challenge these corrections and instead challenge only the counting of forbearance periods as if borrowers were actually making qualified monthly payments.

Undermining a statutory economic advantage inflicts a cognizable injury that is traceable to Defendants' conduct. The injury is redressable because halting the unlawful counting of non-payments as monthly payments would restore PSLF's statutory payment-and-service requirement. Moreover, Defendants issued the Adjustment in violation of Plaintiffs' procedural right to notice and comment under the Administrative Procedure Act ("APA"). That violation is a cognizable injury sufficient for standing because it impacts Plaintiffs' concrete interest as public service employers to fully enjoy the recruitment and retention benefits that PSLF confers.

## ARGUMENT

## I.    PLAINTIFFS HAVE COMPETITOR STANDING

Plaintiffs have competitor standing under *Southwestern Pennsylvania Growth Alliance v. Browner*, 144 F.3d 984, 988–89 (6th Cir 1998) ("*Growth Alliance*"), which recognizes that companies may challenge government actions that place them at a competitive disadvantage in any marketplace in which they compete. Here, that market is the labor market for college-educated workers. *Growth Alliance* has not been implicitly overruled, as Defendants suggest. *See* Appellees' Br. at 35. Nor is it distinguishable simply because the Adjustment directly operates on borrowers-employees instead of the for-profit companies that compete with Plaintiffs to hire them. *See id.* Defendants still placed Plaintiffs at a competitive disadvantage when seeking to recruit or retain those employees.

Defendants' arguments to the contrary amount to little more than a denial that PSLF benefits public service employers. *See* Appellees' Br. at 25 ("PSLF does not entitle an *employer* to anything[]") (emphasis in original). That claim is contradicted by Defendants' own regulations confirming that PSLF benefits public service employers by using the promise of loan forgiveness to encourage borrowers to work for them. 34 C.F.R. § 685.219(a). Counting periods of forbearance toward PSLF's payment-and-service requirement results in premature cancellation of debt for affected borrowers, which in turn eliminates their PSLF incentive to work for public service employers. That unlawful counting economically disadvantages public service employers like Plaintiffs relative to their non-PSLF-qualifying competitors in the labor market, most notably for-profit employers.[2]

Defendants do not dispute that the erosion of affected borrowers' PSLF incentives is traceable to the Adjustment. They instead rely on an inapposite, non-competitor case to argue that Plaintiffs must further trace affected borrowers' specific employment decisions to the Adjustment. *See* Appellees' Br. at 32-33 (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976)). But the competitor-standing doctrine exists precisely to supply causation between the challenged conduct and the specific decisions

---

[2] In addition to for-profit employers, PSLF's definition of "public service employer" also excludes certain nonprofit organizations, such as "a partisan political organization." *See* 34 C.F.R. § 685.219(b). Public service employers thus also receive a competitive advantage with respect to non-PSLF-qualifying nonprofit organizations, which the Adjustment erodes.

of affected market actors. The linkage Plaintiffs must supply is between the challenged conduct and "economic disadvantage," *Growth Alliance*, 144 F.3d at 988, which in this case is the Adjustment's premature termination of financial incentives designed to encourage affected borrowers to work for public service employers like Plaintiffs. A favorable decision would restore those incentives and redress Plaintiffs' economic disadvantage relative to for-profit competitors.

## A. Economic Disadvantage Is a Cognizable Injury

This Court recognizes that "economic disadvantage" relative to competitors "is an alleged 'injury in fact'[.]" *Growth Alliance*, 144 F.3d at 988. The Adjustment economically disadvantages public service employers like Plaintiffs by reducing the advantage PSLF gives to qualifying public service employers in their labor-market competition against for-profit companies. *See* Opening Br. at 13–16. There is no need to link agency action to specific economic loss, such as lost sales, revenue, or in this case, the inability to recruit or retain specific employees. *Id.* at 14. In short, economic disadvantage *is* the injury.

Defendants mistakenly suggest that *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), implicitly overruled *Growth Alliance. See* Appellees' Br. at 35. But "*sub silentio* overruling of a Court of Appeals decision by a Supreme Court case resting on different facts is a rare occurrence," and "requires strong, objective evidence." *United States v. Wehunt*, 230 F. Supp. 3d 838, 846 (E.D. Tenn. 2017) (quoting *In re Higgins*, 159 B.R. 212, 216 (S.D. Ohio 1993)). Defendants fall far short of that exacting standard. In *Already*, 568 U.S. at

88, Nike filed a trademark infringement action against Already, another athletic footwear company, which counterclaimed to invalidate Nike's trademark. Nike thereafter entered a covenant promising that it would not enforce the trademark against Already, which the Court held mooted Already's counterclaim. *Id.* The Court also rejected Already's alternative competitor-standing argument based on Nike's receiving the benefits of an unlawful trademark. *Id.* at 98–99. The trademark could not inflict a competitive injury against Already when Already has "a judicially enforceable covenant protecting it from litigation relating to the … trademark." *Id.*

If anything, *Already* reinforces *Growth Alliance*'s use of economic disadvantage as the lodestar for competitor standing. Already's standing theory was rejected as "boundless" because it failed to connect benefits that Nike receives from the trademark to any disadvantage for Already. Because the covenant allowed Already to use the trademark to the same extent as Nike, the trademark could not possibly place Already in a position of economic disadvantage relative to Nike. By contrast, lowering competitors' regulatory costs placed an obvious economic disadvantage on the *Growth Alliance* plaintiffs. Defendants thus fail to clear the high bar needed to show implicit overruling of *Growth Alliance*.

Defendants next argue that, unlike in *Growth Alliance*, the "one-time Account Adjustment had no effect on the regulatory landscape governing private-sector employers" that compete with Plaintiffs. Appellees' Br. at 35. They point out that "the Department's action [instead] operates on … student loan borrowers, who do not

5

compete with plaintiffs." *Id.* at 24. But this distinction makes no difference. A foundational economic principle is that the economic impact of a subsidy (or the withdrawal hereof) does not depend on whether employers (consumers of labor) or workers (producers of labor) directly receive it.[3]

In *Growth Alliance*, the agency action operated on the supply side by lowering the operating cost of Ohio firms, thereby making them more attractive to customers than Pennsylvania manufacturers. 144 F.3d at 988. That placed Pennsylvanian firms at an economic disadvantage and thus conferred standing. *Id.* The competitor-standing analysis would have been the same had the agency instead operated on the demand side, for example, by offering consumers a tax credit or other financial incentive to buy from Ohio firms rather than Pennsylvania firms. The fact that a policy is directed toward consumers who themselves do not compete with Pennsylvania manufacturers would not alter the conclusion that such agency action would place those manufacturers at an economic disadvantage compared to their Ohio counterparts. It is irrelevant that the action was not directed at the Ohio firms because the agency would still incentivize third-party consumers over whom Ohio and Pennsylvania firms compete to favor Ohio firms at the expense of Pennsylvanian ones.

---

[3] *See, e.g., Subsidies*, LEARN ECON., available at https://www.learn-economics.co.uk/Subsidies.html (last visited Jan. 11, 2024) (distinguishing "economic incidence of a subsidy[]" and its "legal incidence" to explain that "the benefit of the subsidy is distributed between consumers and producers" regardless of who directly receives the subsidy.).

The same principle applies in the labor market. The Adjustment affects the economic incentives of millions of third-party borrowers whom for-profit and public service employers compete to hire. It reduces their incentive to seek loan forgiveness by working for public service firms like Plaintiffs, thereby making for-profit competitors relatively more attractive. Public service firms are placed in a position of economic disadvantage, which is an injury in fact under *Growth Alliance*, 144 F.3d at 988.

## B. The Adjustment Economically Disadvantaged Plaintiffs

Defendants advance three arguments for why the Adjustment does not place public service employers like Plaintiffs in a position of economic disadvantage: (1) it does not reduce competitive benefits that PSLF confers on public service employers; (2) any reduction does not meaningfully affect eligible public service employers' ability to recruit and retain college-educated workers; and (3) Plaintiffs are not among public service employers that the Adjustment injures. Appellees' Br. at 23–31. None of those assertions has merit.

### 1. The Adjustment Reduces PSLF Incentives that Benefit Public Service Employers

Defendants' assertion that "PSLF does not entitle [public service] *employer*[*s*] to anything[,]" *id.* at 25, is contradicted by their own regulation, which explicitly states that PSLF "is intended to encourage individuals to enter and continue in full-time public service employment[,]" *See* 34 C.F.R. § 685.219(a). "By design, ... the PSLF statute

7

facilitates a public service organization's recruitment of employees[.]" *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

Defendants further argue that "[p]ublic service employers are not harmed" because borrowers must still have "worked in public service for (at least) 10 years[]" to receive PSLF forgiveness. Appellees' Br. at 26. But the "statutory deal Congress offered" is not, as Defendants suggest, loan forgiveness in exchange for 120 months of public service employment. *Id.* Rather, as Defendants concede earlier in their brief, the borrower must also have "made 120 [qualifying] monthly payments" and be "employed full-time in a public-service job at the time each of the 120 monthly payments was made." *Id.* at 5 (citing 20 U.S.C. § 1087e(m)(1)(A), (B); 34 C.F.R. § 685.219). Defendants further concede that the Adjustment "affects what counts as a payment" by crediting non-payments during periods of long-term forbearance as qualified monthly payments. *Id.* at 25. For purposes of assessing standing, the Court must "accept as valid" Plaintiffs' allegation that such crediting is unlawful. *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022). The Adjustment thus unlawfully counts non-qualifying periods toward PSLF's 120-month requirement. As a result, affected PSLF participants have fewer years of payment-and-service requirement remaining, and they will receive forgiveness sooner than they otherwise would be eligible. Defendants thus reduce the competitive benefits that PSLF confers on public service employers like Plaintiffs.

Defendants next claim that "the Account Adjustment would give [public service employers] a competitive *advantage*" because borrowers' "path to loan forgiveness will

8

not be impeded by the poor recordkeeping or abusing practices of loan servicers." Appellees' Br. at 27. But Plaintiffs do not challenge Defendants' efforts to improve recordkeeping or to prevent abusive practices. They challenge only the one-time counting of past periods of non-payment as PSLF-qualifying payments. That cannot make PSLF more attractive because, by its very nature, the backward-looking *One Time Account Adjustment* cannot affect PSLF participants' forward-looking incentives.

Defendants further speculate that, if affected borrowers can achieve PSLF loan forgiveness faster, they may be more inclined to seek such forgiveness by working for a public service employer. *Id.* at 27. Under this warped logic, for-profit employers would have competitor standing to challenge the Adjustment on the ground that it results in their public service competitors receiving greater labor-market advantages than allowed under PSLF. It also ignores the fact that when borrowers receive premature forgiveness under the Adjustment—as many already have—they no longer have *any* financial incentive under PSLF to work for a public service employer.

In any event, as Defendants note, affected borrowers would see their PSLF payment-and-service term shortened only if they had already been working for public service employers during prior periods of long-term forbearance. *Id.* at 25–26. The Adjustment could not incentivize them to seek PSLF forgiveness by taking public service jobs when they had already taken such jobs before the Adjustment. It does, however, reduce their incentive to meet the full ten years of payments while employed in public services jobs as required by PSLF by shortening their remaining payment-and-

service term, thereby undermining the benefits that PSLF confers on public service employers.

### 2. The Adjustment Undermines Public Service Employers' Recruitment and Retention Efforts

Defendants next contend that "any *marginal* change in the incentive for some borrowers to pursue public service employment would [not] *meaningfully* affect eligible employers[.]" Appellees' Br. at 27 (emphases added). This boils down to arguing that the economic disadvantage inflicted on each public service employer is small. But there is no *de minimis* exception to competitor injury: "a relatively small economic loss—even an 'identifiable trifle'—is enough to confer standing." *Adams v. Watson*, 10 F.3d 915, 924 (1st Cir. 1993). Plaintiffs thus have standing to challenge agency action that reduces competitive benefits they receive though PSLF even if "their respective shares of the aggregate injury will be minimal." *Id.*

Defendants complain that Plaintiffs "do not allege what percentage of PSLF participants would see their payment counts adjusted." Appellees' Br. at 27. But that is because Defendants' perfunctory press release devising and announcing the Adjustment did not estimate the proportion of PSLF borrowers that it would affect.[4]

---

[4] The press release said 40,000 PSLF participants would have their student loans forgiven immediately, but it did not reveal how many others would receive premature forgiveness by having their payment account adjusted. Dep't of Educ. Press Release, *Department of Education Announces Actions to Fix Longstanding Failures in Student Loan Programs*, Apr. 19, 2022, https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs (last visited Jan. 11, 2024).

At this stage in the litigation, Plaintiffs are entitled to a favorable inference that the percentage is material. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). If Defendants assert otherwise, there should be discovery so Plaintiffs can test that assertion. In any event, the precise magnitude of economic disadvantage inflicted on public service employers is irrelevant. What matters is the direction. Public service employers have competitor standing if the Adjustment reduces economic benefits that Congress conferred on them through PSLF, by even a trivial amount. *Adams*, 10 F.3d at 924.

Defendants next contend that Plaintiffs must identify the "subset" of borrowers who would leave public service employment because the Adjustment reduces their incentive to take such jobs. *See* Appellees' Br. at 28. But the entire premise of competitor standing is that courts may assume that, when the government changes market incentives, third-party market actors such as consumers and employees will change their behavior in ways that economic principles predict. *Adams*, 10 F.3d at 923 (citations omitted) ("Indeed, most 'competitor standing' cases depend on … core economic postulates," such as "standard principles of 'supply and demand.'"). Hence, there is no need for "analysis linking [the challenged conduct] to specific, demonstrated economic harms." *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008). In *Growth Alliance*, for instance, this Court found competitor standing without inquiring into what "subset" of Pennsylvania manufacturers' sales were affected. 144 F.3d at 988. Just as manufacturers need not show "lost sales, decreased market share[,]" and the like

to demonstrate competitive injury, *Can. Lumber*, 517 F.3d at 1332, employers need not identify the subset of specific workers who would make different employment decisions as a result of government action that discourages them from taking public service jobs.

Put another way, the reduction in financial incentive to take public service jobs itself *is* the competitive injury because public service employers must make up for that shortfall by increasing their recruitment and retention efforts, including increasing compensation and other benefits to counteract the lost incentives. In *Sherley v. Sebelius*, 610 F.3d 69, 70–71 (D.C. Cir. 2010), an agency's expansion of eligibility to apply for certain grants inflicted a competitive injury on two researchers by forcing them to compete against a larger number of eligible applicants. The court neither required the researchers to estimate the number of new applicants nor to identify the subset of grants that would be affected or denied because of additional competition. Rather, there would be competitive injury even if the researchers were successful in all their applications because the need to "invest more time and resources to craft a successful grant application[]" in response to the expanded eligibility, by itself, "is an actual, here-and-now injury." *Id.* at 74. Again, even a "trifle" amount of additional effort or expense required is enough for standing. *Adams*, 10 F.3d at 924.

Just like the researchers in *Sherley*, public service employers must respond to the erosion of PSLF benefits by investing more time and resources to recruit and retain college-educated employees if they are to maintain the competitive positions that they

respectively enjoyed in the labor market before the Adjustment. That is likewise a here-and-now injury sufficient to confer competitive standing.

### 3. Plaintiffs Are Among Public Service Employers that the Adjustment Injures

Defendants argue that "even if some public service employers would be harmed" by the Adjustment, Plaintiffs "would [not] be among that group." Appellees' Br. at 28. They dispute Plaintiffs' allegations that they compete against for-profit employers for college-educated workers. *See* Appellees' Br. at 29–30. But the Court must accept those allegations for the purpose of analyzing standing. *Ritchie*, 15 F.3d at 598.

Every public service employer that hires college-educated employees competes with for-profit companies for those employees. Indeed, such competition undergirds PSLF's most fundamental premise. Defendants' own regulation states that PSLF "is intended to encourage individuals to enter and continue in full-time public service employment[.]" 34 C.F.R. § 685.219(a). There could be no such encouragement if public service employers did not compete with for-profit companies to employ those individuals. Plaintiffs are not somehow unique among public service employers in being immune from that competition.

Defendants next rely on the straw-man argument that Plaintiffs do not "compete in the same nationwide labor market for all their staff positions with *all* private-sector employers." Appellees' Br. at 30 (emphasis added). But competitor standing does not require a party to suffer economic disadvantage with respect to all competitors. Rather,

13

economic disadvantage with respect to even a single competitor is enough. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (association had standing to challenge a single company's eligibility for federal subsidies). Moreover, the Court must accept Plaintiffs' allegation that they engage in nationwide labor-market competition. That allegation is not conclusory because a cursory review of Plaintiffs' respective websites would reveal their staff received education from a variety of institutions from around the country.[5] In any event, even if the labor markets in which Plaintiffs compete were somehow limited to Michigan and Washington, D.C., as Defendants claim without evidence, *see* Appellees' Br. at 30, Plaintiffs would still compete with *some* for-profit employers in those areas.

Plaintiffs need not specify the precise percentages of their respective workforces that are eligible for PSLF to establish they are among the group of public service employers harmed by the erosion of PSLF incentives. *See* Appellees' Br. at 28–29. This Court, for instance, did not require Pennsylvania manufacturers in *Growth Alliance* to prove the percentage of their future customers who would be lured toward Ohio firms. Nor did researchers in *Sherley* need to specify the proportion of their future grant applications that would be affected by the agency's expansion of eligibility. Rather, it was enough that they "have received and plan to seek NIH grants." 610 F.3d at 71.

---

[5] *See* Cato Institute, Policy Scholars, available at: https://www.cato.org/people/policy-scholars (last visited at Jan 11, 2023); Mackinac Center for Public Policy, Staff, available at: https://www.mackinac.org/about/staff (last visited Jan. 11, 2023).

Plaintiffs likewise have employed, now employ, and plan to attract and employ student-loan borrowers from around the country with the aid of PSLF incentives. Complaint, RE1 PageID.3, 11.

Plaintiffs also need not identify specific employees or prospective employees whose long-term forbearance was unlawfully counted as qualifying payments under the Adjustment. *See* Appellees' Br. at 29. The Adjustment inflicts economic disadvantage not just with respect to public service employers' current employees but also future ones. Competitive injury in *Sherley* was based on researchers' need to increase effort to be equally competitive in future grants, which was the natural consequence of the agency expanding the applicant pool. 610 F.3d at 71. They planned to apply for future government grants affected by the expansion but did not specify which ones. *Id.* Indeed, the agency would not have announced future grant opportunities yet at the time the researchers sued.

Here, the Adjustment shrinks the pool of borrowers whom PSLF incentivizes to work for public service employers by prematurely forgiving their loans, thus requiring Plaintiffs and other public service employees to increase recruitment and retention efforts to remain equally competitive. Just as the researchers in *Sherley* were not required to identify the affected grants that they intended to apply for in the future, Plaintiffs are not required to name particular borrowers affected by the Adjustment whom they seek to hire in the future with the aid of PSLF incentives.

15

Even if Plaintiffs were required to plead the precise percentage of their employees who participate in PSLF or experienced long-term forbearance, the district court would still have committed reversible error. Instead of dismissing the case *sua sponte*, the district court should have given Plaintiffs an opportunity to amend the complaint with information regarding PSLF-participating employees. *See Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 558 (6th Cir. 2012) ("Before dismissing a complaint *sua sponte*, even if the dismissal is without prejudice, the court must give notice to the plaintiff.").[6] Whether borrowers experienced long-term forbearance (as defined by Defendants) on student loan—and thus were affected by the Adjustment—is not information Plaintiffs would have as their employers. Only Defendants have information regarding the over 3.6 million borrowers whom the Adjustment affected. Discovery is thus needed to determine whether the Adjustment affected any of Plaintiffs' current or prospective employees. Even if this information were needed— and it is not for reasons explained above—the district court still would have erred in *sua sponte* dismissing the action without giving Plaintiffs an opportunity for discovery. *See Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505-06 (6th Cir. 2020) (reversing denial of jurisdictional discovery).

---

[6] While the district court said the dismissal was "without prejudice," Judgment, RE14 PageID.96, it "must have intended to dismiss the Plaintiffs' claims with prejudice because if not, the court would not have entered a final judgment; rather the court would have given the Plaintiffs an opportunity to amend and re-file[.]" *Robert N. Clemens Trust v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845 (6th Cir. 2007).

## C. Plaintiffs Satisfy Causation and Redressability

The case that Defendants contend "demonstrates why causation is lacking" is not even a competitor-standing case. *See* Appellees' Br. at 32 (citing *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26 (1976)). *Simon* concerned a Treasury rule that allegedly subjected hospitals that provide certain services to indigent individuals to disfavored tax treatment. *Id.* at 42–43. The indigent plaintiffs did not claim competitor standing, nor did the Court address that doctrine. Rather, they attempted to link the Treasury rule to hospitals' specific decisions denying them service, and failed. *Id.*

*Simon* is inapposite because "analysis linking [the challenged conduct] to specific, demonstrated economic harms" is not required in competitive standing cases. *Can. Lumber*, 517 F.3d at 1332. Since the "competitor standing doctrine [already] supplies the link between increased competition and tangible injury[,]" Plaintiffs need only "supply the link between the challenged conduct and increased competition." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023). In this circuit, increased competition includes being placed at an "economic disadvantage" with respect to one or more competitors. *Growth Alliance*, 144 F.3d at 988. Accordingly, there is no need to trace a specific decision, such as the denial of service in *Simon*, to the challenged government conduct. Again, *Sherley* did not require researchers to link the challenged agency action to the denial of any future grant applications. 610 F.3d at 73–74. It is enough to link the agency action to increased competition, which "will almost certainly cause an injury in fact." *Id.* at 73.

17

The same logic holds in the marketplace, where manufacturers need not link agency action to lost sales. *Can. Lumber*, 517 F.3d at 1332. They merely need to plead that agency action put them in a position of "economic disadvantage" relative to competitors in order to "allege[] 'injury in fact' directly caused by the [agency] decision." *Growth Alliance*, 144 F.3d at 988. Plaintiffs likewise need not link the Adjustment to, for example, specific PSLF participants declining to accept offers of employment. They need only connect the Adjustment to economic disadvantage in the recruitment and retention of PSLF participants as employees, which they succeed in doing because the Adjustment results in premature forgiveness that eliminates affected borrowers' incentive under PSLF to work for public service employers.

Plaintiffs do not offer a "speculative chain of possibilities" under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), quoted on page 31 of Appellees' Brief. *Clapper* held that activists' costly and burdensome countermeasures based on their unsubstantiated "fear of surveillance" are merely "self-inflicted injuries [] not fairly traceable to the Government's purported activities." *Id.* at 418. By contrast, premature extinguishment of compensation incentives for PSLF participants to take public service jobs is not self-inflicted but rather directly traceable to Defendants' unlawful administrative Adjustment.

*California v. Texas*, 141 S. Ct. 2104, 2113 (2021), cited on page 32 of Appellees' Brief to rebut causation, actually *supports* Plaintiffs' incentive-based standing. That case concerned a statute that initially incentivized the purchase of health insurance through

a tax penalty for not doing so, but then Congress "effectively nullified the penalty." *Id.* at 2112. The Court agreed that standing based on third-party purchases existed when "the penalty provision was still in effect." *Id.* at 2114 (citing among other cases *NFIB v. Sebelius*, 567 U.S. 519 (2012)). But standing could not be sustained after the penalty was withdrawn because, without a penalty to incentivize purchases, third-party purchases were no longer traceable to the challenged statute. *Id.* In other words, the Court recognized that financial incentives predict third-party behavior for standing purposes. When financial incentives are withdrawn—whether a tax penalty or PSLF incentives— third parties become less inclined to engage in the previously incentivized activity. Accordingly, fewer workers being attracted to public service jobs when Defendants prematurely eliminate their PSLF incentives is "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

*Air Excursions*, 66 F. 4th at 280, cited on page 31 of Appellees' Brief, is also inapposite. There, the D.C. Circuit held that "a competitor's receipt of a windfall" in the form of pandemic-relief funds, by itself, fell short of competitor standing because the plaintiff failed to link the windfall to the competitor's lower prices. *Id.* The record indicated that the competitor's "owners used funds … to reduce their equity stake in the company, which is inconsistent with an inference that [the competitor] used the funds to subsidize its pricing decisions[.]" *Id.* at 279. By contrast, no speculation is needed to link the Adjustment to reductions in and eliminations of PSLF incentives:

the promise of loan forgiveness provides zero incentive after the loans are forgiven prematurely. Nor is it speculative to say that jobs with reduced or eliminated compensation incentives are less attractive to workers.

Plaintiffs' competitor standing is not attenuated under *Block Communications, Inc. v. FCC*, 808 Fed. App'x 332, 337 (6th Cir. 2020), cited on page 31 of Appellees' Brief. There, a broadcasting station challenged FCC's grant of "must-carry" rights to a competitor under the theory that affected local cable systems might drop plaintiff if they are required to carry the competitor. *Id.* But the record revealed that local cable systems routinely carried both the plaintiff's and the competitor's stations. *Id.* Hence, it was speculative to conclude that requiring the cable systems to carry the competitor meant they were less likely to carry the plaintiff's station. *Id.* That reasoning is inapplicable here because workers generally do not work full-time simultaneously for both public service and for-profit employers.

Unlike *Air Excursion* and *Block*, the issue here is not whether a government benefit to a competitor—whether pandemic-relief funds or broadcast rights—translates into economic disadvantage to Plaintiffs. Rather, the question is whether the reduction of PSLF's competitive advantage to Plaintiffs with respect to affected borrowers causes competitive injury. No speculation is needed to conclude that discouraging affected borrowers from public service employment inflicts economic disadvantage on public service employers like Plaintiffs. That economic disadvantage is traceable to

Defendants. Enjoining the Adjustment would restore PSLF incentives to work for public service employers, and therefore would redress the injury.

## II.  PLAINTIFFS SUFFERED PROCEDURAL INJURY

Defendants' sole argument against procedural-injury standing is that public service employers like Plaintiffs lack any concrete interest in PSLF. *See* Appellees' Br. at 39–41. That position is untenable, as Defendants' own regulation recognizes that PSLF "is intended to encourage individuals to enter and continue in full-time public service employment[.]" *See* 34 C.F.R. § 685.219(a). *ABA* echoes the same conclusion that "the PSLF statute facilitates a public service organization's recruitment of employees[,]" by "providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service." 370 F. Supp. 3d. at 19.[7] Plaintiffs are public service employers that have a concrete interest in enjoying the recruitment and retention advantages Congress bestowed through PSLF. The

---

[7] While *ABA* applied the "zone-of-interests test," Appellees' Br. at 42, that test for prudential standing is applicable only if Article III standing already exists. *See Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 674 (6th Cir. 2005) ("[T]he zone-of-interests test derives from … the general prudential standing requirement [for] … even those who [already] have Article III injury in fact[.]"). In any event, *ABA*'s zone-of-interests analysis answers the question here: it concluded that a public service employer has an economic interest in receiving recruitment and retention benefits conferred by PSLF incentives, and that such interest fell within PSLF's zone of interests. Nor does employers' lack of "'legal obligations or rights under the PSLF statute[]'" support Defendants' position. *See* Appellees' Br. at 43 (quoting *ABA*, 370 F. Supp. 3d at 25). That public service employers have no right to claim PSLF subsidies for themselves does not alter *ABA*'s conclusion that such employers have a cognizable economic interest in having those subsidies incentivize borrowers to work for them.

Adjustment prematurely negates those advantages, thereby injuring Plaintiffs' economic interests.

Plaintiffs never asserted, as Defendants claim, that "injury-in-fact analysis is relaxed in the procedural rights context." Appellees' Br. at 40. Rather, Plaintiffs ask for the standard analysis—no more relaxed than the one courts apply in environmental cases. There, "'environmental plaintiffs adequately allege injury in fact when they aver that they use [an] affected area'" and "'the aesthetic and recreational values of the area will be lessened[.]'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)). The same is true when environmental plaintiffs aver an aesthetic or recreational interest in observing flora or fauna that agency action allegedly negatively impacts. *See, e.g., Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020) (finding concrete interest in observing monarch butterflies); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) (finding concrete interest in observing longhorn beetles).

Plaintiffs here similarly aver that they have an economic interest in employing PSLF-eligible workers and that the Adjustment reduces the pool of such employees incentivized by PSLF to work for them by prematurely cancelling those workers' loans. Plaintiffs do not merely have "'some day' intentions" to employ PSLF-eligible workers. *See* Appellees' Br. at 41 (quoting *Lujan v. Def's of Wildlife*, 504 U.S. 555, 564 (1992)). Rather, they have employed such workers in the past and currently employ such workers. RE1 PageID.3, 11; Goettler (Cato), Decl., RE1-1 and Lehman (Mackinac)

Decl., 1-2 PageID.23–26. Plaintiffs are also seeking workers to fill current job openings, *id.*, and are being helped in that recruitment effort by PSLF incentives that, according to Defendants' own regulation, encourage student-loan borrowers to take public service jobs, 34 C.F.R. § 685.219(a). The extent of that PSLF assistance is less than it would otherwise be because of the unlawful administrative Adjustment.

Plaintiffs have a concrete economic interest in hiring PSLF-eligible employees because, contrary to Defendants' assertions, such employees absolutely "can be paid less." Appellees' Br. at 41. Allowing public service employers to pay less for workers is one of the purposes of PSLF, which "promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire[.]" *ABA*, 370 F. Supp 3d at 19. This subsidy means that the effective compensation Plaintiffs offer PSLF-eligible employees is greater than their ostensible salaries. PSLF thus "reduces pressure on public service organizations to raise salaries[]" and helps them to attract and retain desirable employees at a lower cost. *Id.*

It does not matter that Plaintiffs do not typically know whether particular employees (or prospective employees) participate in PSLF. Employees certainly know their own student-loan situations and are thus incentivized to work for Plaintiffs by the amount of loans that stand to be forgiven under PSLF. Plaintiffs receive the benefits of that incentive in the form of lower compensation costs even if they are not aware of which specific employees are participating in PSLF. Employers offer all kinds of benefits to attract employees even though they do not know which employees are

attracted by each offered benefit. For instance, many employers subsidize employees' meals with an on-site cafeteria. Some workers will be incentivized by this benefit and others will not—perhaps because they prefer home cooking. An employer's lack of knowledge regarding which prospective employees will use the cafeteria does not change the fact that the cafeteria helps attract and retain workers. If an agency were required by statute to provide cafeteria meals to help public service employers recruit workers, and then it arbitrarily took away that cafeteria subsidy with respect to a subset of individuals, those employers' economic interests would be negatively impacted because the pool of incentivized employees would shrink accordingly.

Student-loan forgiveness under PSLF is simply another government-provided benefit that public service employers—but not their for-profit competitors—use to attract and retain employees at reduced cost. Public service employers like Plaintiffs have a concrete economic interest in maximizing the reach of this statutorily conferred benefit. By counting non-payments as payments to prematurely cancel student loans, the unlawful Adjustment reduces the number of borrowers who are encouraged by PSLF to work for public service employers like Plaintiff. It thereby injures that economic interest.

## CONCLUSION

For the foregoing reasons, as well as those in the Opening Brief, this Court should find that Plaintiffs have standing to bring this case. The judgment of the district court should be reversed, and the matter remanded for further proceedings.

January 11, 2024

/s/ *Sheng Li*

Sheng Li
Russell Ryan
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
sheng.li@ncla.legal

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 5960 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Sheng Li*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Sheng Li*