**No. 23-1736**

# In the United States Court of Appeals for the Sixth Circuit

MACKINAC CENTER FOR PUBLIC POLICY

AND

CATO INSTITUTE,
*Plaintiffs-Appellants*,

v.

MIGUEL CARDONA, *et al.*,
*Defendants-Appellees.*

───────────────

On Appeal from the United States District Court
for the Eastern District of Michigan

───────────────

**PLAINTIFFS-APPELLANTS' PETITION
FOR REHEARING *EN BANC***

───────────────

Sheng Li
Russell G. Ryan
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
sheng.li@ncla.legal

*Counsel for Plaintiffs-Appellants*

## RULE 35(b)(1) STATEMENT

This petition presents a question of national importance:  Whether public-service employers, like the Plaintiffs in this case, have standing to challenge a federal agency's program that shifts tens of billions of dollars in student-loan debt from borrowers who benefitted from those loans to their fellow taxpayers who didn't, without statutory authority from Congress, thereby negating a key competitive recruiting advantage that Congress deliberately gave public-service employers through the Public Service Loan Forgiveness ("PSLF") program. The Panel Opinion (attached as Exhibit A) denying standing conflicts with this Court's precedent holding that "economic disadvantage" caused by government action is sufficient to establish competitor standing. *Sw. Pa. Growth Alliance v. Browner*, 144 F.3d 984, 988–89 (6th Cir. 1998) ("*Growth Alliance*").

The Panel ruling also conflicts with decisions of the Supreme Court and this Court—including *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)—by not crediting Plaintiffs' uncontroverted allegations that they compete against for-profit employers in the labor market, Op. at 12, that the challenged agency action reduces the number of monthly payments affected student-loan borrowers must make to have their loans forgiven under PSLF, *id.* at 13, and thus that the agency action undermines Plaintiffs' PSLF recruiting advantage by predictably accelerating how soon employees participating in the program could leave public-service employment and still have the remainder of their student-loan debt forgiven. These allegations were key to Plaintiffs' standing and should have been

accepted as true, with all reasonable inferences drawn in Plaintiffs' favor, at this initial stage of the case.

*En banc* review is therefore warranted.

# TABLE OF CONTENTS

RULE 35(b)(1) STATEMENT ........................................................... i

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................ iv

STATEMENT OF ISSUES MERITING *EN BANC* REVIEW ................................ 1

STATEMENT OF FACTS AND DISPOSITION OF THE CASE ........................... 1

REASONS FOR GRANTING THE PETITION ...................................... 6

    I.    The Panel Held 'Economic Disadvantage' Insufficient for Competitor Standing in Disregard of Precedent ...................................... 6

    II.    The Panel Improperly Limited Competitor Standing in Cases Where the Government Acts on Third Parties ............................ 9

    III.    The Panel Failed to Draw Inferences in Plaintiffs' Favor and to Credit Allegations that Support Competitor Standing ............................ 13

CONCLUSION ........................................................................ 16

CERTIFICATE OF COMPLIANCE ..................................................... 17

CERTIFICATE OF SERVICE ......................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Watson,*
10 F.3d 915 (1st Cir. 1993) ................................................................ 7

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ................................................................... 6, 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................... i, 13

*Can. Lumber Trade All. v. United States,*
517 F.3d 1319 (Fed. Cir. 2008) .......................................................... 7

*Clinton v. City of New York,*
524 U.S. 417 (1998) .................................................................... 6

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ................................................................... 10

*DirecTV, Inc. v. Treesh,*
487 F.3d 471 (6th Cir. 2007) .................................................... i, 13, 14

*Dismas Charities, Inc. v. U.S. Dep't of Just.,*
401 F.3d 666 (6th Cir. 2005) .......................................................... 12

*Sherley v. Sebelius,*
610 F.3d 69 (D.C. Cir. 2010) ........................................................... 7

*Sw. Pa. Growth Alliance v. Browner,*
144 F.3d 984, (6th Cir. 1998) ......................................... i, 6, 7, 8, 14

*U.S. Telecom Ass'n v. FCC,*
295 F.3d 1326 (D.C. Cir. 2002) ....................................................... 14

*Warth v. Seldin,*
422 U.S. 490 (1975) ................................................................... 13

**Statutes**

20 U.S.C. § 1087e(m) .................................................................... 1

26 U.S.C. § 30D ....................................................................... 11

## Other Authorities

Consumer Financial Protection Bureau,
*Staying on track while giving back: The cost of student loan servicing breakdowns for people serving their communities* (Washington, D.C.: June 2017).........................................2

Federal Student Aid,
*Temporary Expanded Public Service Loan Forgiveness, (TEPSL)* .........................................2

Press Release, U.S. Dep't of Educ.,
*Biden-Harris Administration Announces Additional $4.9 Billion in Approved Student Debt Relief* (Jan. 19, 2024) .........................................5

Press Release, U.S. Dep't of Educ.,
*Biden-Harris Administration Announces an Additional $9 Billion in Student Debt Relief* (Oct. 4, 2023) .........................................5

Press Release, U.S. Dep't of Educ.,
*Biden-Harris Administration Announces Nearly $5 billion in Additional Student Debt Relief* (Dec. 6, 2023) .........................................5

Press Release, U.S. Dep't of Educ.,
*Biden-Harris Administration Approves Additional $5.8 Billion in Student Debt Relief for 78,000 Public Service Workers* (Mar. 21, 2024) .........................................5

Press Release, U.S. Dep't of Educ.,
*Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans* (July 14, 2023) .........................................4

Press Release, U.S. Dep't of Educ.,
*Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs* (Apr. 19, 2022).........................................2, 3, 15

*Subsidies,*
Learn Econ. .........................................11

## Rules

Fed. R. App. P. 35(b) .........................................6, 16

## Regulations

34 C.F.R. § 685.209 .........................................3

34 C.F.R. § 685.219 .........................................1, 14

34 C.F.R. § 685.221 .........................................3

## STATEMENT OF ISSUES MERITING *EN BANC* REVIEW

1. Whether the Panel improperly departed from precedent by holding that "economic disadvantage" is insufficient to establish competitor standing.

2. Whether the Panel improperly excluded competitor standing in cases where the government acts on third-party borrowers who do not compete with Plaintiffs.

3. Whether the Panel failed to draw inferences in Plaintiffs' favor and to credit allegations in the Complaint that supported competitor standing.

## STATEMENT OF FACTS AND DISPOSITION OF THE CASE

The Mackinac Center for Public Policy and Cato Institute (collectively "Plaintiffs") are public-service employers that benefit from PSLF in their recruitment and retention of college-educated workers. Congress created PSLF through the College Cost Reduction and Access Act of 2007 to "encourage individuals to enter and continue in full-time public service employment[.]" 34 C.F.R. § 685.219(a). PSLF does this by forgiving student-loan debt owed to the Treasury, but *only* if a borrower: (1) makes 120 monthly payments on an eligible loan under a qualifying repayment plan; (2) was employed full-time in a qualifying "public service job" when making each of the 120 payments; and (3) is still in public-service employment at the time of forgiveness. 20 U.S.C. § 1087e(m)(1); 34 C.F.R. § 685.219(c). Borrowers thus must work in a public-service job for 120 months *and* make a qualifying payment in each of those months to receive forgiveness. A public-service job includes, among other things, working for § 501(c)(3) nonprofit organizations like Plaintiffs. 20 U.S.C. § 1087e(m)(3)(B)(i).

The Department of Education ("Department") alleged that loan servicers had improperly steered borrowers into excessive periods of forbearance. Press Release, U.S. Dep't of Educ., *Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs* (Apr. 19, 2022).[1] Borrowers make no qualifying payments during periods of forbearance, and Congress did not design the PSLF to count those periods toward the 120-month payment-and-service requirement. Instead of asking Congress to address this issue through legislation, the Department acted unilaterally through a mere press release in April 2022 to make "a one-time account adjustment that will count forbearances of more than 12 months consecutive and more than 36 months cumulative toward forgiveness under … PSLF." *Id.* The Department would also count long-term forbearance as qualifying payments under income-driven repayment (IDR) plans. *Id.*[2]

According to the April 2022 press release, the Department declared 40,000 PSLF participants immediately eligible for debt cancellation because counting forbearance as qualifying payments allowed those borrowers to satisfy their 120-monthly-payment

---

[1] https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs (last visited July 1, 2024).

[2] Under IDR, a borrower's debt will be forgiven after he or she makes a requisite number of qualifying payments. There are different IDR plans, each with specific monthly repayment amounts based on borrowers' income. *See* 34 C.F.R. §§ 685.209(a)–(c), 685.221. Monthly payments under qualifying IDR plans count toward PSLF's 120-monthly-payment requirement.

requirement. *Id.* Several thousand other borrowers likewise had their outstanding loan-payment obligations cancelled by administrative fiat under IDR in defiance of the design erected by Congress. *Id.* Affected borrowers whose loans were not immediately cancelled had past periods of forbearance—during which they made no payments—credited as payments toward PSLF's and IDR's monthly-payment requirements. This means their loans will be forgiven sooner than would occur otherwise and their balances dumped on taxpayers—without ever having to meet the minimum requirements Congress demanded in those laws. The Department estimated that "[m]ore than 3.6 million borrowers will … receive at least three years of additional credit toward IDR forgiveness" but did not provide a similar estimate for PSLF. *Id.*

In July 2023, the Department announced it would saddle taxpayers with an *additional* $39 billion under the "one-time" account adjustment (hereinafter "One-Time Adjustment") to bail out 804,000 more borrowers.[3] These borrowers were not eligible for this debt relief under the governing statutes. Only by counting *non*-payments (during long-term forbearance) as qualifying payments did they become eligible.

Plaintiffs filed suit challenging the One-Time Adjustment in August 2023. Plaintiffs are public-service employers that benefit from PSLF because they "have

---

[3] Press Release, U.S. Dep't of Educ., *Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans* (July 14, 2023), available at: https://www.ed.gov/news/press-releases/biden-harris-administration-provide-804000-borrowers-39-billion-automatic-loan-forgiveness-result-fixes-income-driven-repayment-plans (last visited July 1, 2024).

previously employed, and currently employ, borrowers who participate, … in the statutory PSLF program" and "expect to recruit other such employees in the future." R.1, PageID 11. While the One-Time Adjustment has several elements, Plaintiffs challenge only the fictive counting of non-payments as monthly payments on the ground that it prevents "the full statutory benefit to which they are entitled under PSLF." *Id.* at 13. Plaintiffs allege that the One-Time Adjustment violates the Department's statutory authority, the Appropriations Clause of Article I of the U.S. Constitution, and the Administrative Procedure Act. *Id.* at 15 to 20.

The district court summarily dismissed the complaint without prejudice complaint for lack of standing. R.13. Plaintiffs appealed. During the pendency of the appeal, the Department cancelled billions more dollars in student-loan debt owed by hundreds of thousands of PSLF borrowers. Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Approves Additional $5.8 Billion in Student Debt Relief for 78,000 Public Service Workers* (Mar. 21, 2024); Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Announces Additional $4.9 Billion in Approved Student Debt Relief* (Jan. 19, 2024) (cancelling "$3.2 billion for 43,900 borrowers through PSLF"); Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Announces Nearly $5 billion in Additional Student Debt Relief* (Dec. 6, 2023) (cancelling "$2.6 billion for 34,400 borrowers through PSLF."); Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Announces an Additional $9 Billion in Student Debt Relief* (Oct. 4, 2023) (cancelling "$5.2 billion in additional debt relief for 53,000 borrowers under [PSLF] programs."). Many of these

cancellations "stem from fixes," including the One-Time Adjustment, made to PSLF and IDR. *See* Dec. 6, 2023 Press Release.

On May 17, the Panel (Judges Siler, Cole, and Mathis) affirmed the dismissal of Plaintiffs' Complaint for lack of standing. The Panel held that Plaintiffs did not establish competitor standing, which it said is not met by "[e]conomic disadvantage alone." Op. at 12. The Panel also deemed Plaintiffs' competitor standing too speculative because the One-Time Adjustment does not directly affect Plaintiffs' for-profit competitors but rather "benefits third parties—student-loan borrowers—who are not in competition with public service or private employers." *Id.* at 9, 15. The Panel refused to credit Plaintiffs' allegation that they compete in the labor market against for-profit employers. *Id.* at 11. It also erroneously found that borrowers affected by the One-Time Adjustment "must still make 120 payments" to receive PSLF forgiveness, *id.* at 13, even though the entire point of the One-Time Adjustment is to reduce the number of required payments by counting *non*-payments as payments. The Panel also rejected Plaintiffs' theory of procedural standing to object to the press release nature of these policy changes done entirely without regard to notice-and-comment rulemaking requirements, holding that public-service employers lack a "concrete interest" in the effect of the One-Time Adjustment on financial incentives under PSLF to work for public-service employers. *Id.* at 16–17.

For the reasons stated below, the Court should grant this petition for *en banc* review.

## REASONS FOR GRANTING THE PETITION

**I.    THE PANEL HELD 'ECONOMIC DISADVANTAGE' INSUFFICIENT FOR COMPETITOR STANDING IN DISREGARD OF PRECEDENT**

This Court's precedent holds that competitor standing exists where government action puts a plaintiff in a position of "economic disadvantage" compared to its competitors. *Growth Alliance*, 144 F.3d at 988–89. The Panel explicitly departed from this precedent, citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013), to assert that "[e]conomic disadvantage alone is not enough," Op. at 12. *En banc* review is needed to determine whether *Already* overruled or otherwise limited *Growth Alliance*. *See* Fed. R. App. P. 35(b)(1).

"[G]overnmental actions that alter competitive conditions [are] sufficient to satisfy the Article III 'injury-in-fact' requirement." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up). Under the competitive standing doctrine, an injury-in-fact occurs when a company's "position in the relevant marketplace would be affected adversely by the challenged governmental action." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993); *accord Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008). There is no need to link the challenged action to "to specific, demonstrated economic harms," and plaintiffs may "fairly employ economic logic" to establish competitive harm. *Can. Lumber*, 517 F.3d at 1332–33.

A plaintiff may establish competitor standing in this Court by linking government action to "economic disadvantage." *Growth Alliance*, 144 F.3d at 988. In *Growth Alliance*, an association representing Pennsylvanian manufacturers challenged agency action that lowered environmental compliance costs for firms in Ohio. This Court held that the association had competitor standing because reduced costs gave Ohio firms "an economic advantage over [their] neighbors in southwestern Pennsylvania," which necessarily means each Pennsylvania firm "suffers an economic disadvantage compared to its Ohio neighbor." *Id.* There was no need for the Pennsylvania manufacturers to link the Ohio manufacturers' reduced environmental costs to tangible economic injury, such as lost sales or revenue for a specific Pennsylvania firm. It was enough to link the agency designation to reduced compliance costs for Ohio firms, which placed *each* Pennsylvania firm at a relative economic disadvantage. *Id.* Nor did the Pennsylvania manufacturers need to identify specific Ohio firms against which they competed; the court accepted the Pennsylvania manufacturers' allegations of such competition as true. *Id.* At bottom, linking government action to "economic disadvantage," by itself, was enough to confer competitor standing.

Under *Growth Alliance*, Plaintiffs need not link the One-Time Adjustment to specific loss, such as the effect on a specific current or prospective employee. Rather, what is needed is linking the One-Time Adjustment to "economic disadvantage," *i.e.*, reduced competitive benefits for public-service employers due to the One-Time Adjustment to PSLF. Plaintiffs satisfy that requirement because the Adjustment

prematurely cancels the debt of affected borrowers, transferring their payment obligation to taxpayers to an extent Congress never authorized, thereby reducing their PSLF incentive to take public-service jobs and making jobs in the for-profit sector relatively more attractive. Consider an affected borrower who reaches PSLF's 120 monthly-payment requirement by having 36 months of nonpayment during forbearance counted as payments. But for that One-Time Adjustment, the borrower would have a significant financial incentive under PSLF to work in a public-service job while making qualifying payments for another 36 months. Because of the Adjustment, the borrower's loan balance is cancelled regardless of where he or she works, including at a for-profit company that competes with public-service employers in the labor market. This reduction in the financial incentive to work in a public-service job is multiplied by millions of borrowers affected by the unlawful debt forgiveness policy and constitutes an "economic disadvantage" for public-service employers, which suffices to establish competitor standing under *Growth Alliance*, 144 F.3d at 988–89.

The Panel, however, relied on *Already* to conclude that "[e]conomic disadvantage alone is not enough" for competitor standing. Op. at 12. It insisted that Plaintiffs plead additional facts regarding specific losses that were not needed in *Growth Alliance,* including the identities of their for-profit competitors and "any current employee that has received credit under the adjustment" or "have stopped working for them." *Id.* at 10. This departure from *Growth Alliance* is wrong because *Already* did not require more than economic *disadvantage* to establish competitor standing. Rather, it held that a

government-conferred *benefit* on a competitor was not enough for competitor standing when it does not impose any disadvantage on the plaintiff. In *Already*, 568 U.S. at 88, Nike filed a trademark infringement action against Already, which counterclaimed to invalidate Nike's trademark. Nike mooted that counterclaim with a covenant not to enforce the trademark against Already, and Already sought to continue the counterclaim by asserting competitor standing based on Nike's receiving the benefits of an unlawful trademark. *Id.* at 89. The Court rejected that "boundless theory," explaining that, even if the trademark gave Nike an economic benefit, it did not place Already at any *disadvantage* because the covenant allowed Already to use the mark. *Id.*

If anything, *Already* reinforces *Growth Alliance*'s use of economic disadvantage as the lodestar for competitor standing. *En banc* review is needed to correct the Panel's error and reaffirm that linking government action to economic disadvantage is enough to establish competitor standing under this Court's precedent.

## II.  THE PANEL IMPROPERLY LIMITED COMPETITOR STANDING IN CASES WHERE THE GOVERNMENT ACTS ON THIRD PARTIES

The Panel compounded its error by holding that competitor standing does not exist here because the One-Time Adjustment is directed only at third-party borrower-employees rather than at the for-profit employers against whom Plaintiffs compete in the labor market. Op. at 15; *see also id.* at 9 ("the adjustment benefits third parties—student-loan borrowers—who are not in competition with public service or private employers."); *id.* at 11 ("The financial benefit goes to the student-loan borrowers."); *id.*

at 12 ("the adjustment has nothing to do with … private employers"). This is an issue of exceptional importance that calls for correction through *en banc* review. If left to stand, the Panel decision would prevent judicial review of any unlawful government action that imposes economic disadvantage, as long as it strategically does so only through third parties, such as competitors' employees, customers, or suppliers.

There is no reason to deny an injured competitor's standing whenever the government inflicts the injury through third parties because Plaintiffs may rely on "the predictable effect of Government action on the decisions of third parties" to establish standing. *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). Standing in *Department of Commerce* was based upon the State's predicting that a census question about citizenship would discourage *some* third-party noncitizens from completing the form, which it asserted leads to undercounting that *could* contribute to the loss of a House seat or federal funds. *Id.* at 766–67. Here, the One-Time Adjustment prematurely forgives and will continue to forgive the federal student debt of countless third-party borrowers, who will no longer have any financial incentive under PSLF to seek (or stay in) employment with public-service employers like Plaintiffs. It is hardly speculative to conclude that reducing financial incentives to work in a public-service job will discourage *some* affected borrowers from those jobs. For-profit jobs become comparatively more attractive, which benefits Plaintiffs' for-profit competitors in the labor market to their own economic disadvantage, thereby negating the loan-forgiveness benefit Congress legislated through the PSLF. Economic logic entails that

such economic disadvantage contributes to higher labor costs for public-service employers.

Put another way, affected borrowers who receive accelerated forgiveness may now work for for-profit employers while still retaining PSLF benefits. The One-Time Adjustment thus allows for-profit employers to benefit from PSLF's wage subsidy, thereby increasing "price competition" for labor, which the Panel recognizes is a basis for competitor standing. *See* Op. at 9.

The Panel's distinction between borrower-employees and employers ignores the economic logic upon which the competitor standing doctrine is based. It does not matter whether government action directly affects buyers or sellers, or employers or employees. The economic effect is the same because the PSLF financial subsidy to employees is necessarily shared with employers in the form of lower labor costs—and *vice versa*.[4]

For instance, while federal statutory tax credits for purchasing electric vehicles go to consumers rather than manufacturers, *see* 26 U.S.C. § 30D, they clearly benefit manufacturers by making their products more attractive than non-electric vehicles. If the government acted unlawfully to extend that tax credit to subsidize purchases of non-electric vehicles too, electric-vehicle manufacturers would plainly suffer

---

[4]  *See Subsidies*, LEARN ECON., available at https://www.learn-economics.co.uk/Subsidies.html (last visited June 29, 2024) ("the benefit of [a] subsidy is distributed between consumers and producers").

competitive disadvantage and yet would lack standing to sue under the Panel's reasoning.

This logic does not change when it comes to the labor market. Consider the facts in *Growth Alliance*, but instead of reducing environmental compliance costs, suppose a federal agency subsidized employees of Ohio firms by paying off their consumer debt. This would allow Ohio firms to attract workers by offering lower wages than Pennsylvania firms across the border. Pennsylvania firms are placed in a position of economic disadvantage in the competition for workers. Again, the Panel decision would deny competitor standing simply because the debt cancellation directly benefits debtors "who are not in competition with [Pennsylvania] or [Ohio] employers." Op. at 9.

The Panel's error has wide-ranging ramifications. This Court has warned that "the absence of competitor standing may render some agency actions effectively immune from judicial review." *Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 677 (6th Cir. 2005). The Panel's reasoning here would make judicial review effectively unavailable where the government indirectly confers unlawful benefits on a plaintiff's competitors. Federal agencies would have free rein to inflict competitive injury. All they need to do is provide benefits to a competitor's employees, customers, or suppliers, instead of directly to the competitor itself. *En banc* review is needed to prevent the competitor standing doctrine from being improperly gutted.

### III. THE PANEL FAILED TO DRAW INFERENCES IN PLAINTIFFS' FAVOR AND TO CREDIT ALLEGATIONS THAT SUPPORT COMPETITOR STANDING

Finally, the Panel's determination that Plaintiffs lacked competitor standing was predicated on the wrong standard of review and an erroneous rejection of the unchallenged allegations contained in Plaintiffs' complaint.

To avoid dismissal, a complaint must plead factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face" and allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Courts must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV*, 487 F.3d at 476. The same standard applies to dismissals for lack of standing. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The Panel, however, repeatedly refused to accept Plaintiffs' well-pleaded allegations and drew inferences *against* them. To start, the Panel denied competitor standing because "Plaintiffs have not established the markets in which they or their competitors operate." Op. at 11; *see also id.* at 12. But Plaintiffs alleged that they compete in the labor market to recruit and retain college-educated employees, R.1 PageID 3, 11, against, *inter alia*, "non-qualifying employers in the private sector," *id.* at 12. This allegation is well-pleaded, uncontroverted, and not conclusory. The existence of labor-market competition between public-service employers and for-profit companies undergirds the entire PSLF program's design. After all, the promise of loan forgiveness

under PSLF can "encourage individuals to enter and continue in full-time public service employment[,]" 34 C.F.R. § 685.219(a), and that is true only if public-service and for-profit employers compete for those same individuals.

A single competitor is sufficient for competitor standing. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002). And such standing can be based on a category of unidentified competitors. *See, e.g.*, *Growth Alliance*, 144 F.3d at 988–89. No leap of faith is required to conclude that Plaintiffs—national and regional think tanks—compete in the market to recruit and retain college-educated workers against at least *some* for-profit employers. The Panel's rejection of that uncontroversial and indisputable allegation neglected to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV*, 487 F.3d at 476.

Next, the Panel concluded that "Plaintiffs' complaint does not explain how the adjustment reduces the financial incentive for borrowers to remain in public service jobs." Op. at 10. This ignores the Complaint's explanation that the One-Time Adjustment prematurely cancels the debt of affected borrowers by counting at least 36 months of forbearance—when no payments were made—toward PSLF's 120 monthly-payment requirement. R.1 PageID12–13. An affected borrower whose debt is prematurely cancelled in this way has *zero* financial incentive under PSLF to work in a public-service job. *Id.* By contrast, without the One-Time Adjustment, the borrower would have a financial incentive under PSLF to work in a public-service job while

making qualifying monthly payments for many more months. *Id.* at 12. The Complaint further explained that affected borrowers whose loans have not yet been outright cancelled by the One-Time Adjustment need to make 36 fewer monthly payments while working in public-service jobs before having their loans cancelled and their payment obligations billed to their fellow taxpayers. *Id.* That means they are incentivized by PSLF to work in public service for 36 fewer months than Congress required—solely because of the One-Time Adjustment.

The Panel improperly rejected Plaintiffs' well-pleaded explanation of harm, concluding that affected borrowers "must still make 120 payments, all of which must come during a period of public service employment." Op. at 13 (citing Department's website). The Panel effectively decided the merits of the case by concluding that crediting non-payments does not reduce the statutorily required number of qualifying monthly payments an affected borrower must make. This conclusion is also erroneous because the whole point of the One-Time Adjustment is to *obviate* the need for affected borrowers to make their full 120 qualifying payments by "count[ing] forbearances of more than 12 months consecutive and more than 36 months cumulative toward forgiveness under … PSLF." April 2022 Press Release, *Supra* p.2. For example, the One-Time Adjustment allows public-service-employed student-loan debtors who made no payments during some 36-month period of forbearance to exit public service after 10 years of service even if they had made their qualifying payments for only seven years. Without the One-Time Adjustment, even though they had met the 120-month service

obligation, they would still need to stay in a public-service job for another three years—that is, to meet the number of service years Congress legislated when it established the PSLF. The Panel's refusal to credit Plaintiffs' well-pleaded allegation that affected borrowers must now make fewer total monthly payments is clearly erroneous and demonstrates that the Panel decision was decided based on the wrong dismissal standard.

The proper standard of review for dismissal based on lack of standing is an issue of exceptional importance that is needed to maintain uniformity in this Court's decisions. *See* Fed. R. App. P. 35(b). *En banc* review is needed to correct the Panel's departure from that standard.

## CONCLUSION

The Court should grant Plaintiffs' petition for *en banc* rehearing.

July 1, 2024                                    Respectfully submitted,

                                    */s/ Sheng Li*
                                    Sheng Li
                                    Russell G. Ryan
                                    Mark Chenoweth
                                    NEW CIVIL LIBERTIES ALLIANCE
                                    1225 19th St. NW, Suite 450
                                    Washington, DC 20036
                                    (202) 869-5210
                                    sheng.li@ncla.legal
                                    *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,892 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Sheng Li*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Sheng Li*