RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0113p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

MACKINAC CENTER FOR PUBLIC POLICY; CATO INSTITUTE,

    *Plaintiffs-Appellants*,

    *v.*

MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity; RICHARD CORDRAY, Chief Operating Officer of Federal Student Aid, U.S. Department of Education, in his official capacity; U.S. DEPARTMENT OF EDUCATION,

    *Defendants-Appellees*.

No. 23-1736

---

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:23-cv-11906—Thomas L. Ludington, District Judge.

Argued: March 21, 2024

Decided and Filed: May 17, 2024

Before: SILER, COLE, and MATHIS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Sheng Li, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., for Appellants. Thomas Pulham, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Sheng Li, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., for Appellants. Thomas Pulham, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Seth E. Mermin, David S. Nahmias, U.C. BERKELEY CENTER FOR CONSUMER LAW & ECONOMIC JUSTICE, Berkeley, California, PERSIS S. Yu, R. T. Winston Berkman-Breen, STUDENT BORROWER PROTECTION CENTER, Washington, D.C., for Amici Curiae.

## OPINION

MATHIS, Circuit Judge. Many people consider a college education the ticket to the American dream. Some take out student loans to get the ticket. Paying back those loans can turn into a nightmare. Congress and the U.S. Department of Education stepped in to help by creating income-driven student-loan repayment plans and the Public Service Loan Forgiveness program.

Various problems arose with these plans, including student-loan servicers steering borrowers into postponing or reducing their student-loan payments for extended periods of time. In response, the Department of Education announced, in April 2022 and July 2023, a one-time account adjustment that would count months or years that borrowers spent in excessive forbearance status toward debt forgiveness. The Mackinac Center for Public Policy and the Cato Institute did not take kindly to the Department of Education's action, so they sued to stop it. The question presented is whether Plaintiffs' complaint sufficiently alleged that they suffered an injury in fact resulting from the adjustment based on competitor standing and deprivation of a procedural right. We hold that it does not. We thus affirm the district court's dismissal of Plaintiffs' complaint for lack of subject-matter jurisdiction.

### I.

#### A.

For many, cost is the greatest barrier to attending college.[1] The average rate charged to full-time undergraduate students for tuition, fees, room, and board now exceeds $25,000 per year.[2] Fortunately, Congress took measures to lend a hand through Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq*.

---

[1] *See* Mary Deweese, Note, *Failed: The Myths and Realities of Community Colleges, and How to Fulfill the American Dream Through Community College Reform*, 23 Geo. J. on Poverty L. & Pol'y 293, 296 (2016).

[2] *Tuition Costs of Colleges and Universities*, Nat'l Ctr. for Educ. Stat., https://nces.ed.gov/programs/digest/d23/tables/dt23_330.10.asp (last visited Apr. 12, 2024).

Title IV's purpose is pretty straightforward. Congress sought "to assist in making available the benefits of postsecondary education to eligible students" to attend college by providing "special programs" to assist those with financial need. 20 U.S.C. § 1070(a)(4)(A). To that end, Congress directed the Department of Education to "carry out programs to achieve the purposes" of Title IV. *Id.* § 1070(b).

Through the William D. Ford Federal Direct Loan Program, the federal government "make[s] loans to all eligible students" to attend college. *Id.* § 1087a. The Department of Education administers this student-loan program. The Direct Loan Program accounts for roughly $1.6 trillion in student-loan debt owed by approximately 43 million borrowers. *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023). To defray some borrowers' costs of repaying the student loans, Congress has approved several loan-forgiveness programs, including income-driven repayment ("IDR") plans and the Public Service Loan Forgiveness ("PSLF") program. *See* 20 U.S.C. §§ 1087e(m), 1098e(b)(7).

Under IDR plans, the Department of Education will forgive a student-loan debt after the borrower makes the number of monthly payments required under one of four plans selected based on the borrower's income and family size.[3] IDR plans have a forgiveness timeline of 20 or 25 years, and up to 3 years of deferment for economic hardship may count toward the monthly payment requirement. 34 C.F.R. §§ 685.209(a)–(c), 685.221. Because these plans are based on the borrower's income, some low-income borrowers may have a required monthly payment as low as $0. *See, e.g., id.* § 685.209(c)(5).

Congress created the PSLF program through the College Cost Reduction and Access Act of 2007. Under the PSLF program, the Department of Education must "cancel" a borrower's debt if the borrower: (1) makes 120 monthly payments on an eligible loan under a designated payment plan, including an IDR plan; (2) was employed in a "public service job" when she made each of the 120 payments; and (3) still has public service employment at the time of forgiveness. 20 U.S.C. § 1087e(m)(1)(A), (B); 34 C.F.R. § 685.219(c). A public service job includes, among other things, working for a tax-exempt nonprofit organization. 20 U.S.C. § 1087e(m)(3)(B)(i).

---

[3]*7 FAQs About Income-Driven Repayment Plans*, Fed. Student Aid, https://studentaid.gov/articles/faqs-idr-plan/ (last visited Apr. 10, 2024).

No. 23-1736         *Mackinac Ctr. for Pub. Pol'y, et al. v. Cardona, et al.*         Page 4

The purpose of the PSLF program is "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements." 34 C.F.R. § 685.219(a).

Under the IDR and PSLF programs, late or partial payments and some periods of forbearance do not count toward the 120 monthly payments, nor does deferment for reasons other than economic hardship. *See* 20 U.S.C. § 1087e(m)(1)(A) (describing what counts as payments under the PSLF program); 34 C.F.R. §§ 685.219(c)(2), 682.215(f) (describing what counts as payments under the PSLF and IDR programs, respectively). The Department of Education defines "forbearance" as "permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously were scheduled." 34 C.F.R. § 682.211(a)(1). A loan servicer can approve a period of forbearance for a borrower. *Id.*

Loan forgiveness under PSLF and IDR programs may seem clear-cut, but there have been numerous problems with administering these programs. This in turn affected borrowers' ability to obtain loan forgiveness. As a result, in April 2022, the Department of Education announced its plan to "address[] historical failures in the administration of the federal student loan programs." Press Release, U.S. Dep't of Educ., Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs (Apr. 19, 2022).[4] One such failure involves the alleged steering of borrowers into long-term periods of forbearance in violation of Department of Education rules, which provides for "a 12-month limit for any single use of forbearance, and a 36-month cumulative limit on discretionary forbearance." *Id.* To prevent this practice and mitigate the resulting harm, the Department of Education announced it would make "a one-time account adjustment that will count forbearances of more than 12 months consecutive and more than 36 months cumulative toward forgiveness under IDR and PSLF." *Id.* Essentially, the Department of Education would count the relevant period(s) of forbearance as payments. With the adjustment, approximately 40,000 borrowers would be eligible for immediate discharge of debt under the PSLF program, and several thousand would be eligible for forgiveness under

---

[4]https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs.

IDR plans. *Id.* About 3.6 million borrowers would receive at least three years of additional credit toward IDR forgiveness. *Id.*

In July 2023, the Department of Education also announced that it would provide "$39 billion in debt relief for [] 804,000 borrowers" who "have accumulated the equivalent of either 20 or 25 years of qualifying months." Press Release, U.S. Dep't of Educ., Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans (July 14, 2023).[5] The Department of Education explained that this relief is part of the previously announced adjustment. *Id.* Eligible borrowers were to receive notifications that they were entitled to forgiveness. *Id.* Borrowers who wished to opt out of the discharge could do so by contacting their loan servicer. *Id.*

**B.**

Plaintiffs are nonprofit, tax-exempt organizations that are qualified public service employers under the PSLF program. They "have previously employed, and currently employ, borrowers who participate, may become eligible to participate, or have previously participated in the statutory PSLF program" and "expect to recruit other such employees in the future." R. 1, PageID 11.

In August 2023, Plaintiffs filed suit against Miguel Cardona, Secretary of the Department of Education; Richard Cordray, Chief Operating Officer of Federal Student Aid at the Department of Education; and the Department of Education. Although the Department of Education's adjustment has several aspects, Plaintiffs challenge only the part that would count the months or years spent in long-term forbearance as payments toward forgiveness, claiming that the action would keep them from realizing "the full statutory benefit to which they are entitled under PSLF" and make it more difficult for them to recruit and retain employees. *Id.* at 13. Plaintiffs' complaint includes four counts. First, Plaintiffs allege that the adjustment violates the Appropriations Clause of Article I of the U.S. Constitution. Second, they allege that Defendants exceeded their authority and violated the Administrative Procedures Act ("APA") by

---

[5]https://www.ed.gov/news/press-releases/biden-harris-administration-provide-804000-borrowers-39-billion-automatic-loan-forgiveness-result-fixes-income-driven-repayment-plans.

crediting borrowers' periods of forbearance toward forgiveness under the IDR or PSLF programs. Third, Plaintiffs allege that the adjustment was arbitrary and capricious and therefore violates the APA. Fourth, Plaintiffs allege that Defendants violated the APA when they enacted the adjustment via press release rather than through notice-and-comment rulemaking.

Shortly after filing their complaint, Plaintiffs filed an ex parte motion for a temporary restraining order and preliminary injunction, seeking to prevent the Department of Education from discharging any debt through the long-term forbearance aspect of the adjustment. Before Defendants could respond, however, the district court dismissed Plaintiffs' complaint sua sponte without prejudice, finding that Plaintiffs lacked standing, and denied their motion for injunctive relief as moot. Plaintiffs now appeal, challenging the district court's standing determination.

## II.

The U.S. Constitution limits federal courts' jurisdiction to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. These words do not cover every "challenge to government action dressed up in a complaint with an official-looking caption." *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 536 (6th Cir. 2021). Instead, to bring a case, a plaintiff must have standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). That is, "the plaintiff must have a personal stake in the case." *Id.* (internal quotation marks omitted). "This is the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that the defendant caused, and (3) that the court can redress with a decision in the plaintiff's favor. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The burden of demonstrating standing falls on Plaintiffs. *Id.* And they must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As the district court dismissed this case at the pleading stage, Plaintiffs needed to "'clearly . . . allege facts demonstrating' standing." *Spokeo*, 578 U.S. at 338 (alteration in original) (quoting *Warth*, 422 U.S. at 518). A federal court

must dismiss any case if the plaintiff fails to show standing. *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016) (citation omitted).

We review a district court's determination of Article III standing de novo. *Id.* In determining whether Plaintiffs have established standing, we consider their complaint and any documents attached to the complaint. *Id.* And we accept the complaint's factual allegations as true and construe the complaint in Plaintiffs' favor. *Id.* But we need not accept the complaint's legal conclusions as true. *Bearden v. Ballad Health*, 967 F.3d 513, 517 (6th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

This case turns on whether Plaintiffs have clearly alleged facts showing that they suffered an injury in fact due to the Department of Education's account adjustment for student-loan borrowers.

### III.

To establish an injury in fact, Plaintiffs must show that they suffered harm "that is concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423 (citation omitted). A "concrete" injury "must actually exist." *Spokeo*, 578 U.S. at 340. It must be "real, and not abstract." *Id.* (internal quotation marks omitted). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). An injury is "imminent" if it "is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

A party faces an uphill battle in establishing standing if it "is not [it]self the object of the government action or inaction" at issue. *Lujan*, 504 U.S. at 562. In such a scenario, whether an element of standing exists "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict[.]" *Id.* (quotation omitted). As such, a party generally lacks standing to challenge the government's provision of benefits to a third party. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342–46 (2006) (discussing lack of standing in the state taxpayer context).

Plaintiffs claim they can show injury in fact under theories of competitor standing and deprivation of a procedural right. We discuss each argument in turn.

A.

Government action that creates increased competition can cause economic injury. That is the "basic law of economics." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (quotation omitted). Thus, courts allow parties to rely on competitor standing to satisfy the injury-in-fact prong of the standing analysis. *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010). Specifically, the doctrine of competitor standing "recognizes that plaintiffs suffer an economic injury 'when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them.'" *Block Commc'ns, Inc. v. FCC*, 808 F. App'x 332, 336 (6th Cir. 2020) (quoting *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018)); *see also Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023). The doctrine's premise is "that one direct competitor's gain of market share is another's loss." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023).

A party invoking competitor standing does not have to wait for the harm to materialize. *See El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995). But such harm must be "imminent." *Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993).

Competitor standing "supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition." *Air Excursions*, 66 F.4th at 281. "The latter must be apparent from the nature of the challenged action itself . . . or from the well-pleaded allegations of the plaintiff's complaint[.]" *Id.* (internal citation omitted).

We have identified two considerations for allowing competitor standing to establish an injury in fact. "First, when the government enters the market by chartering specially favored or subsidized market actors, any limit on the activity of such institutions may arguably have, as an implicit purpose, the goal of not distorting the market more than necessary." *Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 676–77 (6th Cir. 2005). And second, "the absence of

competitor standing may render some agency action effectively immune from judicial review." *Id.* at 677.

Plaintiffs contend that the Department of Education's student-loan adjustment increased competition between them—public service employers—and private employers. So they must show that the adjustment "results in 'an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact' to any competitor in the relevant market." *Air Excursions*, 66 F.4th at 279–80 (quoting *Sherley*, 610 F.3d at 73). We can presume increased competition if one of the following circumstances exists: (1) the government's actions allowed new persons or entities to enter a "fixed regulated market"; (2) the government created "price competition" by lifting "price controls" on competitors; or (3) the government reimburses a "competitor for selling its product or service at discounted rates." *Id.* at 280 (citations and quotation marks omitted). If the plaintiff cannot show one of those circumstances, its complaint must establish that the government's action increased competition in the relevant market.

Plaintiffs arguably attempt to rely on circumstance (2). But it is not at all apparent that the adjustment lifted price controls on private employers, considering the adjustment benefits third parties—student-loan borrowers—who are not in competition with public service or private employers. Student-loan borrowers can also reject the adjustment and can otherwise decline the discharge of their student-loan debt. Typically, an increase in competition is obvious because the action directly impacts a competitor and does not necessarily "depend[] on the independent actions of third parties[.]" *New World Radio*, 294 F.3d at 172. That is not the case here. So we turn to Plaintiffs' complaint to see if it makes the case for competitor standing.

But the complaint stumbles out of the gate. Plaintiffs failed to allege "specific, concrete facts" to show that the adjustment has caused or will cause them competitive injury. *Turaani v. Wray*, 988 F.3d 313, 318 (6th Cir. 2021) (quoting *Warth*, 422 U.S. at 508). Instead, the complaint includes numerous legal conclusions masquerading as facts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that a complaint "requires more than labels and conclusions" for a plaintiff to show an entitlement to relief). Beyond that, Plaintiffs claim that they suffered a concrete economic injury when the Department of Education authorized the adjustment because it allegedly reduced Plaintiffs' competitive benefits, namely "the financial

incentive for student-loan debtors to seek and remain in jobs with public service employers, at any given wage[.]" D. 11 at pp.15–16. According to Plaintiffs, "creating that deliberate advantage is the main point of the program." R. 1, PageID 12. The adjustment thus disadvantages Plaintiffs in the market "to recruit and retain these [college-educated] borrowers as employees." R. 1-1, PageID 24.

Yet Plaintiffs' complaint does not explain how the adjustment reduces the financial incentive for borrowers to remain in public service jobs. Instead, the complaint makes broad, conclusory assertions like "[u]nlawful cancellation of student-loan debt reduces the amount of a borrower's PSLF-cancellable debt and thus reduces the amount by which PSLF benefits qualified employment"; "[b]y counting non-payments during periods of forbearance . . . the Department shortens by 36 months the period affected PSLF debtors otherwise must work for a public service employer in order to have their loans forgiven"; and "[b]ut for the One-Time Account Adjustment, these 40,000 borrowers would have a strong financial incentive under PSLF to seek and maintain employment with public service employers like Plaintiffs for the entire 10-year statutory PSLF term." R. 1, PageID 12–13.

Plaintiffs have not alleged any facts showing how the adjustment affects their ability to "recruit and retain college-educated employees." *Id.* at 13. They have not identified any current employee that has received credit under the adjustment, nor do they claim that they expect to imminently hire any employee who has received such credit. Furthermore, they have not alleged that any employees have stopped working for them (or stated an intention to do so) based on the adjustment. And they have not identified their competitors beyond saying private employers that hire college-educated workers. As such, they have failed to sufficiently plead that they have suffered an injury in fact.

Plaintiffs' counterarguments do not persuade us otherwise.

### 1.

Plaintiffs rely on *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008), and *Southwest Pennsylvania Growth Alliance v. Browner*, 144 F.3d 984 (6th Cir. 1998), to argue that they are not required "to link the Adjustment to specific tangible loss, such

as the effect on a specific current or prospective employee." D. 11 at pp.13–15. But these cases do not help Plaintiffs.

*Canadian Lumber* involved Congress's amendment to the North American Free Trade Agreement that allowed "antidumping and countervailing duties assessed on imported goods" to be distributed to "affected domestic producers for qualifying expenditures" instead of depositing that money with the U.S. Treasury. 517 F.3d at 1324 (quotation omitted). This seemingly gave domestic producers a competitive advantage over their foreign counterparts. The Federal Circuit affirmed the Court of International Trade's finding that the Canadian Wheat Board had suffered "an economic injury" caused by U.S. Customs and Border Protection's "distribution of money to the North Dakota Wheat Commission" under the law at issue. *Id.* at 1334. This was so because the government gave money "to an entity that aim[ed] to take away market share from Canadian wheat." *Id.* "[E]conomic logic" supported this conclusion. *Id.* at 1333.

This case differs from *Canadian Lumber*. For one thing, Plaintiffs have not established the markets in which they or their competitors operate. As such, they have failed to plead facts showing that the adjustment financially benefits certain private employers, or private employers in general. The financial benefit goes to the student-loan borrowers. Also, assuming we do not require facts regarding the adjustment's impact on specific employees or a specific tangible loss, Plaintiffs have not provided sufficient facts that allow us to infer—by economic logic—that they would more likely sustain injury from the adjustment.

In *Sw. Pa. Growth Alliance*, we held that an association representing Pennsylvania manufacturers had standing to sue following the Environmental Protection Agency's designation of an area in Ohio as attainment, which lifted certain restrictions for the area and put Pennsylvania manufacturers at an economic disadvantage compared to Ohio businesses. 144 F.3d at 988. We did not require a showing of tangible loss as to any specific business entity, but such a showing was unnecessary because the EPA conceded that whether an area was attainment or non-attainment would drive restrictions on businesses in those areas. *Id.* This sufficed to show an economic disadvantage and establish injury in fact. *Id.*; *see Block Commc'ns*, 808 F. App'x at 336 (recognizing that an economic injury occurs when "agencies lift

regulatory restrictions" on a plaintiff's competitors (quotation omitted)). Defendants have made no such concession in this case.

But that does not stop Plaintiffs from relying on *Sw. Pa. Growth Alliance*. Indeed, they claim that, like the Pennsylvania manufacturers in that case, they have shown competitor standing because the adjustment puts them in a position of economic disadvantage relative to private employers. Plaintiffs' reliance on *Sw. Pa. Growth Alliance* is misplaced for two reasons. First, unlike *Sw. Pa. Growth Alliance*, Plaintiffs do not claim that the adjustment will cause an economic disadvantage by lifting restrictions on private employers. Nor can they because the adjustment has nothing to do with restrictions on private employers. Second, Plaintiffs claim that private employers' recruitment and retention efforts will flourish thanks to the adjustment, which means increased competition in the market to hire college-educated employees. But the mere fact that Plaintiffs' competitors may benefit from the adjustment is insufficient to establish competitor standing. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) ("[S]tanding [must be] based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." (citations omitted)); *see also Air Excursions*, 66 F.4th at 280 ("[A]n agency action does not confer competitor standing if it merely creates a skewed playing field, by, for example, providing a windfall to a competitor." (internal quotation marks and citations omitted)).

Even if that were enough, Plaintiffs' failure to plead sufficient facts prevents us from determining their competitors. Neither the complaint nor its attached declarations answer this question. And when pressed at oral argument, Plaintiffs referenced only a nationwide market for college-educated employees and referred us to their respective webpages, which list their supported nationwide professions.

Plaintiffs only speculate how and why their unidentified competitors might benefit from the adjustment. If we recognized Plaintiffs' purported economic disadvantage concept, we would create a "boundless theory of standing." *Already*, 568 U.S. at 99. That we cannot do. Economic disadvantage alone is not enough, *id.*, nor is speculation. *See Block Commc'ns*, 808 F. App'x at 337 (rejecting competitor standing where the potential injuries were "speculative and unsupported by specific facts"). In *Canadian Lumber,* the court "*presumed* . . . that a boon to

some market participants is a detriment to their competitors," 517 F.3d at 1334, but Plaintiffs have not alleged sufficient facts to allow us to make the same presumption. Plaintiffs blame their inability to provide specific information on the fact that "employers are not typically involved in the PSLF loan-forgiveness process until an employee completes his or her 120-month payment-and-service requirement and seeks certification from current and former employers." D. 11 at p.13 n.6. Regardless, Plaintiffs must provide *some* facts (*e.g.*, how many employees have been involved in the PSLF loan-forgiveness process) to support their argument that they "almost certainly" would be injured because of the adjustment. Instead, Plaintiffs state that the adjustment will impact their ability to recruit and retain employees without supplying any explanatory facts. And without such facts, Plaintiffs have failed to "nudge[] their [competitor standing] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## 2.

Plaintiffs' argument that the adjustment injures them by reducing their expected benefits under the PSLF program does not save their claims. First, Plaintiffs argue that the adjustment "unlawfully abridges PSLF's statutory 10-year payment requirement" by counting periods of long-term forbearance toward a borrower's total monthly payments, allegedly requiring only seven years of public service employment instead of ten years. D. 11 at p.18. But Plaintiffs' view of how the adjustment works is just plain wrong. Student-loan debtors must still make 120 payments, all of which must come during a period of public service employment. *See, e.g.*, *Public Service Loan Forgiveness (PSLF)*, Fed. Student Aid[6] ("Because you have to make 120 qualifying monthly payments, it will take at least 10 years before you can qualify for PSLF."); *Public Service Loan Forgiveness FAQ*, Fed. Student Aid[7] ("[Borrowers] must make payments to cover 120 separate monthly obligations."). Plaintiffs' inaccurate legal assertions regarding the time required to achieve forgiveness under PSLF cannot show injury in fact.

---

[6]https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service (last visited Apr. 10, 2024).

[7]https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/questions#qualifying-payments (last visited Apr. 10, 2024).

Second, Plaintiffs claim that the adjustment "takes individuals out of the pool of borrowers whom PSLF incentivizes to work for public service employers," thereby affecting Plaintiffs' ability to recruit and retain college-educated employees and "undermin[ing] the statutory competitive advantage Congress conferred on [them]." D. 11 at p.19. Plaintiffs have not pointed to any employees who have left, nor have they alleged that they have been unable to fill vacancies due to a reduction in the pool of student-loan borrowers. Moreover, assuming a reduction in the pool of borrowers did affect Plaintiffs' ability to fill vacancies, several factors beyond the adjustment could have a similar impact. For example, an employee may choose to work for a different public service employer to satisfy part of their 120-month obligation for any number of reasons unrelated to the adjustment, such as pay, location, work-life balance, or any combination of factors. Without factual allegations concerning how many of Plaintiffs' employees will be impacted by the adjustment and how many individuals may make employment decisions based on the adjustment, Plaintiffs have not established an injury in fact. *See Air Excursions*, 66 F.4th at 279–80.

Third, Plaintiffs claim the adjustment "reduces the incentives provided by PSLF by making IDR forgiveness relatively more attractive by comparison." D. 11 at p.19. This argument is unconvincing and illogical. Plaintiffs have not alleged that any of their employees have stopped seeking PSLF forgiveness because of the adjustment. And without supporting facts, the claim is pure conjecture, not enough to show a competitive injury. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting standing theory based on conjecture). Without the adjustment, it takes 10 years to have debt cancelled under the PSLF program, and 20 to 25 years under IDR plans. *See* 20 U.S.C. § 1087e(m)(1); 34 C.F.R. §§ 685.209(a)–(c), 685.221. According to Plaintiffs, by shortening the IDR period to 17 to 22 years and the PSLF period to 7 years, borrowers will not want to seek PSLF forgiveness. Even if the adjustment operated this way (it does not), a borrower could have their debt cancelled faster under the PSLF program than IDR plans with or without the adjustment. So, if an employee seeks speediness in ridding herself of student-loan debt, the PSLF program is probably the way to go, with or without the adjustment.

At bottom, how the adjustment impacts Plaintiffs is up to individuals who are not parties to this lawsuit. Plaintiffs have not pointed to any case holding that competitor standing exists to challenge the government's provision of benefits to third parties. Further, "most competitor standing cases depend on [] core economic postulates," *Adams*, 10 F.3d at 923 (quotation omitted), and Plaintiffs' allegations regarding supply and demand and the impact of financial incentives on third-party student-loan debtors are wholly speculative. *Cf. DaimlerChrysler Corp.*, 547 U.S. at 344 (holding that plaintiffs did not have standing because their injury was "'conjectural or hypothetical' in that it depend[ed] on how legislators respond[ed] to a reduction in revenue" (quotation omitted)). Therefore, Plaintiffs have not "suppl[ied] the link between the challenged conduct and increased competition," *Air Excursions*, 66 F.4th at 281, and they cannot establish an injury in fact through competitor standing.

### 3.

Plaintiffs also argue that the district court erred by dismissing the case without giving Plaintiffs an opportunity to amend their complaint. But because Plaintiffs failed to raise that argument in their opening brief, it is forfeited. *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).

### B.

Plaintiffs have also failed to demonstrate Article III standing based on the alleged deprivation of their procedural right to participate in notice-and-comment rulemaking under the APA. Plaintiffs assert that Defendants did not comply with the APA when they adopted the adjustment by press release instead of through notice-and-comment rulemaking.

The injury-in-fact prong of the standing analysis determines this issue as well. Under our precedent, "merely stating a procedural injury is not enough." *Rice v. Vill. of Jonestown*, 30 F.4th 584, 591 (6th Cir. 2022). Some aspects of the standing inquiry are relaxed in cases involving procedural injury, *see id.* at 592, but a litigant still must demonstrate "that it has a concrete interest that is affected by the deprivation of the claimed right," *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (internal quotation marks omitted). "The deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural

right *in vacuo*—is insufficient to create Article III standing." *Id.* (internal quotation marks omitted). Plaintiffs must show that "the procedures in question were 'designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing.'" *Rice*, 30 F.4th at 591 (quoting *Lujan*, 504 U.S. at 573 n.8).

Plaintiffs claim the PSLF program gave them competitive advantages and they have a "concrete interest in retaining those advantages." D. 11 at p.25. Plaintiffs ask us to analyze this case like an environmental standing case because such cases often involve procedural injury. As Plaintiffs see it, just as an individual in an environmental standing case may show a concrete interest by asserting "an aesthetic or recreational interest in a particular place, or animal, or plant species" and a credible threat of harm to that interest, Plaintiffs can show a concrete interest by "alleging an economic interest in recruiting a particular species of worker—here PSLF-eligible borrowers—and that Defendants' conduct impaired such interest." *Id.* at 27. Under this approach, Plaintiffs contend that neither "[a]bsolute certainty" nor specificity is required; the injury may be identified as an increased risk of harm stemming from the agency action. *Id.*

Again, we look to the complaint, and it does not explain how Defendants' failure to engage in notice-and-comment rulemaking impaired Plaintiffs' purported interest in hiring PSLF-eligible borrowers. *See Lujan*, 504 U.S. at 573 n.8 (rejecting the idea that "the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed)"). It is far too speculative for Plaintiffs to say—without any supporting facts—that they have been injured because the Department of Education did not engage in notice-and-comment rulemaking. And mere speculation simply will not do.

Plaintiffs' reliance on an out-of-circuit district court opinion does not change the result. Plaintiffs claim that the court in *American Bar Association v. U.S. Department of Education*, 370 F. Supp. 3d 1 (D.D.C. 2019) (*ABA*), "found interest to challenge agency action that deprived a single public service employer of *all* PSLF benefits." D. 11 at p.30. First, the *ABA* court did not address standing. *ABA*, 370 F. Supp. 3d at 18–19. Second, the circumstances of that case were different. The plaintiffs were the ABA and law school graduates enrolled in the PSLF

program and employed by public service employers. *Id.* at 10. The district court determined that the ABA was injured when it was eliminated as a qualifying public service employer, and the individual plaintiffs were injured when their employers' PSLF status was removed. *See id.* at 14–17. The interests in that case were different than the ones here—the ABA and individual plaintiffs were unable to benefit from the PSLF at all, whereas Plaintiffs here continue to receive the benefits of their status as PSLF-qualified employers and have not shown that any of their employees have been deprived of PSLF's benefits. Therefore, Plaintiffs have not shown that Defendants' failure to use notice-and-comment rulemaking for the adjustment affected any concrete interest. For these reasons, they cannot establish an injury in fact on procedural grounds.

\*   \*   \*

Because Plaintiffs failed to show that they suffered an injury in fact for any of the claims they asserted, the district court lacked subject-matter jurisdiction to adjudicate their claims. *See Lujan*, 504 U.S. at 560.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's judgment.